1

Matthew R. Wilson (*admitted pro hac vice*)
Michael J. Boyle, Jr. (*admitted pro hac vice*)

2

Meyer Wilson Co., LPA
1320 Dublin Road, Ste. 100

3

Columbus, Ohio 43215

4

(614) 224-6000
(614) 224-6066 (Fax)

5

mwilson@meyerwilson.com

6

mboyle@meyerwilson.com

7

Michael L. Greenwald (*admitted pro hac vice*)

8

Aaron D. Radbil (*admitted pro hac vice*)
Greenwald Davidson Radbil PLLC

9

7601 N. Federal Highway, Suite A-230

10

Boca Raton, Florida 33487
(561) 826-5477

11

mgreenwald@gdrlawfirm.com

12

aradbil@gdrlawfirm.com

13

Counsel for Plaintiff and the proposed class

14

15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

16

17

| | | |
|---|---|---|
| Christine Head, *on behalf of herself and others similarly situated*, | ) ) ) | No.: 3:18-cv-08189-DLR |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL** |
| Citibank, N.A., | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

18

19

20

21

22

23

24

25

26

27

28

**Request for Relief**

Christine Head ("Plaintiff") respectfully requests that this Court certify the following class, and appoint Meyer Wilson Co., LPA ("Meyer Wilson") and Greenwald Davidson Radbil PLLC ("GDR") as class counsel:

> All persons and entities throughout the United States (1) to whom Citibank, N.A. placed a call in connection with a past-due credit card account, (2) directed to a number assigned to a cellular telephone service, but not assigned to a current or former Citibank, N.A. customer or authorized user, (3) via its Aspect dialer or with an artificial or prerecorded voice, (4) from August 15, 2014 through the date of class certification.

**The Telephone Consumer Protection Act**

"Americans passionately disagree about many things. But they are largely united in their disdain for robocalls." *Barr v. Am. Ass'n. of Political Consultants, Inc.*, --- S. Ct. ----, 2020 WL 3633780, at *2 (July 6, 2020) (Kavanaugh, J.).

Against that backdrop, the "TCPA prohibits persons from (1) making 'any call,' (2) 'using any automatic telephone dialing system or an artificial or prerecorded voice,' (3) 'to any telephone number assigned to a . . . cellular telephone service. . . .'" *Grant v. Capital Mgmt. Servs., L.P.*, 449 F. App'x 598, 600 (9th Cir. 2011).

Of note, "[e]xpress consent is not an element of a plaintiff's prima facie [TCPA] case." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017). Rather, it "is an affirmative defense for which the defendant bears the burden of proof." *Id*.

**Background**

"The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back." *Barr*, 2020 WL 3633780, at *2. But it's not only the people's representatives who are fighting back against these ubiquitous, annoying calls. The people—like Christine Head here—are too. In short, Ms. Head grew tired of incessant robocalls from Citibank, N.A. that were meant for someone else. And it's quite likely that

tens of thousands of other people around the country also would like similar calls to stop. As Chief Justice Roberts recently said of the TCPA during the oral argument in *Barr*: "It's an extremely popular law. Nobody wants to get robocalls on their cell phone."[1]

This matter arises from robocalls Citibank placed to persons who are not its customers. Thus, that Citibank may have had consent to call its own customers is irrelevant. *See N.L. by Lemos v. Credit One Bank, N.A.*, 960 F.3d 1164, 1166 (9th Cir. 2020) ("The principal question in this case is whether Credit One can escape liability under the TCPA because the party it intended to call (its customer) had given consent to be called, even though the party it actually called had not. Consistent with every circuit to have addressed this issue, we hold that this argument fails under the TCPA's text, most naturally read.").

**Statement of Relevant Facts**

**I.    Citibank places hundreds of millions of robocalls each year.**

Citibank employs more than 2,000 agents in connection with its ongoing campaign to place outbound calls regarding delinquent credit card accounts. *See* Transcript of Deposition of Amy Mullahey pursuant to Rule 30(b)(6) ("Mullahey Dep."), attached as Exhibit A, at 174:1-5. Accordingly, Citibank estimates it places *over one million outbound calls each day* regarding delinquent credit card accounts. *Id*. at 176:8-177:10 ("So, I mean, we could – we could easily make a million calls or more."). Over the course of the approximately six-year proposed class period, therefore, Citibank likely placed more than *two billion* outbound calls regarding delinquent credit card accounts.

These outbound calls—which Citibank placed through its Aspect dialing system— involved hundreds of thousands of accounts, if not more. *Id*. at 173:5-24 ("I can tell you we have a lot of delinquent customers, right? I mean, that's what – that's what our business is. Our business is calling customers who are delinquent."). And Citibank used its Aspect dialer to place outbound calls throughout the proposed class period regarding credit card accounts to persons located in more than 40 states, including this one. *Id*. at 152:22-153:24.

---

[1]    Transcript of Oral Argument (May 6, 2020), at 40:20-22, http://www.supremecourt. gov/oral_arguments/argument_transcripts/2019/19-631_omjp.pdf

Significantly, Citibank's Aspect dialing system can automatically dial telephone numbers from a stored list, and transfer connected calls to an available agent. Mullahey Dep. at 80:3-8. Additionally, Citibank places the majority of its calls through its Aspect dialer in predictive mode, which means the dialer launches calls based on algorithms that predict when an agent becomes available, "and the system dials based on these assumptions." *See* Transcript of Deposition of Matthew Roe pursuant to Rule 30(b)(6) ("Roe Dep."), attached as Exhibit B, at 38:16-39:8, 39:16-23.

**II.    Citibank maintains records of all outbound calls it placed using its Aspect dialer during the proposed class period, and can verify whether a particular person was a credit card accountholder.**

Citibank maintains records of all telephone numbers it called using its Aspect dialer. Thus, "if given a particular 10-digit telephone number, Citibank can search its records for the Aspect Dialing System to determine whether calls may have been placed to the phone number for the period from August 15, 2014 through October 22, 2019." *See* Citibank's Response to Request for Admission No. 9, attached as Exhibit C. Citibank can also identify the date(s) it made each call to a particular telephone number, and whether and when it delivered a prerecorded message. *Id.* at nos. 10-12. Likewise, given a full name or social security number, Citibank can determine whether a particular person is, or was, a Citibank accountholder. Mullahey Dep. at 68:8-70:14.

**III.   Citibank notates telephone numbers as potential wrong numbers—and those it should cease calling—when it is so informed.**

Citibank enters particular notations when a call recipient informs it that it is calling a wrong number, resulting in a "wrong party" disposition both in the Aspect dialer and in Citibank's system of record. *Id.* at 83:2-8, 85:1-7, 94:20-95:1; Roe Dep. at 50:23-51:1, 51:13-17, 53:7-14. For at least the past three years, Citibank has generated a daily report reflecting all calls dispositioned as wrong party, which includes the telephone numbers at issue. Mullahey Dep. at 83:12-18, 94:4-7.

Citibank uses a separate notation to signify when it is to cease calling a particular telephone number. *Id.* at 71:12-20, 104:4-12, 104:16-18, 118:13-15.

3

**IV.**   **Citibank placed approximately 110 calls, and delivered 23 prerecorded voice messages, to Plaintiff's cellular telephone number during the class period.**

Plaintiff was the sole and customary user of her cellular telephone number—(928) XXX-0023—at the time Citibank placed calls to it. *See* Transcript of Deposition of Christine Head ("Head Dep."), attached as Exhibit D, at 20:10-21:1-12, 21:19-22:17, 23:1-11 ("I was the only person that had the phone, no one else had access to it at all."), 63:1-64:7 ("I was the only person that used that phone, yes."), 84:6-18.

More specifically, from October 2017 through December 2017, Citibank used its Aspect dialer to place approximately 110 calls to Plaintiff's cellular telephone number.[2] Mullahey Dep. at 35:18-36:16, 36:11-18, 46:17-23. Citibank also delivered 23 prerecorded voice messages to Plaintiff's cellular telephone voicemail during that time. *Id.* at 39:18-22; *see also* Roe Dep. at 54:23-56:6.

Plaintiff answered some of Citibank's calls, none of which included a live person on the other end. Head Dep. at 38:19-3:20 ("…it was just a robot, you can't talk to a robot."), 41:1-3 (Q. For any of the calls that you answered, was there ever a live person on there? A: No."), 65:2-6. At one point, Plaintiff called Citibank to inform it that it was calling the wrong number and to stop calling. *Id.* at 42:14-25. Citibank placed Plaintiff on an extended hold, after which she ultimately ended the call. *Id.* at 43:13-44:5, 69:11-70:15.

**V.**   **Citibank did not have any relationship with Plaintiff, and Plaintiff did not give Citibank express consent to place calls to her cellular telephone number.**

Plaintiff does not have, and never had, a Citibank credit card. *See* Head Dep. at 14:3-15, 23:23-25, 32:3-5, 65:20-66:3 (Q. And just to confirm again, you've never, as far as you're aware, you've never had a credit card with Citibank; right? A. No, I have not."), 84:6-18; Mullahey Dep. at 66:3-5. None of Citibank's calls to Plaintiff's cellular telephone number were intended for her; rather, they were all intended for a person named Jack Bingham. Mullahey Dep. at 65:15-17 ("Q. Were any of Citibank's calls to the 0023 telephone number intended for Christine Head? A. No."); *id.* at 65:10-14, 116:7-15.

---

[2]   Citibank's records note that Plaintiff's -0023 telephone number was assigned to a cellular telephone service. Mullahey Dep. at 60:2-4.

4

1   Plaintiff does not know Mr. Bingham, Head Dep. at 28:15-21, and Plaintiff did not provide

2   Citibank with consent to call her cellular telephone number. Mullahey Dep. at 75:24-76:3.

3   **VI.     Citibank did not confirm that Plaintiff's cellular telephone number belonged**
4   **to the intended recipient of its calls before placing automated calls, and**
     **delivering prerecorded messages, to it.**

5          Citibank claims to have obtained Plaintiff's cellular telephone number from one of

6   its accountholders—Jack Bingham—in 2017 when Mr. Bingham applied for a Home

7   Depot-branded Citibank credit card. Mullahey Dep. at 75:4-10. But after receiving the 0023

8   telephone number from Mr. Bingham, Citibank took no steps to verify that the telephone

9   number in fact belonged to Mr. Bingham before autodialing it. *Id.* at 76:4-9, 76:18-24.

10  **VII.    Citibank identified well more than one million telephone numbers as potential**
11  **wrong or bad numbers, including Plaintiff's.**

12         At some point in 2017, Citibank began archiving the date on which it added

13  designations to telephone numbers in its system—such as "wrong party" or "cease-and-

14  desist" designations. *Id.* at 118:3-15. As a result, Citibank can generate, in an automated

15  fashion, a list of all telephone numbers to which it attached a wrong party designation, or

16  a cease-and-desist designation, over the last three years. *Id.* at 119:3-7.

17         To that end, Citibank produced a list of telephone numbers that contain wrong party

18  and other indicators, including, among other things, the full names and addresses associated

19  with the credit card accounts, redacted account numbers, the designations at issue, and the

20  date Citibank changed the telephone number designation. For only a portion of the

21  proposed class period, Citibank identified more than one million such telephone numbers.

22  *See* Declaration of Michael L. Greenwald, ¶¶ 42-43, attached as Exhibit E.

23         Of note, Citibank ultimately assigned a "cease and desist" designation to Plaintiff's

24  0023 cellular telephone number. Mullahey Dep. at 103:10-104:12.

25                                      **Argument**

26  **I.      Plaintiff's proposed class is well suited for class treatment.**

27         As Judge Easterbrook wrote: "Class certification is normal in litigation under [the

28  TCPA], because the main questions . . . are common to all recipients." *Ira Holtzman,*

                                          5

1    *C.P.A., & Assocs. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013); *accord Krakauer v. Dish*

2    *Network, L.L.C.*, 925 F.3d 643, 656 (4th Cir. 2019) ("Given the remedial purpose of the

3    TCPA, it is no surprise that its cause of action would be conducive to class-wide

4    disposition. In enacting the law, Congress sought to deter an activity that, while pernicious

5    and disruptive, does not trigger extensive liability in any single case. Since few individuals

6    would have an incentive to bring suit, no matter how frustrated they were with the intrusion

7    on their privacy, the TCPA opted for a model that allows for resolution of issues without

8    extensive individual complications.").

9           And this is especially true in non-debtor and wrong-number cases, like this one,

10   where courts do not have to inquire as to whether each putative class member may be

11   subject to an independent consent defense. *See, e.g.*, *Knapper v. Cox Commc'ns, Inc.*, 329

12   F.R.D. 238 (D. Ariz. 2019) (Logan, J.) (certifying over the defendant's objection a "wrong

13   number" TCPA class); *Reyes v. BCA Fin. Servs., Inc.*, No. 16-24077-CIV-Goodman, 2018

14   WL 3145807 (S.D. Fla. June 26, 2018) (same), *reconsideration denied,* No. 16-24077-

15   CIV, 2018 WL 5004864 (S.D. Fla. Oct. 15, 2018), *vacated by joint motion,* No. 16-24077-

16   CIV, 2020 WL 1846165 (S.D. Fla. Mar. 18, 2020); *Lavigne v. First Community*

17   *Bankshares, Inc.*, No. 1:15-cv-00934-WJ/LF, 2018 WL 2694457 (D.N.M. June 5, 2018)

18   (same); *West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295 (N.D. Cal. 2017) (same); *see also*

19   *Johnson v. Navient Solutions, Inc.*, 315 F.R.D. 501 (S.D. Ind. 2016) (same); *Abdeljalil v.*

20   *Gen. Elec. Capital Corp.*, 306 F.R.D. 303, 306 (S.D. Cal. 2015) (same); *Johnson v. NPAS*

21   *Solutions, LLC*, No. 9:17-CV-80393, 2017 WL 6060778, at *1 (S.D. Fla. Dec. 4, 2017)

22   (certifying for settlement purposes a "wrong number" TCPA class); *Reid v. I.C. Syst. Inc.*,

23   No. 2:12-cv-02661-ROS, Doc. 230 (D. Ariz. Nov. 9, 2017) (same); *James v. JPMorgan*

24   *Chase Bank, N.A.*, No. 8:15-CV-2424-T-23JSS, 2016 WL 6908118, at *1 (M.D. Fla. Nov.

25   22, 2016) (same); *Munday v. Navy Fed. Credit Union*, No. SACV151629JLSKESX, 2016

26   WL 7655807, at *12 (C.D. Cal. Sept. 15, 2016) (same); *accord McMillion v. Rash Curtis*

27   *& Assocs.*, No. 16-CV-03396-YGR, 2017 WL 3895764, at *10 (N.D. Cal. Sept. 6, 2017)

28   (certifying, over the defendant's objection, two "non-debtor" TCPA classes).

6

## II.   Plaintiff satisfies the requirements of Rule 23(a).

### A.   The proposed class is so numerous that joinder of all members is impracticable.

The first requirement of Rule 23(a) is that the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The requirement is met if, due to class size, it would be extremely difficult or inconvenient to join all class members." *Brink v. First Credit Res.*, 185 F.R.D. 567, 569 (D. Ariz. 1999) (Silver, J.). "[I]n light of prevailing precedent, the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable, and the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone." *Amone v. Aveiro*, 226 F.R.D. 677, 684 (D. Haw. 2005) (citing *Newberg & Conte, 1 Newberg on Class Actions* § 3.6 (4th ed. 2002)). Consequently, "courts [generally] find the numerosity requirement satisfied when a class includes at least 40 members." *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010); *see also Jordan v. Freedom Nat'l Ins. Servs. Inc.*, No. 16-cv-362-PHX-DLR, 2016 WL 5363752, at *3 (D. Ariz. Sept. 26, 2016) (Rayes, J.) (certifying class action).

Here, Citibank identified over one million telephone numbers it associates with credit card accounts, which are potential wrong or bad numbers. *See supra*, Statement of Facts, Sections I-III, VII. Moreover, Citibank makes over one million outbound calls each day regarding past-due credit card balances to consumers in over 40 states—more than two billion such calls during the proposed class period. *See id.*, Section I.

Given the tremendous number of calls Citibank makes, and the more than one million telephone numbers containing wrong or bad number indicators, it stands to reason that the proposed class is sufficiently numerous such that joinder is impracticable—particularly given the low threshold for numerosity. *See, e.g.*, *Torres v. Goddard*, 314 F.R.D. 644, 654–55 (D. Ariz. 2010) (McNamee, J.) ("court is entitled to make 'common sense assumptions' in order to support a finding of numerosity") (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)); *see also Valenzuela v. Ducey*, No. CV-16-03072, 2017 WL 6033737, *5 (D. Ariz. Dec. 6, 2017) (Campbell, J.) ("Where the exact

size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.") (internal citation omitted); *Drossin v. Nat'l Action Fin. Servs., Inc.*, 255 F.R.D. 608, 614-15 (S.D. Fla. 2009) (finding a proposed class to be sufficiently numerous where the number of class members was an unknown subset of 30,139 individuals, and noting that it was reasonable to assume that fifty of the "tens of thousands" of people the defendant called were class members).

### B. Questions of law and fact are common to all members of the proposed class.

Rule 23(a)(2) requires the existence of common questions of law or fact. Fed. R. Civ. P. 23(a)(2). The showing required to meet the commonality requirement is "minimal" and "not high." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). As well, "Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.* at 1019.

This case presents a host of common questions. First, whether Citibank placed the calls at issue by using an automatic telephone dialing system ("ATDS") is a common question. To be sure, Citibank utilized its Aspect dialer to place calls to each proposed class member. *See supra*, Statement of Facts, Sections I-II. Accordingly, whether Defendant's Aspect dialer, as Citibank used it, is an ATDS is a question that results in an answer common to all class members. *See Bennett v. GoDaddy.com, LLC*, No. 16-CV-03908-PHX-ROS, 2019 WL 1552911, at *5 (D. Ariz. April 8, 2019) (Silver, J.) (certifying TCPA class action and noting that "determining whether Defendant's dialing system was 'an automatic telephone dialing system' is a question crucial to the validity of the putative class's claims that can be resolved in one stroke, based on the same evidence for everyone.");[3] *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 567 (W.D. Wash. 2012) (finding as a common question of law "whether [the defendant's] system of transmission

---

[3] As Judge Silver explained in rejecting arguments against certification, "[c]ountless courts have certified classes under the TCPA . . . ." *Bennett*, 2019 WL 1552911, at *12.

qualifies as an automatic telephone dialing system under the TCPA").

Second, that each class member suffered the same injury and is entitled to the same statutorily mandated relief gives rise to another common question. *See Lavigne*, 2018 WL 2694457, at \*4 ("Plaintiff identifies a number of common questions of law or fact: . . . . • whether the class suffered the same injury, receipt of call in violation of the TCPA."); *Gehrich v. Chase Bank USA, N.A.*, No. 12 C 5510, 2016 WL 806549, at \*4 (N.D. Ill. Mar. 2, 2016) ("Each class member suffered roughly the same alleged injury: receipt of at least one phone call or text message from Chase to her cell phone."); *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 251 (N.D. Ill. 2014) ("Those who are members of one of the proposed classes by definition received the same calls . . . made by or for one of the defendants, using the same artificial or prerecorded voice technology. This is a common alleged injury presenting a common question . . . .").

Finally, another common question is whether callers are liable under the TCPA for calls placed to wrong or reassigned telephone numbers. *See Lemos*, 960 F.3d at 1166.

As Judge Logan summarized:

> The Court finds that the commonality requirement is met. Whether Defendant used an ATDS or an artificial or prerecorded voice to allegedly call the putative class members would produce an answer that is "central to the validity of each claim in one stroke." *Mazza*, 666 F.3d at 588. As would whether liability attaches for wrong or reassigned numbers. This is so even if what triggers liability for wrong or reassigned numbers were to change. Likewise, whether consent was or was not given is a common question applicable to the class. Lastly, all putative class members allegedly suffered the same injury—a receipt of at least one phone call by Defendant in violation of the TCPA. (Doc. 43 at 9.) Thus, whether each class member suffered the same injury is also a "common contention." *Mazza*, 666 F.3d at 588. Therefore, commonality is satisfied.

*Knapper*, 329 F.R.D. at 242.

**C. Plaintiff's claims are typical of the claims of the members of the proposed class.**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties be typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). To that end, "the

commonality and typicality requirements of Rule 23(a) tend to merge." *Bogner v. Masari Investments, LLC*, 257 F.R.D. 529, 532 (D. Ariz. 2009) (Campbell, J.) (citing *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 510-11 (N.D. Cal. 2007)). That is, a claim "is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of the other class members and his or her claims are based on the same legal theory." *Id*.

Here, Plaintiff and the members of the proposed class were each harmed in the same way by Citibank's common practice: the use of automated and prerecorded calls to cellular telephone numbers in an attempt to reach persons other than the intended recipients of its calls. Moreover, since Citibank indisputably used its Aspect dialer to place multiple calls (and deliver prerecorded messages) to Plaintiff's cellular telephone number (a non-customer), *see supra*, Statement of Facts, Sections I-V, Plaintiff's claims are typical of those of the proposed class members. *See Knapper*, 329 F.R.D. at 242-43; *McMillion*, 2017 WL 3895764, at *7 ("Additionally, with respect to Perez, the analysis conducted by plaintiffs' expert demonstrates that he, like the members of the Non-Debtor classes, never had a debt collection account with Rash Curtis. Accordingly, the Court finds that Perez has satisfied Rule 23(a)(3)'s typicality requirement ….").

### D. Plaintiff, and her counsel, will fairly and adequately protect the interests of the members of the proposed class and thus satisfy Rules 23(a)(4) and 23(g).

Rule 23(a)(4) requires that the named plaintiff fairly and adequately protect the interests of the class. This prerequisite is met by showing that: (1) the proposed representative does not have conflicts of interest with the proposed class; and (2) the representative plaintiff is represented by qualified counsel. *Hanlon*, 150 F.3d at 1020.

Here, Plaintiff is capable of, has, and will continue to protect the interests of the proposed class. She communicates regularly with her counsel, responded to Citibank's discovery requests, traveled for deposition, and is prepared to make all necessary decisions involving this case with class members' best interests in mind. *See generally* Ex. D.

Plaintiff retained counsel with long experience in class action litigation, including that under the TCPA, and who are ably qualified to serve the proposed class here. *See* Ex.

10

E, ¶¶ 9-37; Declaration of Matthew R. Wilson, ¶¶ 3-9, attached as Exhibit F.

**III.     Plaintiff satisfies the requirements of Rule 23(b)(3).**

**A. The questions of law and fact common to the members of the proposed class predominate over any questions affecting only individual class members.**

The predominance factor "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S. Ct. 2231, 138 L.Ed.2d 689 (1997). The focus of the predominance inquiry is on "the relationship between the common and individual issues." *Hanlon*, 150 F.3d at 1022. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Id*.

Here, Plaintiff and the members of the proposed class must show that: "(1) the defendant called a cellular telephone; (2) using an automatic telephone dialing system [or an artificial or prerecorded voice]; (3) without the recipient's prior express consent." *Mendez v. C-Two Grp., Inc.*, No. 13-cv-05914-HSC, 2015 WL 8477487, at *7 (N.D. Cal. Dec. 10, 2015) (certifying TCPA class action) (quoting *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012)). As such, "whether [Defendant] used an automated telephonic dialing system to [place the subject calls] and caused injuries to the class members is an issue that predominates over those that may be considered individualized." *Mohamed v. Am. Motor Co., LLC*, 320 F.R.D. 301, 316 (S.D. Fla. 2017).

Moreover, that the members of the proposed class are non-customers of Citibank, who necessarily did not provide Citibank with express consent to place calls to their cellular telephone numbers, means that express consent does not serve as an obstacle to predominance, as it might in other scenarios arising under the TCPA. *See Abdeljalil*, 306 F.R.D. at 311 (rejecting the defendant's argument that consent defeated predominance in connection with a TCPA "wrong-number" class, and finding that "plaintiff has met his burden of demonstrating that questions of fact and law predominate over individualized issues"); *accord C-Mart, Inc. v. Metro. Life Ins. Co.*, 299 F.R.D. 679, 691 (S.D. Fla. 2014)

11

(certifying TCPA class and explaining that "[w]ith consent and application of the [established business relationship] Safe Harbor being eliminated as criteria that serve to define (and defeat) the class . . . . predominance is satisfied").

But even if issues regarding prior express consent existed—they do not—common issues would still predominate. *See Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 699 (S.D. Fla. 2015) ("The Court agrees with the Court in *Reliable Money Order, Inc. v. McKnight Sales Co.*, 281 F.R.D. 327, 338 (E.D. Wis. 2012), *aff'd,* 704 F.3d 489 (7th Cir. 2013), that any issues relating to whether any of the recipients gave permission to receive faxes prior to transmission or whether any of the plaintiffs had an established business relationship with the defendant can be handled within the framework of a class action."); *accord James*, 2016 WL 6908118, at *1 ("Also, the class satisfies Rule 23(b)(3)'s predominance requirement. Class-wide proof can answer the predominant questions (whether Chase auto-dialed each person and whether each call violates the TCPA).").

Additionally, other potential issues—such as "difficult damage calculations, individual determinations of who the telephone user was, when the call was made and proof that [the defendant] actually made the calls . . . difficult[y] [in] determining the identity of users . . . [and] the distinct possibility that every record marked as a wrong number may not have actually been a wrong number," *Johnson*, 315 F.R.D. at 502—do not stand in the way of a finding of predominance. *See id*. (certifying a "wrong-number" TCPA class, and rejecting the defendant's contention that individual issues would "overwhelm the litigation and destroy the required commonality of facts"); *West*, 323 F.R.D. at 301-02 ("Defendant does not persuade. As an initial matter, several district courts have deemed commonality and predominance satisfied in TCPA cases despite the possibility that a substantial proportion of the phone numbers marked as 'wrong number' in defendant's call log databases 'may not have actually been a wrong number.'").

**B. A class action is superior to other available methods for the fair and efficient adjudication of this matter.**

Rule 23(b)(3) also requires that a district court determine that "a class action is

superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3) (setting forth superiority factors).

In general, litigating TCPA claims as part of a class action is superior to litigating them in successive individual lawsuits. *See Reliable Money Order, Inc.*, 281 F.R.D. at 339 ("[M]any courts have found class actions to be an appropriate method of adjudication of TCPA violations."); *see also Palm Beach Golf Ctr.-Boca, Inc.*, 311 F.R.D. at 699 ("[T]he Court finds that a class action is superior to other methods for adjudicating the putative class members' TCPA claims."). This is especially true here, where the class likely has tens of thousands of members, if not more.

Additionally, the claims the proposed class are identical, they arise from the same standardized conduct, and they result in uniform damages calculated on a per-violation basis. *See Knapper*, 329 F.R.D. at 247 ("The Court is persuaded that putative class members who would ultimately become part of the class would have little incentive to prosecute their claims on their own. Should individual putative class members choose to file claims on their own, given the potential class size and the relatively small amount of statutory damages for each case, individual litigation would not promote efficiency or reduce litigation costs. This is particularly so for claims that all stem from the same cause of action and involve common issues. Therefore, the Court finds that a class action is a superior method to adjudicate this matter."); *Lavigne*, 2018 WL 2694457, at *8 ("[T]he complex nature of this TCPA action lends itself to the efficiencies of class certification. It would [be] inefficient to reinvent [the] wheel on approximately 30,000 separate cases.").

Moreover, absent a class action, thousands of claims like Plaintiff's—all of which stem from Citibank's identical conduct in robocalling non-customers—will go un-redressed. *See Siding & Insulation Co. v. Beachwood Hair Clinic, Inc.*, 279 F.R.D. 442, 446 (N.D. Ohio 2012) ("Under the TCPA, each individual plaintiff is unlikely to recover more than a small amount (the greater of actual monetary loss or $500). Individuals are therefore unlikely to bring suit against [the defendant], which makes a class action the superior mechanism for adjudicating this dispute."); *Green v. Serv. Master On Location*

13

1   *Servs. Corp.*, No. 07 C 4705, 2009 WL 1810769, at \*3 (N.D. Ill. June 22, 2009)

2   ("[R]esolution of the issues [under the TCPA] on a classwide basis, rather than in thousands

3   of individual lawsuits (which in fact may never be brought because of their relatively small

4   individual value), would be an efficient use of both judicial and party resources."); *accord*

5   *Abdeljalil*, 306 F.R.D. at 312.

6       As well, there are unlikely to be serious difficulties in the management of this case

7   as a class action.[4] This is, in part, because Citibank has in its possession not only records

8   of all calls it placed during the class period by using its Aspect dialer (as well as all

9   prerecorded messages it delivered), but also names and addresses of its accountholders.

10  *See supra*, Statement of Facts, Sections I-III, VII. Citibank also knows which of its

11  telephone numbers are assigned to a cellular telephone service, and maintains notations for

12  those designated as wrong numbers or with cease-and-desist instructions. *Id*.

13      Given the foregoing, many of the names and addresses of individuals associated

14  with cellular telephone numbers at issue can be identified in a practical and efficient

15  manner. *See* Expert Report of Carla Peak, attached as Exhibit G; *accord Brown v. DirecTV,*

16  *LLC*, 330 F.R.D. 260, 273-274 (C.D. Cal. 2019) (certifying TCPA class action and

17  discussing use of the defendant's internal wrong number notations to identify potential

18  class members); *Knapper*, 329 F.R.D. at 244-246 (discussing viability of reverse number

19  lookup process to identify potential class members for notice purposes); *West*, 323 F.R.D.

20  at 302 (same); *Birchmeier*, 302 F.R.D. at 254 (rejecting argument that class was not

21  manageable because it would allegedly be either impossible, or costly and onerous, to

22

23  [4]      Even if real manageability concerns did exist—they do not—failure to certify a class
action under Rule 23(b)(3) solely on manageability grounds is disfavored. *See Mullins v.*
24  *Direct Digital, LLC*, 795 F.3d 654, 663-64 (7th Cir. 2015) ("[B]efore refusing to certify a
class that meets the requirements of Rule 23(a), the district court should consider the
25  alternatives as Rule 23(b)(3) instructs rather than denying certification because it may be
26  challenging to identify particular class members. District courts have considerable
experience with and flexibility in engineering solutions to difficult problems of case
27  management . . . . Under this comparative framework, refusing to certify on manageability
grounds alone should be the last resort."), *cert. denied*, 136 S. Ct. 1161 (2016).
28

14

obtain the identities of the subscribers for the phone numbers of 930,000 class members).

A class action is therefore the superior method to adjudicate this controversy. *See Johnson v. Comodo Grp., Inc.*, No. 16-4469 (SDW) (LDW), 2020 WL 525898, at \*11 (D.N.J. Jan. 31, 2020) (certifying TCPA class action); *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 690 (S.D. Fla. 2013) (concluding that a "class action would be the superior method of adjudicating the plaintiffs' claims under the . . . TCPA.").

## IV.   This Court should follow Judge Logan's sound analysis in *Knapper*, not the inapposite decision in *Revitch*.

While Citibank likely will reference *Revitch v. Citibank*, No. C 17-06907, 2019 WL 1903247 (N.D. Cal. April 28, 2019), *Revitch* is inapposite because, unlike here, the plaintiff there defined his proposed class by reference not only to his own name, but also to the defendant's internal records, which did not always accurately identify non-customers. *See* 2019 WL 1903247, at \*3 (defining the class to include "*Jeremiah Revitch and* all persons in the United States … whose cellular telephone is identified in Defendant's Contact Utilities Database[]"). In sharp contrast, Plaintiff defines her class by reference to *objective criteria not predicated on Citibank's recordkeeping*.

And as the court in *Revitch* noted, by defining the proposed class with reference to those "not listed in Defendant's records as the intended recipient of the calls," *id.*, at \*1, the *Revitch* plaintiff failed the predominance test under Rule 23(b)(3) because the "problem here is not identifying the individuals who fall within plaintiff's proposed class. Rather, the problem is that adjudicating the claims of those who *do* fall within plaintiff's proposed class would devolve into the tedious resolution of individualized issues based on individualized evidence." *Id.*, at \*4.

Here, no such problem exists. Plaintiff defines her proposed class by reference to those who are not, and never were, Citibank's accountholders or authorized users of its credit cards. Questions of consent for non-customers, therefore, can be resolved in a single stroke, because whether Citibank had consent to robocall persons with whom it has no

15

relationship is a common legal question. *See Knapper*, 329 F.R.D. at 242 ("Likewise, whether consent was or was not given is a common question applicable to the class.").

**V.      Plaintiff's proposed notice plan satisfies Rule 23(c)(2)(B).**

Rule 23(c)(2)(B) requires delivery of the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Of course, "neither Rule 23 nor the Due Process Clause requires actual notice to each individual class member." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017). In fact, Rule 23 "recognizes it might be *impossible* to identify some class members for purposes of actual notice." *Id*. at 1129. Consequently, "[c]ourts have routinely held that notice by publication in a periodical, on a website, or even at an appropriate physical location is sufficient to satisfy due process." *Id*.

Here, to properly provide notice to potential class members, Plaintiff will first perform reverse lookups for the telephone numbers Citibank has identified as potential wrong numbers.[5] *See* Ex. G. Plaintiff will then send Court-approved notice to potential class members by direct mail. In addition, Plaintiff will create a dedicated website. *See id*. Plaintiff also will issue notice by internet and traditional publication, ensuring that as many potential class members as possible receive notice of this class action and are apprised of their rights and options. *See id*. Persons receiving notice must then determine whether they are *bona fide* class members (*i.e.*, non-customers who received calls or prerecorded messages from Citibank) who will be affected by this case.

Then, should there ultimately be a judgment in favor of the class, class members who wish to participate in any recovery will be able to attest to receiving wrong-number calls from Citibank and, if necessary, submit supporting documentation such as telephone

---

[5]      The existence of a list of telephone numbers to which a defendant placed calls makes a TCPA class readily identifiable. *See Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 997 (8th Cir. 2016) ("[F]ax logs showing the numbers that received each fax are objective criteria that make the recipient clearly ascertainable."); *Mey v. Venture Data, LLC*, No. 14-123, Doc. 247 at 26 (N.D. W. Va. June 6, 2017) (certifying a TCPA class, and noting that "numerous reliable databases exist from which a class administrator can accurately identify names and addresses based on a list of telephone numbers").

records. That is, class members will be able to identify themselves, by way of a sworn statement made in connection with a claim form, should the class prevail on the merits. *See Briseno*, 844 F.3d at 1132 (explaining that the need for self-identification and related discovery from absent class members, if necessary, does not disturb a defendant's due process rights, and noting that "there is no due process right to a *cost-effective* procedure for challenging every individual claim to class membership").

And Citibank—which has records of all calls it made and prerecorded messages it delivered for the entire class period, as well as the names of its accountholders and authorized users—will have the ability to verify or contest claimants' membership in the class.[6] Simply, Citibank can quickly verify (or contest) whether a claimant is or was an accountholder, and can identify all calls made to a particular telephone number.

This method of class notice and class member participation is industry standard in TCPA class actions like this one, and thus should be approved. *See* Ex. G; *Knapper v. Cox Commc'ns, Inc.*, No. 2:17-cv-913-SPL, Doc. 120 at 4 (D. Ariz. July 12, 2019) (Logan, J.) (approving materially similar notice plan in certified TCPA class action).

## Conclusion

Plaintiff respectfully requests that this Court certify the proposed class, appoint Plaintiff as the class representative, and appoint GDR and Meyer Wilson as class counsel.

---

[6]     Plaintiff need not "demonstrate that there is an 'administratively feasible' means of identifying absent class members." *Briseno*, 844 F.3d at 1123 ("We have never interpreted Rule 23 to require such a showing, and, like the Sixth, Seventh, and Eighth Circuits, we decline to do so now."); *see also Brown*, 330 F.R.D. at 273 n.10.  Indeed, if it were otherwise, defendants could avoid class certification by keeping poor records. *See Birchmeier.*, 302 F.R.D. at 250 ("Doing this—or declining to certify a class altogether, as defendants propose—would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct.").

17

Dated: July 8, 2020                             Respectfully submitted,

                                                */s/ Michael L. Greenwald*
                                                Michael L. Greenwald
                                                Greenwald Davidson Radbil PLLC

                                                */s/ Matthew R. Wilson*
                                                Matthew R. Wilson
                                                Meyer Wilson Co., LPA

                                                Counsel for Plaintiff and the proposed class

## CERTIFICATE OF SERVICE

I certify that on July 8, 2020, the foregoing document was filed with the Court using CM/ECF, which will send notification of such to counsel of record.

                                                */s/ Michael L. Greenwald*
                                                Michael L. Greenwald

18