## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Christine Head, on behalf of    )   NO.
herself and others similarly    )   18-CV-08189-DLR
situated,                        )
                                 )
            Plaintiff,           )
                                 )
   vs.                           )
                                 )
Citigroup, Inc.,                 )
                                 )
            Defendant.           )

DEPOSITION OF CHRISTINE HEAD
December 5, 2019
Phoenix, Arizona
10:13 a.m.

Reported by:
DOREEN SUTTON, RPR, CSR, CR, FAPR
Certified Reporter
Certificate No. 50076
Prepared for:
THE COURT
( ORIGINAL)

## Page 2

```
 1            I N D E X
 2  WITNESS                       PAGE
 3  CHRISTINE HEAD
 4  Examination by Mr. Sasso         4
 5  Examination by Mr. Boyle        83
 6  Re-examination by Mr. Sasso     85
 7
 8
 9
10
11
12            E X H I B I T S
13  NUMBER      DESCRIPTION        PAGE
14  Exhibit 1   Plaintiff's Response to
                Defendant Citibank N.A.'s
15              First Set of Requests for
                Production to Plaintiff     54
16
    Exhibit 2   First Amended Class Action
17              Complaint                   61
18  Exhibit 3   Second Amended Class Action
                Complaint                   77
19
20
21
22
23
24
25
```

## Page 3

```
 1              DEPOSITION OF CHRISTINE HEAD
 2
 3       The deposition of CHRISTINE HEAD was taken
 4  before DOREEN SUTTON, Certified Reporter No. 50076, for
 5  the State of Arizona, on December 5, 2019, at the
 6  location of BALLARD SPAHR, One East Washington Street,
 7  Suite 1000, Phoenix, Arizona, commencing at the hour of
 8  10:13 a.m.
 9
10  APPEARANCES:
11  FOR THE PLAINTIFF:
12  Mr. Michael J. Boyle
    MEYER WILSON CO., LPA
13  1320 Dublin Road, Suite 100
    Columbus, Ohio 43215
14  mboyle@meyerwilson.com
15
16  FOR THE DEFENDANT:
17  Mr. Marcos D. Sasso
    BALLARD SPAHR LLP
18  2029 Century Park East, Suite 800
    Los Angeles, California 90067
19  sassom@ballardspahr.com
20  Mr. Michael DiGiacomo
    BALLARD SPAHR LLP
21  One East Washington Street, Suite 2300
    Phoenix, Arizona 85004
22  digiacomom@ballardspahr.com
23
24
25
```

## Page 4

```
 1              CHRISTINE HEAD,
 2  called as a witness herein, having been first duly sworn
 3  by the certified reporter, was examined and testified as
 4  follows:
 5
 6              EXAMINATION
 7  BY MR. SASSO:
 8       Q.  Good morning.  Can you state your name for the
 9  record, please.
10       A.  My name is Christine Head, H-E-A-D.
11       Q.  Have you ever gone by any other names or
12  nicknames?
13       A.  In my past when I was married, my last name had
14  been Sandoval, but Head is my maiden name.
15       Q.  Have you ever gone by Christine Comstock?
16       A.  Yes, but was never legally changed.
17       Q.  What city do you currently live?
18       A.  Kingman, Arizona.
19       Q.  And is it a house?  Apartment?  What is it?
20       A.  It's a trailer, it's my home.
21       Q.  And do you own --
22       A.  Yes.
23       Q.  -- the trailer?
24       A.  Yes.
25       Q.  How long have you owned it?
```

## Page 5

1    A.  Since 2000, January.
2    Q.  Have you ever had your deposition taken?
3    A.  No, I have not.
4    Q.  So to give a little bit of context of what we're
5    doing —
6    A.  Yes.
7    Q.  — I represent Citibank and my counsel here,
8    Mike DiGiacomo, also represents Citibank.  The oath you
9    just took is the same type of oath you'd take in court.
10    A.  Right.
11    Q.  The court reporter is going to take down
12    everything we say.  However, she can't record if we're
13    both talking at the same time, so just let me finish my
14    questions, I'll let you finish your answers, that way we
15    have a clean record.
16        Just like you've been doing, audible answers,
17    yes, no, or whatever the answer is.  The head nods,
18    "uh-huh," things like that are difficult for the court
19    reporter to capture, so just keep going as you're doing.
20        If you answer a question, we'll assume you
21    understood the question, so if there's any confusion or
22    something's unclear, just ask and I'll try to rephrase
23    it.
24    A.  Okay.
25    Q.  We can take breaks as needed.  The only caveat

## Page 6

1    is that if there is a question pending, I just ask that
2    you answer the question, then we can take a break.
3    A.  Okay.
4    Q.  If I ask you a question, and I'm assuming your
5    attorney might agree on this, we don't want you to guess
6    at the answer.  The way I try to explain it is that while
7    we don't want you to guess, we are entitled to your best
8    estimate.  So, for example, if I ask you to estimate the
9    size or length of this table, you probably could just by
10    looking at it.  Of if I asked you to tell me the size of
11    the table in my dining room at home, I'm assuming you'd
12    have to guess.  Does that make sense?
13    A.  Yes.
14    Q.  It's sort of not a really good example of how to
15    explain it, but it's the example that every attorney, I
16    think, uses because we've all been taught that one.
17        Have you taken any medication in the last 24
18    hours that might inhibit your ability to provide your
19    best testimony today?
20    A.  No.
21    Q.  I should have mentioned, from time to time, your
22    attorney may object to a question.  Unless he instructs
23    you not to answer, you still must answer the question;
24    make sense?
25    A.  Yes.

## Page 7

1    Q.  I know I asked you, you said you've never been
2    deposed before; right?
3    A.  No, I have not.
4    Q.  Have you ever been a plaintiff in a lawsuit
5    other than this current case?
6    A.  No.
7    Q.  Have you ever been a defendant in a lawsuit?
8    A.  No.
9    Q.  Did you prepare for today's deposition?
10    A.  I looked at the original complaint that was
11    submitted to the court and I looked at my discovery
12    responses.
13    Q.  And did you look at any other documents?
14    A.  No.
15    Q.  Did you speak to anybody?
16    A.  Just Mike.
17    Q.  Just your attorney?
18    A.  Yes.
19    Q.  Mike Boyle?
20    A.  Uh-huh.
21    Q.  Did you speak to any other attorneys or just
22    Mike?
23    A.  No, just Mike.
24    Q.  You said the original complaint.  There was the
25    first complaint that was filed and a first amended

## Page 8

1    complaint.  Do you know off the top of your head which
2    one it was?
3    A.  It was the second one, the amended one.
4    Q.  Other than meeting with Mike and reviewing the
5    two documents that you identified, have you done anything
6    independent of that to prepare for today?
7    A.  No, I have not.
8    Q.  Are you currently employed?
9    A.  I'm self-employed, yes.
10    Q.  What do you do for your employment?
11    A.  I clean houses.
12    Q.  How long have you been doing that?
13    A.  For about couple of years, two years.
14    Q.  Prior to doing that, what was the last job you
15    had where you weren't self-employed, you were working for
16    somebody else?
17    A.  I was working for a company in Kingman as a
18    warehouse clerk.
19    Q.  Approximately when was that?
20    A.  That was over a year ago, August of last year.
21    Q.  August of 2018?
22    A.  Yes.
23    Q.  What's the company?
24    A.  Import Corner.
25    Q.  How long were you with, is it Import Corner?

CHRISTINE HEAD                                                                    HEAD VS. CITIGROUP, INC.
DECEMBER 5, 2019                                                                  18-CV-08189-DLR

## Page 9

1   A.  Yes.
2   Q.  How long were you with them?
3   A.  I worked off and on with them for about nine
4   years.  I was just seasonal help.
5   Q.  When you were, I guess, off season with them,
6   were you working anywhere else?
7   A.  I was cleaning houses.
8   Q.  So, I guess, for the last maybe ten years, those
9   have been the two main --
10  A.  Yes.
11  Q.  -- the only two employment jobs you've had?
12  A.  Yes.
13  Q.  What's your highest level of education?
14  A.  Some college.
15  Q.  Do you have any licenses?
16  A.  I have a library paraprofessional certificate.
17  At one time I was a notary commission, I've let my
18  commission expire, and I have a paralegal certificate.
19  Q.  Have you ever worked in a law firm as a
20  paralegal?
21  A.  No.
22  Q.  Are those, the library paraprofessional --
23  A.  Yes.
24  Q.  -- and the paralegal certificate, are those both
25  here in Arizona?

## Page 10

1   A.  The library paraprofessional was through Mohave
2   County and the paralegal was through Arizona --
3   University of Arizona, extended university.
4   Q.  Any other licenses?
5   A.  No.
6   Q.  Are you married?
7   A.  No.
8   Q.  Do you have any children?
9   A.  Yes.
10  Q.  Are they adult, or --
11  A.  One's 26 and one's 19.
12  Q.  Have you spoken to them at all about the case?
13  A.  No.  My youngest daughter drove me up here and
14  she doesn't really understand what's going on, I just
15  told her I had a court deposition.
16  Q.  Is it a son and daughter?
17  A.  Both daughters.
18  Q.  Do you have any roommates?
19  A.  No.
20  Q.  I believe you mentioned you previously had been
21  married?
22  A.  Yes, I've been previously married twice and
23  divorced.
24  Q.  What were your married names, just what you
25  have --

## Page 11

1   A.  The first time I was married, the last name was
2   Sandoval and I restored my maiden name after I got
3   divorced.  And the second marriage I didn't take the last
4   name, I kept my married name, but I went by Comstock.
5   Q.  What was the name of your first ex-husband?
6   A.  Jeff.
7   Q.  Sandoval?
8   A.  Yes.
9   Q.  And the second?
10  A.  Mike Comstock.
11  Q.  Have you ever filed for bankruptcy?
12  A.  No.
13  Q.  You already said you've never been a plaintiff
14  in a case other than this one; right?
15  A.  Right.
16  Q.  I did sort of a public records search and there
17  was a case I saw, Mohave County -- I'm sorry, Westlake
18  Financial Services versus Christine Head; do you recall
19  that?
20  A.  Yes, that was there was a question about the
21  payments that I was making and the contract that I had
22  originally signed and I disputed it, so I don't know if
23  that made me a defendant or a plaintiff.
24  Q.  Was there a lawsuit brought by it?
25  A.  No, it was judged that I had to pay the

## Page 12

1   outstanding on the car payments that I had missed.
2   Q.  So there was a judgment entered against you; is
3   that right?
4   A.  Yes.
5   Q.  But as far as you recall, that never went to a
6   trial?
7   A.  No.
8   Q.  It was for a car payment; is that correct?
9   A.  Yes.
10  Q.  Have you ever been convicted of a felony?
11  A.  No.
12  Q.  Have you ever pled guilty to a felony charge?
13  A.  No.
14  Q.  Have you ever been convicted of any crimes?
15  A.  Misdemeanors, traffic related.
16  Q.  How many?
17  A.  Several; I don't know off the top of my head
18  exactly how many.
19  Q.  Between one to five?
20  A.  Probably one to five.
21  Q.  More than five?
22  A.  I don't believe so.
23  Q.  Do you have a time frame for those?
24  A.  No, not off the top of my head.  '98 to 2017,
25  probably.

CHRISTINE HEAD
DECEMBER 5, 2019

HEAD VS. CITIGROUP, INC.
18-CV-08189-DLR

## Page 13

1      Q.   Do you recall what the most recent one was?
2      A.   It's been a couple of years, I think it was
3   2017.
4      Q.   You said they were all traffic related?
5      A.   Yes.
6      Q.   And all misdemeanors?
7      A.   Yes.
8      Q.   Other than the traffic-related misdemeanors, any
9   other criminal cases that you've had?
10     A.   I think back in 1998, I had a trespassing for --
11  I had trespassed on my mom's property and they charged me
12  with burglary, but I completed the probation and it was
13  an undesignated offense, so they didn't charge it as a
14  felony.
15     Q.   You said it was 1998?
16     A.   I believe so. It's been about 20 years.
17     Q.   I'm sorry, can you repeat that; you were charged
18  with burglary, but it was not prosecuted that way?
19     A.   No, they dropped all the charges and they
20  designated it undesignated offense after I completed my
21  probation, I never went to jail for it.
22     Q.   How long was the probation?
23     A.   I was given two years probation, but I completed
24  it in half time and paid my fines within a year.
25     Q.   Are there any other criminal cases that we

## Page 14

1   haven't talked about?
2      A.   No.
3      Q.   Do you have any Citibank credit card accounts
4   that you're aware of?
5      A.   No, I don't.
6      Q.   Any Macy's accounts?
7      A.   No.
8      Q.   Best Buy accounts?
9      A.   No.
10     Q.   Home Depot accounts?
11     A.   No.
12     Q.   Sears accounts?
13     A.   No.
14     Q.   Do you carry any credit cards at all?
15     A.   No.
16     Q.   So this deposition is in connection with a case
17  that you brought against Citibank. Can you tell me why
18  you sued Citibank?
19     A.   Because I kept getting robocalls repeatedly,
20  even though I blocked the number on my phone, and it kept
21  calling me same time every day, about the same time,
22  between 11:30 and 12:30 every single day for about a
23  year. And because they were calling for somebody's
24  account that I had nothing to do with, it was an
25  incorrect number to begin with. I feel like if they're

## Page 15

1   calling on behalf of Home Depot, they should have at
2   least had the right person.
3      Q.   When did the calls start?
4      A.   November 2017.
5      Q.   Do you know how long -- strike that.
6           Are you still receiving phone calls?
7      A.   No, I'm not.
8      Q.   When did the calls stop?
9      A.   When I didn't have the phone anymore.
10     Q.   When was that?
11     A.   In April 2017, I believe.
12     Q.   You said the calls started November 2017?
13     A.   Yes.
14     Q.   And the calls stopped?
15     A.   When I quit working at that place; it was my
16  phone and part of the kudo of working there was I could
17  use the Apple phone for my personal phone as well as
18  work, but it was my phone.
19     Q.   So you said that you left that in April 2017.
20  I'm trying to get the timing right; that doesn't seem
21  like that would work.
22     A.   I don't remember when I stopped working for Jeff
23  Brownmiller.
24     Q.   Who is that?
25     A.   That was my employer that I worked part-time for

## Page 16

1   doing bookwork for.
2      Q.   I asked you earlier what jobs you had, you
3   identified the housecleaning and working at the
4   warehouse. Is this a different one?
5      A.   Yes, I actually forgot about them. When you
6   asked me, I was thinking about all the problems I had
7   with Import Corner.
8      Q.   How long did you work for Jeff Brownmiller?
9      A.   About six months, and that was only part-time.
10     Q.   Do you know the time frame for when that was?
11     A.   January -- no, I don't remember.
12     Q.   Was it 2019?
13     A.   No.
14     Q.   2018?
15     A.   No, it was in 2017. I know I started there in
16  the summertime and worked until the wintertime, so I
17  don't remember the exact dates, though.
18     Q.   So you worked from the summer of 2017 to winter
19  of 2017 for him?
20     A.   Yes.
21     Q.   And I think you mentioned as part of your job
22  there, you were given access to a cell phone number or an
23  actual cell phone?
24     A.   I was given a cell phone for my use and then he
25  would be able to call me on the phone when he needed me

CHRISTINE HEAD
DECEMBER 5, 2019

HEAD VS. CITIGROUP, INC.
18-CV-08189-DLR

## Page 17

1    for work. It was only 20 hours a week, but that was part
2    of the kudo of working there.
3        Q.   What were you doing for him?
4        A.   I was doing payroll and I was doing bookkeeping,
5    keeping track of all his receipts from his purchases,
6    fielding phone calls.
7        Q.   What type of business was it?
8        A.   It was Rock Aggregate, he would fix mining
9    equipment and resell it, refurbish mining equipment.
10       Q.   Rock Aggregate was the name?
11       A.   Rock Aggregate Materials.
12       Q.   What was the number associated with that phone?
13       A.   My number is (928) ████0082.
14       Q.   I'm sorry, say that again.
15       A.   (928) ████0082. I think that's the number. I
16    know it was 0082.
17       Q.   The number you read back to me, maybe I wrote it
18    down wrong; (928) ████0082?
19       A.   Yes.
20       Q.   Is that the number that you were receiving phone
21    calls from Citibank on?
22       A.   Yes.
23       Q.   So we started going down this road talking about
24    why you brought the case against Citibank. Do you recall
25    how many phone calls you received from Citibank?

## Page 18

1       A.   At least two dozen or more.
2       Q.   And as best you can tell, in terms of timing, it
3    was when you started working for Jeff Brownmiller or at
4    some point when you acquired the phone?
5       A.   I'd had the phone for a while and I started
6    receiving calls in November 2017.
7       Q.   And then the calls stopped; when exactly, if you
8    can recall?
9       A.   I don't know exactly when they stopped.
10       Q.   Would it have been the end of December 2017 or
11    would they have gone into 2018?
12       A.   I think they went into 2018, but I don't recall
13    exactly how late they were.
14       Q.   Do you know that the case was filed as a class
15    action?
16       A.   Yes.
17       Q.   Do you know what that means?
18       A.   Yes, I do.
19       Q.   What's your understanding of what a class action
20    is?
21       A.   It's not just one person that's involved in the
22    case, it's everybody that the case has affected.
23       Q.   Was it your decision to bring it as a class
24    action?
25       A.   I was agreeable to that, yes.

## Page 19

1       Q.   Do you know what your role is as part of the
2    class action?
3       A.   Class representative.
4       Q.   What does that mean to you?
5       A.   It means that I have to represent everybody
6    that's in the class action fairly.
7       Q.   Anything else that's involved with it?
8       A.   Making sure that things are compensated
9    correctly, such as damages and liability.
10       Q.   So other than talking to your attorneys about
11    the case, have you spoken to anyone else about this case?
12       A.   No, I have not.
13       Q.   Have you spoken with anybody identified in the
14    case who's been identified to you as an expert related to
15    the case?
16       A.   No.
17       Q.   Do you have any social media accounts?
18       A.   No.
19       Q.   A Facebook?
20       A.   I have a Facebook but I don't use it, I don't
21    remember my login for it.
22       Q.   An Instagram?
23       A.   No.
24       Q.   Twitter?
25       A.   No.

## Page 20

1       Q.   I'm trying to come up with the names of all the
2    other ones, but I don't even know what they are.
3       A.   I'm not really into social media.
4       Q.   Fair to say you have not posted about the case
5    on Facebook?
6       A.   No.
7       Q.   You said earlier that the phone number that you
8    received the phone calls on was (928) ████0082. My
9    understanding was that the number was (928) ████0023.
10       A.   Okay. I've had at least a different phone since
11    then, that is the right number, the ███ I just couldn't
12    remember when you asked me.
13       Q.   The ███0023, that was the phone number --
14       A.   Yes.
15       Q.   -- that you got from the Rock Aggregate guy,
16    whose name now escapes me, and that was the phone number
17    that you got calls from Citibank?
18       A.   Yes, it was.
19       Q.   So is the other number you gave me your current
20    number or just a different one?
21       A.   No, the first part of that is my daughter's
22    number. I don't know why I couldn't remember the number
23    when you asked me.
24       Q.   The (928) ████0082 --
25       A.   That's not a correct number at all.

CHRISTINE HEAD
DECEMBER 5, 2019

HEAD VS. CITIGROUP, INC.
18-CV-08189-DLR

## Page 21

1  **Q.  So you had the 0023 number, so when we're**
2  **talking, if I say the 0023 number, fair to say that's the**
3  **phone number we're talking about --**
4  A.  Yes.
5  **Q.  -- the number you got the Citibank calls on?**
6  A.  Yes.
7  **Q.  So you had use of that phone number only for the**
8  **time that you worked for Jeff Brownmiller; right?**
9  A.  Well, I actually had use of the phone after I
10  stopped working for him and was given the option to
11  purchase the phone.  At that time I couldn't afford to,
12  so I did not.
13  **Q.  When you say you had the option of purchasing**
14  **the phone, are you talking about the physical phone**
15  **itself or the phone number?**
16  A.  The physical phone itself, I was given the phone
17  as my personal phone to use, but that was his way of
18  getting ahold of me when I needed to work.
19  **Q.  So for the phone number itself, once you stopped**
20  **working for him, did the phone number stay with him or**
21  **did you take that phone number with you?**
22  A.  I gave it back to him.
23  **Q.  So you had use of that phone number just for the**
24  **time that you worked for him?**
25  A.  Well, about a month after I stopped working for

## Page 22

1  him I still had the phone.  He'd given me about a month
2  to decide if I wanted to keep it or not.
3  **Q.  So when you gave him back the phone, you also**
4  **gave him back the phone number?**
5  A.  Yes.
6  **Q.  While you had use of the 0023 phone number, did**
7  **you ever pay any bills for the phone number?**
8  A.  No.
9  **Q.  Were those paid by Mr. Miller or the company**
10  **that you worked for?**
11  A.  They were paid by the company, but it was my
12  personal phone.
13  **Q.  So you had access to that phone number for use**
14  **for your purposes for your work with Mr. Miller, but he**
15  **also let you use it for your personal reasons?**
16  A.  Yes, he expected me to use it as my personal
17  phone.
18  **Q.  And so the company paid the bill?**
19  A.  Yes.
20  **Q.  While you were using that phone number, did you**
21  **share that phone number with anyone else?**
22  A.  Uh-uh.
23  **Q.  Meaning did you give anybody else access to use**
24  **that number?**
25  A.  No.

## Page 23

1  **Q.  As far as you were aware, you were the only**
2  **person who was using that phone number during the time**
3  **you had it?**
4  A.  I was the only person that had the phone, no one
5  else had access to it at all.
6  **Q.  Just so we're clear, when I say the phone, I'm**
7  **talking about the phone number itself, not actually the**
8  **physical phone; I know you may, like, hand your phone to**
9  **somebody to borrow it for any reason, but the phone**
10  **number itself.**
11  A.  No, it was only my phone number.
12  **Q.  You no longer have the physical phone itself;**
13  **right?**
14  A.  No.
15  **Q.  When you had use of the phone number, did you**
16  **ever give it out, for example, to the gas company or the**
17  **water and power company?**
18  A.  I don't remember if I did or not.  I don't think
19  so.
20  **Q.  At the time you had the 0023 number, were you**
21  **using any other phone numbers?**
22  A.  No, not that I recall.
23  **Q.  Do you recall if at the time that you had the**
24  **0023 number, did you have any credit card accounts?**
25  A.  No.

## Page 24

1  **Q.  Did you have a bank account?**
2  A.  No.
3  **Q.  Were you paying any utilities?**
4  A.  Yes, and I paid cash.
5  **Q.  So what utilities were you using at that point?**
6  **I'm just talking about when you were using the 0023**
7  **number.**
8  A.  My electric, my gas, my water bill.
9  **Q.  And do you recall if you gave -- strike that.**
10  **Was the electric, gas, and water all the same**
11  **company or different companies?**
12  A.  The electric and the gas are the same company.
13  The water company is city.
14  **Q.  Do you recall if while you were using the 0023**
15  **number, if you ever gave either of those companies that**
16  **phone number as your contact number?**
17  A.  Not that I recall.  They never had any need for
18  it.
19  **Q.  Did you give the 0023 number to your bank during**
20  **the time that you had that phone number?**
21  A.  I didn't have a bank at that time.
22  **Q.  Do you recall who the carrier of the phone was?**
23  A.  It was AT & T.
24  **Q.  Do you have a mortgage for the trailer or do you**
25  **own it outright?**

**Page 25**

1  A. I own it.
2  Q. Do you recall if during the time that you had
3  access to the 0023 number, if you applied for credit of
4  any kind?
5  A. No, I did not.
6  Q. Do you know who Sandra Carr is?
7  A. No, I don't.
8  Q. How about Caitlyn J. Carr?
9  A. No.
10  Q. Do you know if either person is related or
11  connected with Mr. Miller's company?
12  A. I have no idea.
13  Q. During the time that you had the 0023 number, do
14  you recall if you ever received phone calls for either
15  Sandra or Caitlyn Carr?
16  A. No, I did not.
17  Q. Like I mentioned before, I think we did, like, a
18  public records search and it came back with a series of
19  phone numbers that might be connected to you.  I want to
20  just run through them, the best you can recall, if you
21  remember these numbers at all.
22  A. Okay.
23  Q. (928)███-5033?
24  A. I don't know, doesn't sound familiar.
25  Q. (928)███-4340?

**Page 26**

1  A. Sounds familiar, but I don't know what number
2  that is.
3  Q. Do you currently have a cell phone number?
4  A. Yes, I do.
5  Q. What's that phone number?
6  A. (928)███-7180.
7  Q. I guess that's one of the numbers actually that
8  got identified.  How long have you had that phone number?
9  A. For about a year, little over a year.
10  Q. Are you the person that pays the bill?
11  A. It's a Q-link phone, it's a government-issued
12  phone.
13  Q. Why do you have a government-issued phone?
14  A. Because I'm poor.
15  Q. Do you know if that phone number is listed —
16  well, do you know if that phone number's listed under
17  your name?  Do you ever see a bill?
18  A. I get a renewal statement for it and yes, it is
19  under my name.
20  Q. So let me go back to some of these other phone
21  numbers. The next phone number is (928)███-1836; do you
22  recall ever having that phone number?
23  A. I don't know.  I don't think so.
24  Q. So the next number is (480)███-6234?
25  A. No.

**Page 27**

1  Q. (928)███-2588?
2  A. That was my mom's phone number.
3  Q. Did you ever use that as your number?
4  A. No, I used it a couple times in Bashas' for the
5  discount because I was buying groceries for her.
6  Q. Next number was (916)███-0643?
7  A. No.
8  Q. You don't recall having that one?
9  A. No, I do not.
10  Q. The next number is (601)███-0728?
11  A. No.
12  Q. You don't recall using that?
13  A. No, I don't.
14  Q. Next number is (928)███-2460.  Do you recall
15  using that number?
16  A. That might have been a SafeLink phone that I
17  had, but I don't remember how long ago I had that.
18  Q. Did that ring to a cell phone or a landline?
19  A. It was a cell phone.
20  Q. And the next number is (928)███-7839.  Do you
21  recall having that phone number?
22  A. No.
23  Q. The next one is (928)███-4135.  Do you recall
24  that number?
25  A. No.

**Page 28**

1  Q. And then the next one is (918)███-2756.  Do you
2  recall that number?
3  A. No.
4  Q. That was the last of them.
5  A. Okay.
6  Q. So the 7180 number, you said you think you've
7  had it about a year, so going back to, I guess, late
8  2018; does that seem right?
9  A. Yes.
10  Q. So between the time that you left, between the
11  time that you stopped using the 0023 number to when you
12  started using the 7180 number, were there any phone
13  numbers you were using between those two points?
14  A. Not that I recall, no.
15  Q. Do you know Jack Bingham?
16  A. No.
17  Q. Do you know how the 0023 number ended up on his
18  credit card —
19  A. I have no idea.
20  Q. — Home Depot account?
21  A. No clue.
22  MR. BOYLE:  Just let him finish the question,
23  take a second.
24  Q. BY MR. SASSO:  So did you ever come to have an
25  understanding that the phone number, the 0023 number, was

**CHRISTINE HEAD**
**DECEMBER 5, 2019**

**HEAD VS. CITIGROUP, INC.**
**18-CV-08189-DLR**

**Page 29**

1 associated with his Home Depot credit card account?
2   A.  That's what I've heard, but I have no idea who
3 he is.
4   Q.  You've heard that from who?
5   A.  From my attorney.
6   Q.  So other than talking with your attorney, do you
7 have any kind of independent knowledge or understanding
8 of that?
9   A.  No.
10   Q.  Have you ever worked at Home Depot?
11   A.  No.
12   Q.  Are you familiar with the Telephone Consumer
13 Protection Act?
14   A.  Somewhat.
15   Q.  And when did you first become familiar with
16 that?
17   A.  After I started receiving the robocalls from
18 Citibank.
19   Q.  How did you go about getting your understanding
20 of the statute?
21   A.  I went online and I did some research and found
22 out what they were doing was not legal.
23   Q.  And so you searched for it on the Internet?
24   A.  Yes.
25   Q.  And how did you go about doing that search?

**Page 30**

1   A.  I typed in Citibank and robocalls and see what
2 came up, I believe.
3   Q.  Do you recall what came up when you made that
4 search?
5   A.  Quite a few results about Citibank having
6 previous problems with robocalls.
7   Q.  What did it say about the Telephone Consumer
8 Protection Act, if you can recall?
9   A.  That robocalls were in violation of our rights
10 as consumers of telephones.
11   Q.  What is your understanding of what rights
12 consumers have with respect to robocalls?
13   A.  Well, if I block a call and put my number on a
14 do-not-call list, I shouldn't be getting calls from
15 robots.
16   Q.  When you say if you block a call, what do you
17 mean?
18   A.  You have the function to block it on a cell
19 phone.  And I also had put that number on the
20 donotcalllist.gov and was still receiving calls.
21   Q.  When you say you blocked the number, you mean on
22 your physical cell phone itself you set the settings so
23 that phone number would be blocked?
24   A.  Yes, and it didn't help at all and it still was
25 able to get through the blocks.

**Page 31**

1   Q.  Is it your testimony for the Citibank phone
2 calls, you tried to do that on your phone to set the
3 setting to block the phone calls?
4   A.  Yes, and it still kept a log of every single
5 time they called, every single day.
6   Q.  And you mentioned the do-not-call list?
7   A.  Yes, I had put that number on the donotcall.gov
8 to try to keep the robocalls from coming, but it didn't
9 help.
10   Q.  And you put the 0023 number --
11   A.  Yes, I put all my phone numbers on there because
12 I don't like telemarketers calling me, especially if
13 they're unsolicited.
14   Q.  You mentioned telemarketing calls.  Do you know
15 if the TCPA, if there's a difference between
16 telemarketing versus nontelemarketing calls under the
17 TCPA?
18   A.  I'm not sure.
19   Q.  With respect to the calls from Citibank --
20 strike that.
21       What's your understanding of what telemarketing
22 is?
23   A.  It's where somebody calls up random phone
24 numbers and tries to sell something.
25   Q.  And with respect to any of the Citibank phone

**Page 32**

1 calls that you received, were any of the phone calls like
2 that, attempts to sell you something?
3   A.  No, they kept calling saying they were calling
4 about my Home Depot account, which I've never had a Home
5 Depot account or Citibank.
6   Q.  So is it fair to say none of the phone calls
7 from Citibank were with respect to try to sell you
8 something?
9       MR. BOYLE:  Objection.
10       THE WITNESS:  No.
11   Q.  BY MR. SASSO:  Or at least as far as you're
12 aware?
13   A.  As far as I'm aware.
14   Q.  When you did your Internet research after
15 receiving the phone calls, was that the first time you
16 became aware of the Telephone Consumer Protection Act?
17   A.  Yes.
18   Q.  Since then, have you done any independent work
19 to understand more about the Telephone Consumer
20 Protection Act?
21   A.  No.
22   Q.  I assume you've not filed any other Telephone
23 Consumer Protection Act cases?
24   A.  No, I have not.
25   Q.  Are you involved in any arbitrations involving

CHRISTINE HEAD
DECEMBER 5, 2019

HEAD VS. CITIGROUP, INC.
18-CV-08189-DLR

## Page 33

1   the Telephone Consumer Protection Act?
2       A.   No.
3       Q.   So after you did your Internet search and became
4   familiar with the Telephone Consumer Protection Act, what
5   did you do next with respect to the calls?
6       A.   I looked for an attorney online and did my
7   research to find out which type of attorney would handle
8   such a case, and that's when I found Meyers Wilson.
9       Q.   What criteria were you looking for for an
10  attorney?
11      A.   Somebody that would handle the telephone suit.
12      Q.   What qualifications were you interested that
13  they had?
14      A.   Well, basically, if they were part of the board,
15  American Bar Association, if they had experience in that
16  field before, which Meyers Wilson had at least 30 years
17  experience in telephone lawsuits.  And they were really
18  prompt about getting back to me when I made my first
19  initial calls.  In fact, they were the only ones that did
20  get back to me about it.
21      Q.   Do you recall if you spoke to any other
22  attorneys other than the Meyer Wilson firm?
23      A.   Well, I did send a couple of texts to some of
24  the ones that were advertised online, but I never got a
25  response back, so...

## Page 34

1       Q.   Do you happen to recall who those were?
2       A.   No, I don't.
3       Q.   How soon after you received the first Citibank
4   phone call did you reach out to try to obtain an
5   attorney?
6       A.   I think it was about a month after receiving the
7   month's worth of calls on a daily basis.
8       Q.   Was the Meyer Wilson firm the only firm that you
9   sort of did some background research on?
10      A.   Yes.
11      Q.   Were there any other firms that you were looking
12  at that might be in the running?
13      A.   No, because nobody else got back to me, so that
14  told me that they weren't interested and that was going
15  to be a waste of my time.
16      Q.   How soon after you -- strike that.
17           Do you recall if you retained the Meyer Wilson
18  law firm before or after the calls stopped?
19      A.   It was before they stopped, I think.
20      Q.   Do you know if the Meyer Wilson firm ever
21  communicated with Citibank about the phone calls?
22      A.   After I retained them, I believe they did, but
23  I'm not positive.  I'm assuming they had to because of
24  the discovery responses.
25      Q.   Let me ask the question a little different.

## Page 35

1   Putting aside filing the lawsuit, do you know if the
2   Meyer Wilson firm reached out to Citibank before filing a
3   lawsuit?
4       A.   I don't know.
5       Q.   Or if the Meyer Wilson reached out to Citibank
6   while you were getting the phone calls?
7       A.   I don't know.
8       Q.   You mentioned the first call you remember
9   receiving was November 2017; correct?
10      A.   Yes.
11      Q.   And approximately how many calls a day do you
12  recall receiving?
13      A.   At least a couple, at least two.
14      Q.   Do you recall if you started to receive the
15  phone calls at the beginning of November?  At the end of
16  November?
17      A.   I don't remember.
18      Q.   And your best recollection in terms of when you
19  stopped receiving the phone calls was when you no longer
20  had access to that number; is that fair or is it
21  different?
22      A.   Yes.
23      Q.   And you think that may have been sometime in
24  early 2018.  Do you have a time frame in 2018 when that
25  might have been?

## Page 36

1       A.   I don't remember.
2       Q.   You mentioned that you recall receiving at least
3   two dozen or more phone calls.  I'd like to try to get
4   your best estimate in terms of the total number that you
5   got of the calls you were receiving; so was it more than
6   25 phone calls?
7       A.   I think it must have been, but I stopped making
8   my log after a while.
9       Q.   How long were you keeping a log?
10      A.   I kept a log for about a month.
11      Q.   What did that entail?
12      A.   At least two dozen calls within that month from
13  two different numbers from Tennessee.
14      Q.   And the log that you kept, was it a handwritten
15  log?
16      A.   Yes, it was.
17      Q.   Like on a sheet of paper or notebook?
18      A.   Yes.
19      Q.   Do you still have copies of that log?
20      A.   I sent it to my lawyer.
21           MR. SASSO:  Do you have that?  We asked for
22  production.
23           MR. BOYLE:  I'll check into that.  I don't know
24  the answer as I sit here.
25           MR. SASSO:  I think Matthew said he didn't think

CHRISTINE HEAD
DECEMBER 5, 2019

HEAD VS. CITIGROUP, INC.
18-CV-08189-DLR

**Page 37**

1  there was any documents.
2      **MR. BOYLE:** I'll check into that when I go back.
3      **MR. SASSO:** Perfect.
4      **Q.  BY MR. SASSO:  So you kept a log, you think, for**
5  **about a month; is that right?**
6      A.  Yes.
7      **Q.  Was that the only log you kept of the phone**
8  **calls?**
9      A.  Well, the log would be on the phone as well.
10      **Q.  But you no longer have the actual physical**
11  **phone; right?**
12      A.  No, I do not.
13      **Q.  Did you take screen shots of the phone log that**
14  **was on the phone?**
15      A.  I wouldn't know how to do that with the phone,
16  so no.
17      **Q.  Do you know if any of the data that was on the**
18  **phone was ever transferred to a different phone or**
19  **different computer?**
20      A.  I have no idea.
21      **Q.  And in terms of the amount of phone calls that**
22  **you were receiving on a per-day basis, was it pretty**
23  **consistent --**
24      A.  Yes.
25      **Q.  -- throughout the time?**

**Page 38**

1      A.  It was usually around 11:23 in the morning it
2  would start.
3      **Q.  Like in a typical day, they would start about**
4  **11:23, you said, and when would the last call come in?**
5      A.  About 12:30 or so.  I would get at least two
6  calls a day.
7      **Q.  And would you receive calls on the weekends?**
8      A.  I would receive calls every day.
9      **Q.  So your recollection is you'd get phone calls**
10  **every day, Monday through Sunday?**
11      A.  Yes.
12      **Q.  Do you recall if you received any phone calls on**
13  **Christmas?**
14      A.  I don't remember.  I think I did, but I don't
15  know for sure.
16      **Q.  Or New Year's Day or any other holidays that**
17  **fell in between that?**
18      A.  I'm sure that I must have.
19      **Q.  When you received the phone calls, did you**
20  **answer every phone call you received?**
21      A.  In the beginning I did, and it was just a robot,
22  you can't talk to a robot.
23      **Q.  When you say "in the beginning," what time frame**
24  **is that?**
25      A.  That first month, I would answer the calls not

**Page 39**

1  knowing who it was, that's when I started keeping a log,
2  because it was the same number over and over again.
3      **Q.  Do you recall what number it was?**
4      A.  It was a 423 area code, and I don't remember the
5  rest of the numbers.
6      **Q.  Was there only one phone number that you would**
7  **receive calls from or were there multiples?**
8      A.  There was a couple of them, at least two.
9      **Q.  Were they both a 423 area code?**
10      A.  Same area code, yes.
11      **Q.  So in the beginning what you said was about the**
12  **first month you would answer the phone calls, you said**
13  **also that it was a robot.  What does that mean?**
14      A.  I would pick up the phone and say hello and
15  there would be a slight pause and a voice would come on,
16  either a male or female voice, saying they were calling
17  about my Home Depot account for Citibank, and to please
18  call them back.
19      **Q.  Did the message include a callback phone number?**
20      A.  Yes, the number that they had called from.
21      **Q.  So the same number that was on -- strike that.**
22      **The 423 number, you would see that on your**
23  **phone, like a caller ID?**
24      A.  Yes.
25      **Q.  And so the phone number that they provided as a**

**Page 40**

1  callback number was that same phone number?
2      A.  Yes.
3      **Q.  Did the callback phone number ever change, as**
4  **best you can recall?**
5      A.  I don't think so, no.
6      **Q.  I just want to make sure I get everything that**
7  **you can recall about the message that you received on the**
8  **phone calls.  You said there was a slight pause and then**
9  **there would be a voice, either a male or female, asking**
10  **you to call Citibank about your Home Depot account and it**
11  **would provide a phone number; right?**
12      A.  Yes.
13      **Q.  Is there anything else that you can recall that**
14  **was in the message?**
15      A.  No.
16      **Q.  And did you ever keep a recording of any of the**
17  **messages?**
18      A.  No.
19      **Q.  Do you recall if there was ever an option to,**
20  **for example, push one to speak to an operator or anything**
21  **like that?**
22      A.  No, there was not.
23      **Q.  Do you recall if there was ever an option to**
24  **push one to make the calls stop or anything like that?**
25      A.  No, there was not.

CHRISTINE HEAD
DECEMBER 5, 2019

HEAD VS. CITIGROUP, INC.
18-CV-08189-DLR

---

**Page 41**

1   Q.   For any of the calls that you answered, was
2   there ever a live person on there?
3       A.   No.
4       Q.   Did any of the calls ever identify who they were
5   trying to reach?
6       A.   No, they did not.
7       Q.   The content of the message was the same, as best
8   you can recall, during the entire period that you were
9   receiving the phone calls?
10      A.   Yes.
11      Q.   In total, do you think you received more or less
12  than a hundred phone calls?
13      A.   I think I received more than a hundred, but I
14  know there was at least two dozen calls and probably
15  more.
16      Q.   When you stopped answering the phone calls, what
17  did you do when a call came in?
18      A.   I would just let it go to voice mail.
19      Q.   When you would let it go to voice mail, was
20  there always a voice mail message?
21      A.   Yes, and it's the same message.
22      Q.   I think we may have covered this, but I just
23  want to make sure.  None of the messages that you
24  received ever asked or tried to encourage you to buy
25  something or Citibank was never selling anything?

---

**Page 42**

1       A.   No, they only called saying I had an outstanding
2   Home Depot account they were trying to follow up on.
3       Q.   Do you know what type of plan you had -- strike
4   that.
5           The phone plan you had for the 0023 number, do
6   you know if it was a per-minute plan or was that a flat
7   fee?
8       A.   I'm not sure about that.
9       Q.   That's because it was owned or paid by the
10  business that you worked for; right?
11      MR. BOYLE:  Objection.
12      Go ahead.
13      THE WITNESS:  Yes.
14      Q.   BY MR. SASSO:  Did you ever try to call
15  Citibank?
16      A.   Yes, I did.  I called one of the numbers that
17  had come up on my caller ID and I was on hold for a long
18  time, for about ten minutes, and there was never any
19  human person that was on the line, so I ended up hanging
20  up after being on hold for ten minutes and not speaking
21  to anybody.
22      Q.   How soon after receiving the first call did you
23  try calling Citibank?
24      A.   It was probably a couple weeks after I started
25  receiving the calls.

---

**Page 43**

1       Q.   How many times did you try calling Citibank?
2       A.   I think at least once.  I know at least one
3   time.  I might have tried twice, but I don't remember if
4   I did a second time or not.
5       Q.   And the number you called, you believe was one
6   of the 423 numbers?
7       A.   It was one of the 423 numbers.
8       Q.   Did you keep a log -- strike that.
9           In the log that you were keeping of the calls
10  from Citibank, do you recall if you made a notation of
11  the day that you tried calling Citibank?
12      A.   No, I did not.
13      Q.   And the day that you called Citibank, you said
14  you were on hold, you think, for ten minutes?
15      A.   At least ten minutes.
16      Q.   And walk me through; so you dialed the phone
17  number, and was there a message or was there someone that
18  answered?
19      A.   They said please hold for the next available
20  representative.
21      Q.   Was that a live, as best you know, was that a
22  live person or was that a recording?
23      A.   That was a recording.
24      Q.   Do you know where you were when you made that
25  phone call?

---

**Page 44**

1       A.   In my house.
2       Q.   You were on hold; did you time it with the
3   timer?
4       A.   I looked at the call after I ended it and it was
5   about ten minutes.
6       Q.   Have you, since you filed this case, have you
7   ever gone back and looked at the phone records for the
8   0023 number to try to count up the total number of calls
9   you received from Citibank?
10      A.   No, I have not.
11      Q.   Have you ever tried to go look at those records
12  to try to identify the date that you called Citibank?
13      A.   No.
14      Q.   You mentioned that call log earlier.  Are there
15  any other similar documents that you have relating to the
16  Citibank phone calls?
17      A.   No.
18      Q.   While you had the 0023 number, would you ever
19  actually receive the phone bills?
20      A.   No.  When I stopped working for Brownmiller, he
21  gave me the option to purchase the phone.
22      Q.   And Brownmiller, that's the name of the owner of
23  the business?
24      A.   Yes.
25      Q.   And I'm sorry, the name of the business again

---

CHRISTINE HEAD
DECEMBER 5, 2019

HEAD VS. CITIGROUP, INC.
18-CV-08189-DLR

---

## Page 45

1 was what?
2    A.  Rock Aggregate Materials.
3    Q.  Do you recall what their address was?
4    A.  No, I don't.
5    Q.  Do you know what city they were in?
6    A.  They were in Kingman on Irving Street, but I
7 don't know the number address of it.
8    Q.  When you did work for them, did you have to go
9 into, like, a physical office or were you able to do it
10 from home?
11    A.  His office was in his home.
12    Q.  Was the Irving Street address his home?
13    A.  Yes.
14    Q.  Do you recall when you made that phone call to
15 Citibank, if it was an off day from work or were you --
16    A.  I don't remember if I worked that day or not,
17 but I know I was at home.
18    Q.  Do you recall if it was in the morning or the
19 evening?
20    A.  In the morning, I believe.
21    Q.  Do you know how many pages your call log is?
22    A.  At least one page, notebook paper.
23    Q.  Do you recall what you wrote down for each of
24 the phone calls?
25    A.  I wrote down the date, the time, the phone

---

## Page 46

1 number.
2    Q.  Did you ever receive any text messages from the
3 Citibank phone number?
4    A.  No, I did not.
5    Q.  Did you ever e-mail Citibank to ask them to stop
6 calling?
7    A.  No.
8    Q.  Did you ever text Citibank to ask them to stop
9 calling?
10    A.  No.
11    Q.  And you didn't keep any copies of the messages;
12 correct?
13    A.  No.
14    Q.  Of the total number of phone calls that you got
15 from Citibank, can you estimate the number that you
16 actually answered versus not answering?
17    A.  No, I couldn't estimate that.
18    Q.  More or less than half?
19    A.  Probably a little less than half.
20    MR. SASSO:  Can we take a break for a few
21 minutes?
22    MR. BOYLE:  Yes.
23    (The deposition was at recess from 11:23 a.m. to
24 11:33 a.m.)
25    Q.  BY MR. SASSO:  So I want to go back and talk a

---

## Page 47

1 little bit more about your role as a class
2 representative.  How did you come to learn of what a
3 class representative is supposed to do in a case?
4    A.  My attorney informed me what my responsibilities
5 are as a class representative.
6    Q.  And have you done any independent investigation
7 in terms of what you're supposed to do?
8    A.  No.
9    Q.  And again, can you list for me what your
10 responsibility is as a class representative?
11    A.  To represent everybody involved as a participant
12 in the case.
13    Q.  Have you ever served as a class representative
14 before?
15    A.  No.
16    Q.  Was it your idea to file the case as a class
17 action?
18    A.  No.
19    Q.  Whose idea was it?
20    A.  My attorney's.
21    Q.  Have you spoken to anyone who you understand to
22 also be part of the class?
23    A.  No, I have not.
24    Q.  Other than representing everyone involved in the
25 case, do you know what other responsibilities you have as

---

## Page 48

1 a class representative?
2    A.  To make sure that I'm honest and to make sure
3 everybody's represented fairly and equally and to keep in
4 communication with my attorney.
5    Q.  Anything else?
6    A.  Not that I can remember.
7    Q.  Do you know who the class members are -- strike
8 that.
9        Do you know what class you're trying to
10 represent?
11    A.  No.
12    Q.  In your own words, how would you describe the
13 members of the class?
14    A.  Typical, working people like myself receiving
15 phone calls that are not even for them by robos,
16 robocallers.
17    Q.  Do you know who Viann Bonoan is, last name is
18 B-O-N-O-A-N?
19    A.  She's another person on the class represented --
20 as a class representative.
21    Q.  Have you ever spoken to her?
22    A.  No, I have not.
23    Q.  Is it your understanding that your attorneys are
24 trying to add her as another class representative to the
25 case?

---

CHRISTINE HEAD
DECEMBER 5, 2019

HEAD VS. CITIGROUP, INC.
18-CV-08189-DLR

---

**Page 49**

1    A.   Yes.
2        Q.   Do you know why they're trying to add her as a
3    class representative?
4        A.   Because she's gone through the same thing that I
5    have gone through with Citibank.
6        Q.   Do you know if there's any reason why she needs
7    to also be added if you're already a class
8    representative?
9        A.   Because she's gone through the same thing I've
10   gone through, she has that right.
11       Q.   Do you know what, if anything, is different
12   about her case?
13       A.   No, I don't know if there's any differences at
14   all.
15       Q.   Do you know if she's already been added as a
16   proposed class representative?
17       A.   I believe so.
18       Q.   It's acceptable, it's okay with you that she is?
19       A.   Of course.
20       Q.   Why is that?
21       A.   Because I know what she's going through if she's
22   had these problems.  It's not fun to get phone calls
23   repeatedly, repeatedly for somebody that they don't even
24   have the correct number.
25       Q.   Just so we're clear, you don't know any of the

---

**Page 50**

1    details about her case, do you?
2        A.   No, I think her case is similar to mine --
3    exactly, exactly like mine, but I don't know where she
4    was getting her calls from, if they were also from
5    Tennessee.
6        Q.   For example, you don't know how many phone calls
7    she got?
8        A.   No.
9        Q.   Or if she asked calls to stop and they stopped?
10       A.   I don't know that, no.
11       Q.   When did you first come to learn that she was
12   potentially going to be added as a plaintiff?
13       A.   Probably about three months ago, maybe two
14   months.
15       Q.   Are you aware if there's any -- well, strike
16   that.
17           Do you know if there are any differences between
18   the facts of your case and her case?
19       A.   I don't think there are any differences.
20       Q.   Are you aware if there are any reasons why you
21   might be a better representative than her for the class?
22       MR. BOYLE:  Objection.
23       THE WITNESS:  No, I don't know.
24       Q.   BY MR. SASSO:  Or vice versa?
25       MR. BOYLE:  Objection.

---

**Page 51**

1        THE WITNESS:  No, I don't know.
2        Q.   BY MR. SASSO:  So far as a class representative,
3    what decisions have you had to make on behalf of the
4    class?
5        A.   If I wanted to go through with being a class
6    representative, if I was okay with that and able to do
7    that, and yes, I am.  And be willing to speak on behalf
8    of everybody that's in the class.
9        Q.   Any other decisions you've had to make so far?
10       A.   No.
11       Q.   Do you think you have the time to serve as a
12   class representative?
13       A.   Yes, I do.
14       Q.   Do you think it will impact your job?
15       A.   No, because I'm self-employed.
16       Q.   And you mentioned that the people that are part
17   of the class are people who received phone calls not
18   intended for them by robocallers, I think is what you
19   said?
20       A.   Yes.
21       Q.   Any other details that go into identifying who
22   is part of this class that you're trying to represent?
23       A.   I'm not sure.
24       Q.   Have you reviewed any of the documents produced
25   by Citibank in the case?

---

**Page 52**

1        A.   No, just the discovery.
2        Q.   When you say "just the discovery," is that the
3    discovery responses from Citibank?
4        A.   Any responses to the discovery.
5        Q.   And so fair to say you have -- strike that.
6            Have you reviewed any of Citibank's responses to
7    your discovery?
8        A.   No.
9        Q.   AT & T produced documents in response to a
10   subpoena that your attorneys had served, I believe the
11   documents came in about two weeks ago, maybe, roughly.
12   Have you reviewed any of those documents?
13       A.   No, I have not.
14       Q.   Are you aware if as part of your responsibility
15   as class representative, you have the authority to settle
16   the case?
17       A.   Yes.
18       Q.   Have you signed an agreement or contract with
19   the Meyers law firm?
20       A.   Yes, Meyer Wilson.  Yes.
21       Q.   What's your understanding in terms of how you're
22   going to be compensated for this case?
23       A.   Well, after it's over with, monetarily and
24   hopefully, Citibank doesn't keep continuing to robocall
25   people.

---

**CHRISTINE HEAD**
**DECEMBER 5, 2019**

**HEAD VS. CITIGROUP, INC.**
**18-CV-08189-DLR**

---

### Page 53

1  Q. When you say that they stop robocalling people,
2  do you mean anybody or anyone; is there any qualification
3  on that?
4  A. Well, if they're calling somebody for an account
5  they should at least have the correct person if they're a
6  bank.
7  Q. So if they are robocalling their customers,
8  that's not the type of person you're talking about?
9  A. If they're robocalling their customers, I would
10  believe they have a right to call them, but probably not
11  robocalls, because you're not even able to speak to a
12  person when you have a robot calling you.
13  Q. But do you know if Citibank customers have a
14  contract with Citibank regarding their credit card
15  accounts?
16  A. I have no idea what they would have.
17  Q. And you don't know what the terms in the
18  contract might be with regard to calling their customers?
19  A. No, I don't.
20  Q. Are you expecting to get any money for acting as
21  a class representative?
22  A. Yes, I would think so.
23  Q. And let me ask it a different way. Do you have
24  any agreement with your attorneys to be compensated
25  differently than class members?

### Page 54

1  A. No -- I don't know.
2  Q. Are you aware if you have an agreement with your
3  attorneys whereby you might receive a portion of any
4  attorney's fees they might get in connection with the
5  lawsuit?
6  A. No.
7  Q. Have you received any compensation already in
8  your role as a plaintiff in this case?
9  A. No, I have not.
10  (Deposition Exhibit No. 1 was marked for
11  identification.)
12  Q. BY MR. SASSO: Ms. Head, you were given
13  Exhibit 1, which is your responses to Citibank's
14  discovery in the case.
15  A. Yes.
16  Q. Do you want to take a minute and just review it
17  and make sure that I've correctly characterized what the
18  document is?
19  Is Exhibit 1 the document you referred to
20  earlier --
21  A. Yes.
22  Q. -- when you said you reviewed your responses in
23  preparation for today?
24  A. Yes.
25  Q. I just want to walk through some of them with

### Page 55

1  you. Can you turn to page two, and request number one
2  asks for all documents relating or referring to your
3  claim against Citi. And there's some objections in the
4  response, but then the response says that "Plaintiff
5  states that she will produce all nonprivileged documents
6  in her custody, possession, or control that are
7  responsive to this request, if any."
8  We already discussed the call log that you had
9  prepared?
10  A. Uh-huh.
11  Q. Are there any other documents that you are aware
12  of that relate to your claim against Citibank?
13  A. No.
14  Q. So it would just be that call log?
15  A. Yes.
16  Q. And number two asks for all documents you
17  received from any nonparty, whether in response to the
18  subpoena or otherwise, relating to the subject matter of
19  the litigation.
20  We have the responses from AT & T to the
21  subpoena, but are you aware of any other documents from
22  any other nonparty relating to your case?
23  A. No.
24  Q. So number three on page three asks for any
25  notes, reports, timelines, and/or memorandums made by you

### Page 56

1  of the events giving rise to the litigation, and your
2  response is that there is no privileged documents in your
3  custody, possession, or control.
4  Is that still accurate?
5  A. That's still accurate.
6  Q. Just skipping ahead to number five and I'll
7  paraphrase, but it asks for communications between you
8  and Citibank, and your response is that you have no
9  documents in response to the request.
10  Is that still accurate?
11  A. That's correct.
12  Q. In preparing these responses, did you search
13  your records for any documents?
14  A. There were no records to search.
15  Q. So we already talked about the call log?
16  A. Right.
17  Q. Did you go back and look at any of your files to
18  see if there's anything related to any of the calls?
19  A. No, there wasn't any.
20  Q. And the only document that you can recall is
21  that call log?
22  A. Yes.
23  Q. The one page or one or two pages?
24  A. Yes.
25  Q. Did you go back, in preparing your responses,

---

**CHRISTINE HEAD**
**DECEMBER 5, 2019**

**HEAD VS. CITIGROUP, INC.**
**18-CV-08189-DLR**

---

### Page 57

1   did you go back to Jeff Brownmiller to see if there were
2   any documents relating to the phone number that might fit
3   any of these categories?
4       A.   No, because I did his books and I know he didn't
5   have any Home Depot cards.
6       Q.   But anything relating to any of the phone calls,
7   like the phone number?
8       A.   No.
9       Q.   How many employees did Jeff Brownmiller have?
10      A.   It varied.  I know there was a couple guys out
11  in the field, but it just depended on what type of work
12  he needed done to what equipment.
13      Q.   Were there any employees that were like
14  yourself, sort of bookkeepers or secretaries, assistants,
15  things like that?
16      A.   He had a tax preparer that he saw in Vegas once
17  a year, that was it.
18      Q.   Other than that, anyone who was sort of
19  semi-regular in the sense of not like a seasonal kind of
20  worker out in the field, but someone who might be in the
21  office?
22      A.   No, I was the only person in the office when he
23  had me in there.
24      Q.   When was the last time you reviewed the
25  responses to the discovery?

### Page 58

1       A.   I looked at it this morning.
2       Q.   And prior to this morning, when was the last
3   time you had reviewed it?
4       A.   When I first got the information to produce
5   documentation.
6       Q.   And then when your attorneys finalized it and
7   sent it to us, did you review a final version before it
8   was sent out?
9       A.   Yes.
10      Q.   And did you make any corrections or changes to
11  any of the responses?
12      A.   No.
13      Q.   And having reviewed it again this morning, are
14  there any changes or updates to any of these responses
15  that need to be made?
16      A.   No, there isn't.
17      Q.   When you did your Internet research after you
18  started getting your phone calls, did you do that on your
19  own personal computer?
20      A.   No, I did that on the phone I was getting calls
21  from.  That was my only access to Internet.
22      Q.   Turning to number 12 on page seven, the request
23  is "All documents that support any damages you claim to
24  have sustained as a result of any action or inaction by
25  Citi, and the response is "Damages in an action pursuant

### Page 59

1   to the Telephone Consumer Protection Act are set by
2   statute," identifies the statute, and then it says "As
3   such, plaintiff has no documents in her custody,
4   possession, or control responsive to this request."
5       Fair to say the damages you're seeking to
6   recover are all based on the TCPA; correct?
7       A.   Yes.
8       Q.   So you're not looking for, for example,
9   emotional distress?
10      A.   Well, it was distressing, but I don't know if
11  you call that emotional, getting phone calls every day, a
12  couple times a day and not being able to block it.  I
13  mean, it was stressful.
14      Q.   In terms of any documents supporting your claim
15  of damages, you're not aware of any that you have; right?
16      A.   Correct.
17      Q.   You did not see any doctors in connection with
18  any of the phone calls, did you?
19      A.   No.
20      Q.   You had mentioned earlier that Meyer Wilson was
21  the only law firm that responded back to your inquiries?
22      A.   Yes.
23      Q.   And prior to today, had you ever met with
24  Mr. Boyle?
25      A.   We'd spoke on the phone.

### Page 60

1       Q.   Have you ever met with Matt Wilson before?
2       A.   I've spoke with him quite a bit on the phone and
3   corresponded with him since November of 2017 through the
4   e-mail.
5       Q.   Is Meyer Wilson the only law firm that is
6   representing you?
7       A.   Yes.
8       Q.   Are you familiar with Greenwald Davidson Radbil?
9       A.   That's one of his people that he works with.
10  I'm not sure what you'd call him.
11      Q.   Let me ask it this way:  Do you have a separate
12  contract with the Greenwald firm?
13      A.   No, I don't.
14      Q.   The only contract you have with attorneys are
15  with the Meyer Wilson firm?
16      A.   Yes.
17      Q.   Do you recall ever meeting with anyone from the
18  Lieff Cabraser firm?
19      A.   No.
20      Q.   And is it your position that the Meyer Wilson
21  firm is experienced and competent to represent you in a
22  class action?
23      A.   Yes, they are.
24      Q.   And how did you come to get that understanding?
25      A.   By talking with Matt on the phone and certain

**Page 61**

1  questions that I asked him to try to decide if I wanted
2  to go with that firm or not, and he made me feel
3  comfortable on the phone and listened to me.
4      Q.   Did you do any Internet research on the firm?
5      A.   Before I talked with him, yes.
6      Q.   Again, it's the only firm that you have, I
7  guess, looked into.  Correct?
8      A.   Yes.  They seemed the most experienced of all
9  the research that I did.
10     Q.   If you believe the Meyer Wilson firm is
11 experienced and competent to handle the case, do you know
12 why the Greenwald firm was also brought in?
13     A.   I'm not exactly sure.
14     Q.   Did you approve of the Greenwald firm being
15 brought in as co-counsel?
16     A.   Yes.
17         (Deposition Exhibit No. 2 was marked for
18 identification.)
19     Q.  BY MR. SASSO:  So Exhibit 2 is the first amended
20 complaint, so after I ask the question I'll have you take
21 a minute to look at that and confirm, but is this version
22 of the complaint that you testified to having reviewed to
23 prepare for today?
24     A.   Yes.
25     Q.   Are you aware that your attorneys are trying to

**Page 62**

1  or have asked the Court for permission to file a second
2  amended complaint?
3      A.   Yes.
4      Q.   And you've reviewed that second amended
5  complaint -- or let me ask it this way:  Have you
6  reviewed the proposed second amended complaint?
7      A.   Yes.
8      Q.   And between the two complaints, do you know what
9  changes there are?  I'm not asking kind of line-by-line
10 changes, but substantially what are the major changes
11 between the two complaints?
12     A.   I believe the other class representative was
13 added on the second complaint.
14     Q.   So in terms of your piece of the case, are you
15 aware if there were any changes made to your facts or
16 allegations in the second amended complaint?
17     A.   No, there shouldn't have been.
18     Q.   So looking at this first amended complaint to
19 paragraph 18, page four, it says "Beginning in or around
20 November 2017, defendant placed a number of calls to
21 plaintiff's cellular telephone number," and then
22 identifies your 0023 number.
23     Fair to say that that still remains your
24 understanding; correct?
25     A.   Yes, that is correct.

**Page 63**

1      Q.   The calls began in November 2017?
2      A.   Yes.
3      Q.   And the calls were to the 0023 number?
4      A.   Yes.
5      Q.   So looking at paragraph 19, it says that
6  "Plaintiff was the only customary user of the 0023
7  number."
8      To you, what does customary user mean?
9      A.   The only person that uses that phone.
10     Q.   And just to be clear, when you had use of that
11 phone, it was actually the company's phone number, but
12 you were given permission to use it?
13     A.   No, that was a separate number than what the
14 company used.
15     Q.   Maybe I don't understand.
16     A.   Brownmiller had a company line just
17 specifically -- it was a landline for phone calls.  That
18 phone was given to me as a personal phone so that I could
19 receive phone calls from him when he needed me to work
20 and to use when I needed a phone.
21     Q.   Do you remember what the landline number was for
22 Brownmiller?
23     A.   I can't remember.
24     Q.   Even the last four digits?
25     A.   I can't remember.

**Page 64**

1      Q.   So the 0023 number was a number that he provided
2  to you to use?
3      A.   Yes.
4      Q.   And as far as you were aware, you were the only
5  person that had use of this number during the time that
6  you had it?
7      A.   I was the only person that used that phone, yes.
8      Q.   And I asked you earlier, but you're not aware if
9  Sandra Carr had use of that phone number during the same
10 period?
11     A.   No.
12     Q.   Or Caitlyn Carr?
13     A.   No.
14     Q.   Paragraph 20 says that "In connection with each
15 of the calls, defendant delivered an artificial or
16 prerecorded voice message referencing plaintiff's
17 supposed Home Depot account."
18     And that relates to the messages that we had
19 talked about earlier today; correct?
20     A.   Yes.
21     Q.   And to be clear, each of the messages that you
22 heard, it's your recollection that they were all
23 recorded?
24     A.   Yes, they were.
25     Q.   They were not a live person?

**Page 65**

1   A.   No, they weren't.

2   Q.   And what's the reason for that belief?

3   A.   Because there was a slight pause and I tried to

4   say you have the wrong number and it overtalked me, and

5   I'd say hello, who is this, and it would just keep on

6   with its recording.

7   Q.   And then looking at paragraph 23, it says "On

8   information and belief, defendant made the calls to

9   plaintiff in an attempt to reach a Home Depot credit card

10  customer."

11       Is it your understanding they were trying to

12  reach a Home Depot credit card customer because that is

13  what was referenced in the message?

14  A.   Yes.

15  Q.   Other than the content of the message, do you

16  have any basis for your understanding that that was the

17  intent of the phone call?

18  A.   No, that's what the prerecorded message said and

19  that's all where I got my information from.

20  Q.   And just to confirm again, you've never, as far

21  as you're aware, you've never had a credit card with

22  Citibank; right?

23  A.   No, I have not.

24  Q.   And have you ever had a checking account with

25  Citibank?

**Page 66**

1   A.   No.

2   Q.   Never had a mortgage with Citibank?

3   A.   No.

4   Q.   So looking at number 27, it says after

5   investigation by counsel, paraphrasing just a little bit,

6   the calls you received were intended for another

7   individual, one Jack Bingham, last name is B-I-N-G-H-A-M,

8   and that there had been a new Citibank account using

9   plaintiff's number on Mr. Bingham's application.  Do you

10  have any understanding -- strike that.

11       When did you learn that the calls were intended

12  for Jack Bingham?

13  A.   That was after I prepared Meyer Wilson for my

14  attorney and that was within this last six months that he

15  made me aware of that.  None of the prerecorded messages

16  ever mentioned the person's name.

17  Q.   That was going to be my next question.  So the

18  messages never referenced Mr. Bingham?

19  A.   No, they did not.

20  Q.   Did they ever identify an account number?

21  A.   No, they did not.

22  Q.   And you never spoke to anyone at Citibank who

23  told you they were intended for Bingham?

24  A.   No, I did not.

25  Q.   And just to confirm, as far as you recall, there

**Page 67**

1   was never, whenever you answered any of the phone calls,

2   there was never a live person; correct?

3   A.   No, there wasn't.

4   Q.   Looking at paragraphs 32 and 33, but my question

5   is it makes reference to the allegation that the calls

6   were made using an ATDS.  What does an ATDS mean to you?

7   A.   Automatic telephone dialing system.

8   Q.   So looking now really at 33, other than what's

9   stated in paragraph 33 about the calls being accompanied

10  with an artificial voice or prerecorded message or that

11  there was no live person on the calls when you answered,

12  do you have any other reason to believe that all the

13  calls made by Citibank were made using an ATDS?

14  A.   They were all prerecorded messages, there was

15  never a live person on it.

16  Q.   So because they were all prerecorded messages,

17  that's the basis for your belief that the calls were done

18  with an ATDS?

19  A.   Yes.

20  Q.   You haven't done any sort of independent

21  investigation into what constitutes an ATDS?

22  A.   No.

23  Q.   So this is kind of a similar question with

24  respect to 34.  It says there that based on information

25  and belief, that the calls were made using equipment

**Page 68**

1   which has the capacity to store numbers to be called and

2   to dial such numbers.

3       Fair to say your basis for believing that to be

4   true is that the calls you received were all prerecorded

5   messages and there was no live person on the calls?

6   A.   Yes.

7   Q.   There's nothing independent of that that would

8   support your allegation at paragraph 34?

9   A.   No.

10  Q.   Paragraph 35 makes reference to calls being done

11  in a manner that predicts when a consumer is going to be

12  available.  Fair to say that your answer would be the

13  same as 33 and 34 in that your good-faith belief is based

14  on the prerecorded messages you got?

15  A.   Yes.

16  MR. BOYLE:  Objection.

17  Q.   BY MR. SASSO:  There's nothing independent that

18  you've done to form your belief that the calls were done

19  in a predictive manner?

20  A.   No, just based on the messages.

21  MR. SASSO:  Let's take a five-minute break.

22  MR. BOYLE:  Sure.

23  (The deposition was at recess from 12:16 p.m. to

24  12:24 p.m.)

25  Q.   BY MR. SASSO:  Ms. Head, under the TCPA, do you

CHRISTINE HEAD
DECEMBER 5, 2019

HEAD VS. CITIGROUP, INC.
18-CV-08189-DLR

## Page 69

1 know how much you might be entitled to receive per phone
2 call?
3     A.   I had heard that it starts at, like, $500 a call
4 and goes up from there to, I believe 1,500 would be the
5 maximum the courts would allow.
6     Q.   And then again, trying to ballpark the total
7 number of phone calls you received, has anything we've
8 done helped to refresh your recollection in that regard?
9     A.   I have no idea how many I received. Quite a few
10 of them.
11     Q.   So going back to the complaint, Exhibit 2,
12 number 36 says that "At one point, plaintiff returned one
13 of defendant's calls to inform defendant that it was
14 calling the wrong number."
15         So was this the phone call that we had talked
16 about earlier this morning?
17     A.   Yes.
18     Q.   And that was the one where you estimate having
19 been on hold for ten minutes?
20     A.   Yes.
21     Q.   And actually, in the next paragraph it says,
22 paragraph 37 says that you were placed on an extended
23 hold and instructed to wait; so again, your estimate is
24 that was a ten-minute-long hold?
25     A.   I believe so, yes.

## Page 70

1     Q.   You then hung up before speaking to anybody;
2 correct?
3     A.   Correct, because an automated voice when I
4 called the number that said please hold for the next
5 available representative and then there was nothing.
6     Q.   And so you tried once and that was it; correct?
7     A.   Yes.
8     Q.   And you said you placed that call approximately
9 a few weeks after you received your first set of phone
10 calls; right?
11     A.   Yes.
12     Q.   So after that one instance, you never tried
13 calling again, did you?
14     A.   No, because it seemed rather pointless when it
15 was just another robot.
16     Q.   So that was based on that one phone call where
17 you were put on hold the first time, you never tried
18 again?
19     A.   No.
20     Q.   You don't know if you would have called back a
21 second time, you might have gotten through to somebody?
22     MR. BOYLE:  Objection.
23     THE WITNESS:  I doubt I would have.
24     Q.   BY MR. SASSO:  Why do you doubt it?
25     A.   Because they had the wrong number to begin with.

## Page 71

1     Q.   But when you returned the phone call, at least
2 based upon this, it did identify that it was Citibank
3 that you were calling; right?
4     A.   Yes.
5     Q.   When you placed that one call to Citibank, you
6 called from your 0023 phone number?
7     A.   Yes.
8     Q.   And you had no other phone numbers at that time?
9     A.   No.
10     Q.   And you said earlier that it was, and it says
11 here in the complaint that the calls were frustrating?
12     A.   Well, yeah, because there was never a live
13 person that called me on the phone, it was always the
14 prerecorded messages. I was frustrated because every
15 time I blocked it, it still came through no matter what
16 and it wasn't even the right number. I never had a Home
17 Depot or Citibank account, so why were they calling me.
18     Q.   And other than that one time that you tried to
19 call Citibank, you never tried again?
20     A.   No.
21     Q.   So it was frustrating to receive the calls,
22 but — never mind.
23         So paragraph 47 says "Plaintiff suffered actual
24 harm as a result of defendant's calls at issue in that
25 she suffered an invasion of privacy, an intrusion into

## Page 72

1 her life, and a private nuisance."
2         So other than the three things listed here, was
3 there anything else where you were actually harmed,
4 anything else that supported your claim that you suffered
5 actual harm?
6     A.   No.
7     Q.   And so you said at that point you were
8 self-employed; is that right?
9     A.   No, I was working for Brownmiller and Import
10 Corner when they needed me.
11     Q.   And the phone calls never — strike that.
12         Did the phone calls ever impact your ability to
13 do your job?
14     A.   Well, yes, because if I'm waiting for a phone
15 call from my boss and they're calling me, then he may not
16 be able to reach me.
17     Q.   Do you know if that ever, in fact, happened?
18     A.   A couple of times.
19     Q.   So describe that for me.
20     A.   He said he tried to call and he couldn't get
21 through and that my voice mail was full. Why was my
22 voice mail full? Well, it was because of all of those
23 messages.
24     Q.   And was your voice mail full of only Citibank
25 phone calls?

CHRISTINE HEAD
DECEMBER 5, 2019

HEAD VS. CITIGROUP, INC.
18-CV-08189-DLR

**Page 73**

1   A.  Pretty much, yes.
2      Q.  Do you know if your phone service at the time
3   had call waiting?
4      A.  No, I don't know if it did.  I don't think so.
5      Q.  Do you recall how many times Mr. Miller said he
6   was not able to get through to you?
7      A.  At least two times.
8      Q.  And I think I asked you this, but you have not
9   gone to see a doctor as a result of the phone calls, have
10  you?
11     A.  No.
12     Q.  Psychiatrist?
13     A.  No.
14     Q.  Have the calls caused any physical ailments to
15  you?
16     A.  Frustration, physical frustration.
17     Q.  So other than your frustration, anything else?
18     A.  No.
19     Q.  Like sweats or shaking or anything like that?
20     A.  Well, I got really frustrated, but not permanent
21  shaking or anything like that.
22     Q.  And then after the two times that Mr. Miller
23  told you that he wasn't able to get through to you, did
24  he also say whether he was unable to leave a voice mail?
25     A.  He said one of the times he couldn't leave a

**Page 74**

1   voice mail because it was full.
2      Q.  What did you do, if anything, to address that?
3      A.  I cleared out my voice mail.
4      Q.  But you didn't call Citibank, did you?
5      A.  I think that might have been about the time I
6   tried to call Citibank, but I'm not sure what day that
7   was.
8      Q.  We already talked about that, but other than
9   that one time, you didn't do a follow-up call?
10     A.  No, I did not.
11     Q.  Other than the two times you identified where
12  Mr. Miller said he was not able to reach you, did anyone
13  else ever say that they were unable to reach you or leave
14  a voice mail?
15     A.  No.
16     Q.  Turning to paragraph 50 in the complaint, do you
17  know why there's a class and a subclass that's set out in
18  paragraph 50?
19     A.  I don't -- I don't understand it.
20     Q.  Well, do you know if there's a difference
21  between the two of them?
22     A.  I know there's a difference, but I'm not sure
23  what the difference is.
24     Q.  Do you know if you are a member of both or one?
25     A.  I think I'm just a member of the one class.

**Page 75**

1      Q.  Just the top class, not the subclass?
2      A.  The first one, yes, the class -- actually, it's
3   the second class.
4      Q.  As you sit here today, do you independently know
5   which of the two classes you may or may not be part of?
6      A.  The subclass.
7      Q.  Do you know if either the class or the subclass
8   includes Citibank customers?
9      A.  I don't know.
10     Q.  And do you know if -- strike that.
11         If a Citibank customer receives a phone call
12  from an auto-dial system, do you know if they should be
13  part of the class or the subclass?
14     A.  I don't think so, but I don't know.  If they
15  didn't have prior consent or given specific authority to
16  call them, then I would think they wouldn't be a part of
17  it.
18     Q.  What do you mean by prior consent?
19     A.  If I have an agreement with the company that
20  they can call me, then they're going to call me.  So
21  unless they give them a specific consent, then I don't
22  think they have a right to call them.
23     Q.  So if they do give consent, at least as far as
24  you know, then all things being equal, Citibank would be
25  okay to call?

**Page 76**

1      MR. BOYLE:  Objection.
2      THE WITNESS:  I would -- I would think so.  I
3   don't know.  I don't know anything about Citibank,
4   really.
5      Q.  BY MR. SASSO:  Going to paragraph 55 on that
6   same page, it says "In addition and upon information and
7   belief, the cellular telephone numbers of all members of
8   the class and subclass can be identified in business
9   records maintained by defendant and third parties."
10         Do you have any independent knowledge that
11  supports that allegation?
12     A.  No, I don't understand the question.
13     Q.  It's a bad question.  Where it says "Upon
14  information and belief," do you have any of your own
15  understanding whether Citibank's records can be used to
16  identify anybody who could be part of the class?
17     A.  No, I don't.
18     Q.  Do you know if Citibank's records can be used to
19  identify you?
20     A.  I doubt it.  I don't know.
21     Q.  And you haven't reviewed any of the documents
22  produced by Citibank in the case?
23     A.  No, I have not.
24     Q.  Paragraph 56 on the next page, it says that
25  "Plaintiff's claims are typical of the claims of the

CHRISTINE HEAD
DECEMBER 5, 2019

HEAD VS. CITIGROUP, INC.
18-CV-08189-DLR

---

### Page 77

1  members of the class and subclass."
2      Do you believe that you're typical of Citibank
3  customers who might have received phone calls using a
4  dialer or prerecorded voice?
5      MR. BOYLE: Objection.
6      THE WITNESS: No, I don't believe so.
7      Q.  BY MR. SASSO: And do you have any reason to
8  believe that your claims are typical of Ms. Bonoan's
9  claims?
10     MR. BOYLE: Objection.
11     THE WITNESS: I think our claims are the same.
12     Q.  BY MR. SASSO: What is that belief based on?
13     A.  That we were non-Citibank customers and we were
14  receiving phone calls for Home Depot cards that we never
15  had by automated robocalls.
16     MR. SASSO: Mark this as the next one, please.
17     (Deposition Exhibit No. 3 was marked for
18  identification.)
19     Q.  BY MR. SASSO: So Exhibit 3 which you just were
20  handed is the second amended complaint, but it's redlined
21  against the first amended complaint so you can see the
22  changes, and this is how it was submitted by your
23  attorneys to the court, because they have to show the
24  court kind of where the changes are.
25     A.  Okay.

---

### Page 78

1      Q.  I guess my only question is before today, have
2  you reviewed the, I guess, proposed edits to your
3  complaint?
4      A.  I haven't seen a document like this, no.
5      Q.  Have you seen the second amended complaint
6  without the redlines?
7      A.  Yes.
8      Q.  And were there any changes that you made to that
9  second amended complaint?
10     A.  No.
11     Q.  And as you sit here today, do you know what the
12  status is of your counsel's efforts to get this amended
13  complaint submitted and, I guess, approved by the Court?
14     A.  I'm not exactly positive on what's been approved
15  or disapproved.
16     Q.  Are you aware if there have been any other
17  depositions in the case so far?
18     A.  No, not that I'm aware of.
19     MR. SASSO: Off the record.
20     (Brief interruption in the proceedings.)
21     MR. SASSO: We can go back on the record.
22     Q.  BY MR. SASSO: I asked you earlier if there were
23  any felonies or sort of criminal records and we talked a
24  little bit about it, you identified one was that the
25  charge originally was a burglary charge but got, I guess,

---

### Page 79

1  a non or undesignated -- how did you describe it again, a
2  dropped --
3      A.  As long as I completed my probation, it was to
4  be an undesignated offense.
5      Q.  So in the public records search, there were some
6  other instances that popped up and I want to walk through
7  them, because the records were actually not entirely
8  clear.
9      A.  Okay.
10     Q.  So the first one was January -- sorry, the
11  burglary one we talked about, you said that was 1998?
12     A.  I don't remember exactly what year that was.  It
13  was about 20 years ago.
14     Q.  I guess at that point it would be roughly around
15  that.  Do you recall having a marijuana violation charge?
16     A.  I have had a paraphernalia charge.
17     Q.  Was that a felony charge?
18     A.  No, it was a misdemeanor.
19     Q.  Do you know when that was?
20     A.  I can't remember.  It's been a long time ago.
21     Q.  Does 1998 sound approximately right?
22     A.  Somewhere in there.  I don't know.  I'd have to
23  actually look at my record and see it.
24     Q.  Do you know how it was resolved?
25     A.  I believe it was dismissed, but I'm not

---

### Page 80

1  positive.  It's been a long time.
2      Q.  Was there not any conviction or anything like
3  that?
4      A.  I don't recall.
5      Q.  Then there was a false report to law enforcement
6  record from charges filed April 1, 2009.  Do you recall
7  that?
8      A.  Yes, that was involving a domestic issue.
9      Q.  Was that a misdemeanor or felony; do you recall?
10     A.  It was a misdemeanor.
11     Q.  Do you recall how that was resolved?
12     A.  Through the courts, I was to make payments on
13  the fine they imposed on me.
14     Q.  Are you still making the payments or are those
15  done?
16     A.  I have to double-check with the court, but I
17  think the payments on that one are done, but I'm not
18  positive.
19     Q.  I think I asked, you said that the drug
20  paraphernalia charge, looks like there's a second one?
21     A.  I've only had one.
22     Q.  So on the drug paraphernalia, possession of drug
23  paraphernalia charge, you entered a guilty plea, is that
24  right, and placed on probation; is that right?
25     A.  As far as I know, yes.

---

## Page 81

1    Q.  And then after the probation was terminated, it
2    was reduced to as a class 1 misdemeanor.  Does that seem
3    right?
4        A.  I think so.  I can't remember exact details,
5    because that was a long time ago.
6        Q.  It looks like it was February 13th, 1998.
7        A.  Sounds about right.
8        Q.  And then there was, looks like two records that
9    we found, one March of 2003 and one November 2003 and
10   they were identified as criminal, but not traffic, and it
11   looks like they were, I don't know if this is right, but
12   charged with dog at large.  Does that sound familiar?
13       A.  Yes, my dog got out of the yard and they
14   threatened to take my license for that.
15       Q.  What license?
16       A.  My driver's license.
17       Q.  And then you paid fines for that?
18       A.  Yes, and my dog stayed in the yard.
19       Q.  And then I think I may have said this one
20   already, but a false report to law enforcement from
21   April 1, 2009?
22       A.  Yes.
23       Q.  Do you recall that?
24       A.  Yes, I do.
25       Q.  How was that resolved?

## Page 82

1        A.  Through court-ordered fines.
2        Q.  Do you recall if that was a misdemeanor or
3    felony?
4        A.  It was a misdemeanor.
5        Q.  So other than the ones we've talked about, any
6    other criminal cases that we haven't covered?
7        A.  No.
8            MR. SASSO:  Let me do another short break and I
9    think I may be close.
10           MR. BOYLE:  Fair enough.
11           (The deposition was at recess from 12:52 p.m. to
12   12:57 p.m.)
13       Q.  BY MR. SASSO:  So just a couple final questions.
14   In terms of when the calls stopped, do you know if the
15   calls stopped in mid-December 2017?
16       A.  I don't remember when they stopped.  I know that
17   I got calls for quite some time.
18       Q.  And if we were to try to figure out when the
19   calls stopped, are you aware of any documents that would
20   help you identify when your last call was that you
21   received?
22       A.  No, I don't have any documents like that.
23       Q.  When you stopped working for Mr. Miller, did you
24   get kind of, like, a termination letter or anything
25   showing when your last day was?

## Page 83

1        A.  No, and he paid me cash, so...
2            MR. SASSO:  I think that's all I have.
3            MR. BOYLE:  I just have a couple quick
4    questions.
5
6            EXAMINATION
7    BY MR. BOYLE:
8        Q.  Ms. Head, earlier in your testimony I believe
9    you referred to the law firm that you reached out to as
10   Meyers Wilson.  Do you recall that?
11       A.  No -- yes, I do.  It's Meyer Wilson.
12       Q.  So in that testimony when you were referring to
13   the law firm you reached out to, your understanding is
14   the name of that law firm is Meyer Wilson; correct?
15       A.  Yes, I understand that.
16       Q.  I'd like you to turn to Exhibit No. 2 that
17   Mr. Sasso provided you.
18       A.  Okay.
19       Q.  And in particular, take your time, but I'd like
20   you to turn to paragraph 50 of that document.  In
21   paragraph 50, do you see the section that is sort of
22   indented and labeled Class?
23       A.  Yes.
24       Q.  I'm just going to ask you a couple questions
25   relating to the times.  The calls that you received that we've

## Page 84

1    been discussing during the course of this deposition, who
2    is your understanding of on whose behalf those calls were
3    made?
4        A.  They stated Citibank, on behalf of a Home Depot
5    account.
6        Q.  And is it your testimony that the calls were
7    made to a cellular telephone number?
8        A.  Yes.
9        Q.  And is it your testimony that the calls that you
10   received involved an artificial and prerecorded voice?
11       A.  Yes, they did.
12       Q.  And I know there was a -- we had some discussion
13   about the times of those calls, but can you testify have
14   that the calls were made to you after August 15th, 2014?
15       A.  Yes.
16       Q.  And I believe your testimony was that you were
17   not and are not a Citibank customer.  Is that correct?
18       A.  That's correct.
19       Q.  Turning for a moment to the second indented
20   portion that says "Subclass"; do you see that portion?
21       A.  Yes, I do.
22       Q.  Based on the messages that you received in
23   connection with the calls that we've been discussing
24   throughout the day, what is your understanding of the
25   nature or type of credit card that Citibank was calling



## Page 85

1  with regard to?
2  A.  They stated they were calling in reference to a
3  Home Depot credit card.
4  Q.  And one last question.  I believe you testified
5  for some period of time with regard to entering into this
6  lawsuit with your counsel.  Do you recall that?
7  A.  Yes, I do.
8  Q.  At any time, were you promised any sort of
9  payment in connection with serving as a class
10  representative?
11  A.  No.
12  MR. BOYLE:  I have no further questions.
13
14  RE-EXAMINATION
15  BY MR. SASSO:
16  Q.  One kind of final question I should have asked
17  before but I didn't:  When we were talking about the
18  criminal record that we talked about that you had, the
19  2009 false report to law enforcement, what was the nature
20  of that report?
21  A.  My now ex-husband and I were having a domestic
22  issue and subsequently, law enforcement was called and
23  they asked who the name was of the person that was
24  getting violent with me and I gave them the wrong name.
25  Q.  And the judgment that we talked about earlier

## Page 86

1  that relates to the car loan or car payment with Westlake
2  Financial, I think the name was, is that judgment still
3  open?  Pending?  Are you still paying it?
4  A.  I haven't gotten any letters from them in a
5  while and I was making payments, but I haven't in quite
6  some time.  I was trying to pay back for the repo'd auto.
7  Q.  So as far as you know as you sit here today, do
8  you know one way or the other if it's still pending?
9  A.  I don't know.
10  Q.  Let me ask the question different.  As you sit
11  here today, do you know if you still owe anything on the
12  judgment?
13  A.  I don't believe I do, but I haven't checked in a
14  while.
15  MR. SASSO:  I have no more questions.  Thank
16  you.
17  (The deposition concluded at 1:03 p.m.)
18
19
20
21      (Signature not requested.)
      _____
22      CHRISTINE HEAD
23
24
25

## Page 87

1  STATE OF ARIZONA      )
                         ) ss.
2  COUNTY OF MARICOPA    )
3  -- BE IT KNOWN that the foregoing proceedings
   were taken before me; that the witness before testifying
4  was duly sworn by me to testify to the whole truth; that
   the questions propounded to the witness and the answers
5  thereto were taken down by me in shorthand and
   transcribed under my direction; that the foregoing is a
6  full, true, and accurate transcript of all proceedings
   had, all done to the best of my skill and ability.
7
   I FURTHER CERTIFY that I am not related to, nor
8  employed by any of the parties hereto, and have no
   interest in the outcome thereof.
9
      Review and signature was requested.
10     Review and signature was waived.
    X  Review and signature was not requested.
11
   I CERTIFY that I have complied with the ethical
12 obligations set forth in ACJA 7-206(F)(3) and
   7-206(J)(1)(g)(1) and (2).  Dated at Scottsdale, Arizona,
13 this 9th day of December, 2019.
14
15
16     DOREEN SUTTON, RPR, CSR, FAPR
17       Certified Reporter
         Certificate No. 50076
18       ***
19
   I CERTIFY that JD REPORTING, INC., has complied
20 with the ethical obligations set forth in ACJA
   7-206(J)(1)(g)(1) through (6).
21
22
23     JD REPORTING, INC.
24       Registered Reporting Firm
         Arizona RRF No. R1012
25