Matthew R. Wilson (*admitted pro hac vice*)
Michael J. Boyle, Jr. (*admitted pro hac vice*)
Meyer Wilson Co., LPA
305 W. Nationwide Blvd.
Columbus, Ohio 43215
(614) 224-6000
(614) 224-6066 (Fax)
mwilson@meyerwilson.com
mboyle@meyerwilson.com

Michael L. Greenwald (*admitted pro hac vice*)
Aaron D. Radbil (*admitted pro hac vice*)
Greenwald Davidson Radbil PLLC
7601 N. Federal Highway, Suite A-230
Boca Raton, Florida 33487
(561) 826-5477
mgreenwald@gdrlawfirm.com
aradbil@gdrlawfirm.com

Counsel for Plaintiff and the proposed class

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christine Head, *on behalf of herself and others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>Citibank, N.A.,<br><br>Defendant. | No.: 3:18-cv-08189-ROS<br><br>**PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL** |

## Request for Relief

Christine Head respectfully requests that this Court certify the following class, appoint her as representative for the class, and appoint Meyer Wilson Co., LPA ("Meyer Wilson") and Greenwald Davidson Radbil PLLC ("GDR") as counsel for the class:

> All persons and entities throughout the United States (1) to whom Citibank, N.A. placed a call in connection with a past-due credit card account, (2) directed to a number assigned to a cellular telephone service, but not assigned to a current or former Citibank, N.A. customer or authorized user, (3) via its Aspect dialer and with an artificial or prerecorded voice, (4) from August 15, 2014 through the date of class certification.

## The Telephone Consumer Protection Act

"Americans passionately disagree about many things. But they are largely united in their disdain for robocalls." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2343 (2020) (Kavanaugh, J.).

Against that backdrop, the "TCPA prohibits persons from (1) making 'any call,' (2) 'using any automatic telephone dialing system or an artificial or prerecorded voice,' (3) 'to any telephone number assigned to a . . . cellular telephone service. . . .'" *Grant v. Capital Mgmt. Servs., L.P.*, 449 F. App'x 598, 600 (9th Cir. 2011). Of note, "[e]xpress consent is not an element of a plaintiff's prima facie [TCPA] case." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017). Rather, it "is an affirmative defense for which the defendant bears the burden of proof." *Id*.

## Background

"The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back." *Barr*, 140 S. Ct. at 2343. But it is not only the people's representatives who are fighting back against these ubiquitous, annoying calls. The people—like Christine Head here—are, too. In short, Ms. Head grew tired of incessant robocalls from Citibank that were meant for someone else. And she is not alone as it is quite likely that hundreds

of thousands of other people around the country also would like similar calls to stop. As Chief Justice Roberts recently said of the TCPA: "It's an extremely popular law. Nobody wants to get robocalls on their cell phone."[1]

Here, Ms. Head's claims arise from robocalls Citibank placed to non-customers. Thus, consent Citibank may have to robocall its own customers is irrelevant. *See N.L. by Lemos v. Credit One Bank, N.A.*, 960 F.3d 1164, 1166 (9th Cir. 2020) ("The principal question in this case is whether Credit One can escape liability under the TCPA because the party it intended to call (its customer) had given consent to be called, even though the party it actually called had not. Consistent with every circuit to have addressed this issue, we hold that this argument fails under the TCPA's text, most naturally read.").

## Statement of Relevant Facts

**I.   Citibank places *hundreds of millions* of robocalls each year.**

Citibank employs more than 2,000 agents to place outbound robocalls regarding delinquent credit card accounts. *See* Transcript of Deposition of Amy Mullahey pursuant to Rule 30(b)(6) ("Mullahey Dep."), attached as Exhibit A, at 174:1-5. Accordingly, Citibank estimates it places *over one million outbound calls each day* regarding delinquent credit card accounts. *Id*. at 176:8-177:10 ("So, I mean, we could – we could easily make a million calls or more."). Since August 14, 2014, therefore, Citibank likely placed more than *2.5 billion* outbound calls regarding delinquent credit card accounts.

These outbound calls—which Citibank placed through its Aspect dialing system—involved hundreds of thousands of accounts, if not more. *Id*. at 173:5-24 ("I can tell you we have a lot of delinquent customers, right? I mean, that's what – that's what our business is. Our business is calling customers who are delinquent."). To be sure, "[a]s part of its portfolio of consumer financial services, Citibank issues and services credit cards, encompassing over 142 million accounts." Expert Report of Margaret A. Daley, ECF No. 99, ¶ 34. And Citibank used its Aspect dialer to place outbound calls throughout the

---

[1] Transcript of Oral Argument (May 6, 2020), at 40:20-22, http://www.supremecourt.gov/oral_arguments/argument_transcripts/2019/19-631_omjp.pdf

2

proposed class period regarding past-due credit card accounts to persons located in more than 40 states, including Arizona. Mullahey Dep. at 152:22-153:24.

Significantly, in connection with these outbound calls regarding past-due credit card accounts, Citibank also delivers prerecorded voice messages. *See* Transcript of Deposition of Matthew Roe pursuant to Rule 30(b)(6) ("Roe Dep."), attached as Exhibit B, at 41:14-22; 42:12-20; Mullahey Dep. at 37:12-17; 38:6-10.

**II.    Citibank maintains records of all prerecorded messages it delivered using its Aspect dialer during the proposed class period, and can verify whether a particular person was a credit card accountholder or user.**

Citibank maintains records of all telephone numbers it called using its Aspect dialer and can identify each prerecorded voice message it delivered. Thus, "if given a particular 10-digit telephone number, Citibank can search its records for the Aspect Dialing System to determine whether at least one artificial or prerecorded voice message may have been delivered to the phone number for the [proposed class] period." *See* Citibank's Response to Request for Admission No. 11, attached as Exhibit C. Citibank can also identify the date(s) it delivered each prerecorded message. *Id*. at nos. 10-12. Likewise, given a full name or social security number, Citibank can determine whether a particular person is, or was, a Citibank accountholder. Mullahey Dep. at 68:8-70:14.

**III.   Citibank notates telephone numbers as potential wrong numbers—and those it should cease calling—only when it is so informed.**

Citibank enters particular notations when a call recipient informs it that it is calling a wrong number, resulting in a "wrong party" disposition both in the Aspect dialer and in Citibank's system of record. *Id*. at 83:2-8, 85:1-7, 94:20-95:1; Roe Dep. at 50:23-51:1, 51:13-17, 53:7-14. For at least the past three years, Citibank has generated a daily report reflecting all calls dispositioned as wrong party, which includes the telephone numbers at issue. Mullahey Dep. at 83:12-18, 94:4-7.

Citibank uses a separate notation to signify when it is to cease calling a particular telephone number. *Id*. at 71:12-20, 104:4-12, 104:16-18, 118:13-15. Citibank also uses specific notations to designate when it attempts to deliver prerecorded voice messages.

3

**IV.    Citibank placed approximately 110 calls, and delivered 23 prerecorded voice messages, to Ms. Head's cellular telephone number during the class period.**

Ms. Head was the sole and customary user of her cellular telephone number—(928) XXX-0023—at the time Citibank placed calls to it. *See* Transcript of Deposition of Christine Head ("Head Dep."), attached as Exhibit D, at 20:10-21:1-12, 21:19-22:17, 23:1-11 ("I was the only person that had the phone, no one else had access to it at all."), 63:1-64:7 ("I was the only person that used that phone, yes.").

More specifically, Citibank used its Aspect dialer to deliver 23 prerecorded voice messages (and place approximately 110 calls) to Ms. Head's cellular telephone.[2] Mullahey Dep. at 35:18-36:16, 36:11-18, 39:18-22, 46:17-23; *see also* Roe Dep. at 54:23-56:6.

Ms. Head answered some of Citibank's calls, none of which included a live person on the other end. Head Dep. at 38:19-3:20 ("… it was just a robot, you can't talk to a robot."), 41:1-3 (Q. For any of the calls that you answered, was there ever a live person on there? A. No."), 65:2-6. At one point, Ms. Head called Citibank to inform it that it was calling the wrong number and to stop calling. *Id*. at 42:14-25. Citibank placed Ms. Head on an extended hold; she ultimately ended the call. *Id*. at 43:13-44:5, 69:11-70:15.

**V.    Citibank did not have any relationship with Ms. Head, and Ms. Head did not give Citibank prior express consent to place calls to her cellular telephone.**

Ms. Head does not have, and never had, a Citibank credit card. *See* Head Dep. at 14:3-15, 23:23-25, 32:3-5, 65:20-66:3 (Q. And just to confirm again, you've never, as far as you're aware, you've never had a credit card with Citibank; right? A. No, I have not."), 84:6-18; Mullahey Dep. at 66:3-5. None of the prerecorded voice messages Citibank delivered to Ms. Head's cellular telephone were intended for her; rather, they were all intended for a person named Jack Bingham. Mullahey Dep. at 65:15-17 ("Q. Were any of Citibank's calls to the 0023 telephone number intended for Christine Head? A. No."); *id*. at 65:10-14, 116:7-15. Ms. Head does not know Mr. Bingham, Head Dep. at 28:15-21, and Ms. Head did not provide Citibank with consent to call her. Mullahey Dep. at 75:24-76:3.

---

[2]    Citibank's records note that Ms. Head's -0023 telephone number was assigned to a cellular telephone service. Mullahey Dep. at 60:2-4.

4

**VI.  Citibank did not confirm that Ms. Head's cellular telephone number belonged to the intended recipient before delivering prerecorded messages to it.**

Citibank claims to have obtained Ms. Head's cellular telephone number from one of its accountholders.[3] Mullahey Dep. at 75:4-10. But after receiving the 0023 telephone number, Citibank took no steps to verify that the telephone number in fact belonged to its accountholder before delivering prerecorded voice messages to it. *Id*. at 76:4-9, 76:18-24.[4]

**VII.  Given the high frequency of cellular telephone number reassignment, the billions of robocalls it made during the class period, and the millions of telephone numbers it identified as potential wrong numbers, Citibank likely delivered prerecorded voice messages to tens of thousands of non-customers.**

"Citibank customers, like all users of cellular phones, sometimes discontinue their cellular service, and that telephone number can be reassigned to a new user." *See* Expert Report of Margaret A. Daley, ECF No. 99, ¶ 34. In 2017, the FCC noted that approximately 25 million telephone numbers are disconnected each year, and 100,000 numbers are reassigned by wireless carriers every day. *Id*., ¶ 37 n.24. In 2016, the industry-wide rate of telephone number reassignment—or "churn"—was 26.3%. *Id*. Among prepaid accounts, the annual reassignment rate was 57.5%. *Id*.; *see also* ECF Nos. 99-4, 99-5, 99-6. And as Citibank's expert explained, this "problem" is particularly acute "when cellular number owners are experiencing financial distress – the precise type of person Citibank may be contacting due to overdue payments." *Id*. That is, a substantial percentage of the cellular telephones to which Citibank delivers prerecorded messages change hands every year.

And as Defendant's expert acknowledges, "[g]iven the rate of reassigned cellular numbers it is impossible not to periodically reach a wrong number." *Id*., ¶ 88 ("This is not to say that Citibank does not on occasion reach wrong numbers.").

---

[3]  The record is devoid of any testimony from Mr. Bingham, the person Citibank says provided Ms. Head's cellular telephone number to it, corroborating Citibank's account.

[4]  For part of the class period, Citibank used a vendor to identify when cellular telephone numbers it associated with its customers were reassigned. *Id*. at 61:15-62:10. But apart from looking at reassignment, Citibank "does not take steps to verify" whether telephone numbers provided by its accountholders belong to them. *Id*. at 76:19-22.

### VIII. Citibank identified millions of telephone numbers as potential wrong or bad telephone numbers, including Ms. Head's.

Given the substantial rate of telephone number reassignment and the tremendous number of delinquent credit card accounts it services, it is not surprising that for only a two-year portion (November 2017-December 2019) of the proposed seven-year class period, Citibank identified nearly *five million* telephone numbers in its records that it designated as potential wrong numbers, or telephone numbers it should "cease-and-desist" calling. *See* ECF No. 99-11, Declaration of Margaret A. Daley, March 12, 2020, ¶ 3.

More specifically, in 2017, Citibank began archiving the date on which it added designations to telephone numbers in its system—such as "wrong party" or "cease-and-desist" designations. Mullahey Dep. at 118:3-15. As a result, Citibank is able to generate, in an automated fashion, a list of all telephone numbers to which it attached a wrong party designation, or a cease-and-desist designation, since 2017. *Id*. at 119:3-7.

Of those nearly five million telephone numbers that had "been designated within Citibank's records as possible wrong numbers" during just two years of the seven-year class period, Citibank's expert selected a sample of 1,000. *See* Renewed Declaration of Margaret A. Daley, attached as Exhibit E, ¶ 15. Of those 1,000 telephone numbers, Citibank's expert identified 346 wireless telephone numbers dialed by Citibank via its Aspect dialer during the proposed class period. *Id*. Citibank attempted to deliver at least one prerecorded message to 201 (or 58.1%) of those cellular telephone numbers. *Id*. at ¶ 16. Extrapolating the percentage of "possible wrong numbers" that were cellular and to which Citibank attempted to deliver a prerecorded message (20.1%) for the entire data set, it stands to reason that Citibank delivered prerecorded voice messages to approximately 1 million cellular telephone numbers it identified "as possible wrong numbers."[5]

Of note, Citibank ultimately assigned a "cease and desist" designation to Ms. Head's 0023 cellular telephone number. Mullahey Dep. at 103:10-104:12.

---

[5]    This is for only a portion of the class period. It can be reasonably inferred that Citibank delivered *millions* of prerecorded messages to *millions* of cellular telephones it designated as potential wrong numbers during the entire seven-year class period.

6

**Argument**

**I.  Ms. Head's proposed class is well suited for class treatment.**

"Class certification is normal in litigation under [the TCPA], because the main questions . . . are common to all recipients." *Ira Holtzman, C.P.A., & Assocs. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013); *accord Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 656 (4th Cir. 2019) ("Given the remedial purpose of the TCPA, it is no surprise that its cause of action would be conducive to class-wide disposition. . . . Since few individuals would have an incentive to bring suit, no matter how frustrated they were with the intrusion on their privacy, the TCPA opted for a model that allows for resolution of issues without extensive individual complications."); *Bennett v. GoDaddy.com, LLC*, No. 16-CV-03908-PHX-ROS, 2019 WL 1552911, at *5 (D. Ariz. April 8, 2019) (Silver, J.) ("Countless courts have certified classes under the TCPA. . . .").

And this is especially true in non-debtor and wrong-number cases, like this one, where courts do not have to inquire as to whether each putative class member may be subject to an independent consent defense. *See, e.g.*, *Knapper v. Cox Commc'ns, Inc.*, 329 F.R.D. 238 (D. Ariz. 2019) (Logan, J.) (certifying over the defendant's objection a "wrong number" TCPA class); *Brown v. DirecTV, LLC*, 330 F.R.D. 260 (C.D. Cal. 2019) (same); *Reyes v. BCA Fin. Servs., Inc.*, No. 16-24077-CIV-Goodman, 2018 WL 3145807 (S.D. Fla. June 26, 2018) (same), *reconsideration denied,* 2018 WL 5004864 (S.D. Fla. Oct. 15, 2018), *vacated by joint motion,* 2020 WL 1846165 (S.D. Fla. Mar. 18, 2020); *Lavigne v. First Community Bankshares, Inc.*, No. 1:15-cv-00934-WJ/LF, 2018 WL 2694457 (D.N.M. June 5, 2018) (same); *West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295 (N.D. Cal. 2017) (same); *Johnson v. Navient Sols., Inc.*, 315 F.R.D. 501 (S.D. Ind. 2016) (same); *Abdeljalil v. Gen. Elec. Capital Corp.*, 306 F.R.D. 303, 306 (S.D. Cal. 2015) (same); *see also Reid v. I.C. Syst. Inc.*, No. 2:12-cv-02661-ROS, Doc. 230 (D. Ariz. Nov. 9, 2017) (Silver, J.) (certifying for settlement purposes a "wrong number" TCPA class); *James v. JPMorgan Chase Bank, N.A.*, No. 8:15-CV-2424-T-23JSS, 2016 WL 6908118, at *1 (M.D. Fla. Nov. 22, 2016) (same); *Munday v. Navy Fed. Credit Union*, No.

SACV151629JLSKESX, 2016 WL 7655807, at *12 (C.D. Cal. Sept. 15, 2016) (same); *accord McMillion v. Rash Curtis & Assocs.*, No. 16-CV-03396-YGR, 2017 WL 3895764, at *10 (N.D. Cal. Sept. 6, 2017) (certifying two "non-debtor" TCPA classes).

**II.     Ms. Head satisfies the requirements of Rule 23(a).**

   **A. The proposed class is so numerous that joinder of all members is impracticable.**

   The first requirement of Rule 23(a) is that the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The requirement is met if, due to class size, it would be extremely difficult or inconvenient to join all class members." *Brink v. First Credit Res.*, 185 F.R.D. 567, 569 (D. Ariz. 1999) (Silver, J.). "[I]n light of prevailing precedent, the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable, and the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone." *Amone v. Aveiro*, 226 F.R.D. 677, 684 (D. Haw. 2005) (citing *Newberg & Conte, 1 Newberg on Class Actions* § 3.6 (4th ed. 2002)). Consequently, "courts [generally] find the numerosity requirement satisfied when a class includes at least 40 members." *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010); *see also Jordan v. Freedom Nat'l Ins. Servs. Inc.*, No. 16-cv-362-PHX-DLR, 2016 WL 5363752, at *3 (D. Ariz. Sept. 26, 2016) (Rayes, J.) (certifying class action).

   Here, for only a minority portion of the class period, Citibank identified nearly five million telephone numbers it associates with credit card accounts, which are potential wrong numbers. *See supra*, Statement of Facts, Sections III, VIII. And Citibank's expert's analysis shows approximately 20.1% are cellular telephone numbers to which Citibank attempted to deliver at least one prerecorded voice message during only a portion of the class period. *See id.*, Section VIII. Moreover, Citibank makes over one million outbound calls each day regarding past-due credit card balances to consumers in over 40 states— more than 2.5 billion such calls during the proposed class period. *See id.*, Section I.

   Given the tremendous number of prerecorded voice messages Citibank delivered to cellular telephone numbers that its records designate as potentially wrong or bad numbers,

and in light of the frequency of cellular telephone number reassignment, it stands to reason that the proposed class is sufficiently numerous such that joinder is impracticable. *See, e.g.*, *Lavigne*, 2018 WL 2694457, at *3-4 (finding numerosity satisfied in a proposed wrong-number TCPA class where "Defendants' own call logs . . . identify 38,125 separate phone numbers (both landline and cell phone) that called in, [and] were coded as 'Bad/Wrong Number,'" and explaining that "[e]ven if only a fraction of the approximately 38,125 are in fact class members, the numerosity requirement here is readily satisfied."); *Torres v. Goddard*, 314 F.R.D. 644, 654–55 (D. Ariz. 2010) (McNamee, J.) ("court is entitled to make 'common sense assumptions' in order to support a finding of numerosity") (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)); *see also Valenzuela v. Ducey*, No. CV-16-03072, 2017 WL 6033737, *5 (D. Ariz. Dec. 6, 2017) (Campbell, J.) ("Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.") (internal citation omitted); *Drossin v. Nat'l Action Fin. Servs., Inc.*, 255 F.R.D. 608, 614-15 (S.D. Fla. 2009) (finding a proposed class to be sufficiently numerous where the number of class members was an unknown subset of 30,139 individuals, and noting that it was reasonable to assume that fifty of the "tens of thousands" of people the defendant called were class members).

**B. Questions of law and fact are common to all members of the proposed class.**

Rule 23(a)(2) requires the existence of common questions of law or fact. Fed. R. Civ. P. 23(a)(2). The showing required to meet the commonality requirement is "minimal" and "not high." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). As well, "Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.* at 1019.

This case presents several common questions. First, whether Citibank utilized a prerecorded voice in connection with its calls to class members is a common question. *See Bennett*, 2019 WL 1552911, at *5 (certifying TCPA class action and noting that, like here,

9

"Defendant used the same dialing system to call Plaintiff and all putative class members.").

Second, that each class member suffered the same injury and is entitled to the same statutorily mandated relief gives rise to another common question. *See Lavigne*, 2018 WL 2694457, at *4 ("Plaintiff identifies a number of common questions of law or fact: . . . . • whether the class suffered the same injury, receipt of call in violation of the TCPA."); *Gehrich v. Chase Bank USA, N.A.*, No. 12 C 5510, 2016 WL 806549, at *4 (N.D. Ill. Mar. 2, 2016) ("Each class member suffered roughly the same alleged injury: receipt of at least one phone call or text message from Chase to her cell phone."); *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 251 (N.D. Ill. 2014) ("Those who are members of one of the proposed classes by definition received the same calls . . . made by or for one of the defendants, using the same artificial or prerecorded voice technology. This is a common alleged injury presenting a common question . . . .").

Finally, another common question is whether callers are liable under the TCPA for calls placed to wrong or reassigned telephone numbers. *See Lemos*, 960 F.3d at 1166.

As Judge Logan summarized:

> Whether Defendant used an [] artificial or prerecorded voice to allegedly call the putative class members would produce an answer that is "central to the validity of each claim in one stroke." *Mazza*, 666 F.3d at 588. As would whether liability attaches for wrong or reassigned numbers. This is so even if what triggers liability for wrong or reassigned numbers were to change. Likewise, whether consent was or was not given is a common question applicable to the class. Lastly, all putative class members allegedly suffered the same injury—a receipt of at least one phone call by Defendant in violation of the TCPA. (Doc. 43 at 9.) Thus, whether each class member suffered the same injury is also a "common contention." *Mazza*, 666 F.3d at 588. Therefore, commonality is satisfied.

*Knapper*, 329 F.R.D. at 242.

**C. Ms. Head's claims are typical of the claims of the members of the class.**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties be typical of the claims or defenses of the class." To that end, "the commonality and typicality requirements of Rule 23(a) tend to merge." *Bogner v. Masari Investments, LLC*, 257

10

F.R.D. 529, 532 (D. Ariz. 2009) (Campbell, J.) (citing *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 510-11 (N.D. Cal. 2007)). That is, a claim "is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of the other class members and his or her claims are based on the same legal theory." *Id*.

Here, Ms. Head and the members of the class were each harmed in the same way by Citibank's common practice of placing calls with a prerecorded voice to cellular telephone numbers that did not belong to Citibank accountholders. Moreover, because Citibank indisputably used its Aspect dialer to deliver prerecorded messages to Ms. Head's cellular telephone number (a non-customer), *see supra*, Statement of Facts, Sections IV-VI, Ms. Head's claims are typical of those of the class members. *See Knapper*, 329 F.R.D. at 242-43; *McMillion*, 2017 WL 3895764, at *7 ("Additionally, with respect to Perez, the analysis conducted by plaintiffs' expert demonstrates that he, like the members of the Non-Debtor classes, never had a debt collection account with Rash Curtis. Accordingly, the Court finds that Perez has satisfied Rule 23(a)(3)'s typicality requirement .…").

**D. Ms. Head, and her counsel, will fairly and adequately protect the interests of the members of the proposed class and thus satisfy Rules 23(a)(4) and 23(g).**

Rule 23(a)(4) requires that the named plaintiff fairly and adequately protect the interests of the class. This prerequisite is met by showing that: (1) the proposed representative does not have conflicts of interest with the proposed class; and (2) the representative plaintiff is represented by qualified counsel. *Hanlon*, 150 F.3d at 1020.

Here, Ms. Head is capable of, has, and will continue to protect the interests of the proposed class. She communicates regularly with her counsel, responded to Citibank's discovery requests, traveled for deposition, and is prepared to make all necessary decisions involving this case with class members' best interests in mind. *See generally* Ex. D.

Ms. Head retained counsel with long experience in class action litigation, including that under the TCPA, and who are ably qualified to serve the proposed class here. *See* Declaration of Michael L. Greenwald, ¶¶ 9-37, attached as Exhibit F; Declaration of Matthew R. Wilson, ¶¶ 3-9, attached as Exhibit G.

11

### III. Ms. Head satisfies the requirements of Rule 23(b)(3).

#### A. The questions of law and fact common to the members of the proposed class predominate over any questions affecting only individual class members.

The predominance factor "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S. Ct. 2231, 138 L.Ed.2d 689 (1997). The focus of the predominance inquiry is on "the relationship between the common and individual issues." *Hanlon*, 150 F.3d at 1022. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Id*.

Here, Ms. Head and the members of the class must show that: "(1) the defendant called a cellular telephone; (2) using an [artificial or prerecorded voice]; (3) without the recipient's prior express consent." *Mendez v. C-Two Grp., Inc.*, No. 13-cv-05914-HSC, 2015 WL 8477487, at *7 (N.D. Cal. Dec. 10, 2015) (certifying TCPA class action) (quoting *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012)).

That the members of the proposed class are non-customers of Citibank, who did not provide Citibank with consent to place calls to their cellular telephone numbers, means that express consent does not serve as an obstacle to predominance, as it might in other scenarios arising under the TCPA. *See Abdeljalil*, 306 F.R.D. at 311 (rejecting the defendant's argument that consent defeated predominance in connection with a TCPA "wrong-number" class, and finding that "plaintiff has met his burden of demonstrating that questions of fact and law predominate over individualized issues").

But even if issues regarding prior express consent existed—they do not—common issues would still predominate. *See Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 699 (S.D. Fla. 2015) ("The Court agrees with the Court in *Reliable Money Order, Inc. v. McKnight Sales Co.*, 281 F.R.D. 327, 338 (E.D. Wis. 2012), *aff'd,* 704 F.3d 489 (7th Cir. 2013), that any issues relating to whether any of the recipients gave permission to receive faxes prior to transmission or whether any of the plaintiffs had an established

12

business relationship with the defendant can be handled within the framework of a class action."); *accord James*, 2016 WL 6908118, at *1 ("Also, the class satisfies Rule 23(b)(3)'s predominance requirement. Class-wide proof can answer the predominant questions (whether Chase auto-dialed each person and whether each call violates the TCPA).").

Additionally, other potential issues—such as "difficult damage calculations, individual determinations of who the telephone user was, when the call was made and proof that [the defendant] actually made the calls . . . difficult[y] [in] determining the identity of users . . . [and] the distinct possibility that every record marked as a wrong number may not have actually been a wrong number," *Johnson*, 315 F.R.D. at 502—do not stand in the way of a finding of predominance. *See id*. (certifying a "wrong-number" TCPA class, and rejecting the defendant's contention that individual issues would "overwhelm the litigation and destroy the required commonality of facts"); *West*, 323 F.R.D. at 301-02 ("Defendant does not persuade. As an initial matter, several district courts have deemed commonality and predominance satisfied in TCPA cases despite the possibility that a substantial proportion of the phone numbers marked as 'wrong number' in defendant's call log databases 'may not have actually been a wrong number.'").

**B. A class action is superior to other available methods for the fair and efficient adjudication of this matter.**

Rule 23(b)(3) also requires that a district court determine that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3) (setting forth superiority factors); *accord In re Az. Theranos, Inc. Litig*., No. 2:16-cv-2138, 2020 WL 5435299, at *8-*9 (D. Ariz. March 6, 2020) (Holland, J.) (certifying class action).

In general, litigating TCPA claims as part of a class action is superior to litigating them in successive individual lawsuits. *See Bennett*, 2019 WL 1552911, at *13 ("Overall, the 'superiority' inquiry comes down to whether it is better to have a single class action seeking relief on behalf of [redacted] individuals or some other, unidentified alternative.

13

Realistically, the only alternative is for Defendant to avoid effectively all liability for its actions. A class action is far superior to the alternative of most of the allegedly harmed individuals obtaining no relief.") (internal citation omitted). This is especially true here, where the class likely has tens of thousands of members, if not more.

Additionally, the claims of the proposed class are identical, they arise from the same standardized conduct, and they result in uniform damages calculated on a per-violation basis. *See Knapper*, 329 F.R.D. at 247 ("Should individual putative class members choose to file claims on their own, given the potential class size and the relatively small amount of statutory damages for each case, individual litigation would not promote efficiency or reduce litigation costs. This is particularly so for claims that all stem from the same cause of action and involve common issues. Therefore, the Court finds that a class action is a superior method to adjudicate this matter."); *Lavigne*, 2018 WL 2694457, at *8 ("[T]he complex nature of this TCPA action lends itself to the efficiencies of class certification. It would [be] inefficient to reinvent [the] wheel on approximately 30,000 separate cases.").

Moreover, and as this Court noted in *Bennett*, absent a class action, tens of thousands of claims like Ms. Head's—all of which stem from Citibank's identical conduct in robocalling non-customers—will go un-redressed. *See Siding & Insulation Co. v. Beachwood Hair Clinic, Inc.*, 279 F.R.D. 442, 446 (N.D. Ohio 2012) ("Under the TCPA, each individual plaintiff is unlikely to recover more than a small amount (the greater of actual monetary loss or $500). Individuals are therefore unlikely to bring suit against [the defendant], which makes a class action the superior mechanism for adjudicating this dispute."); *accord Abdeljalil*, 306 F.R.D. at 312.

Additionally, there are unlikely to be serious difficulties in the management of this case as a class action.[6] This is, in part, because Citibank has in its possession not only

---

[6] Even if real manageability concerns did exist—they do not—failure to certify a class action under Rule 23(b)(3) on manageability grounds is disfavored. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663-64 (7th Cir. 2015) ("[B]efore refusing to certify a class that meets the requirements of Rule 23(a), the district court should consider the alternatives as Rule 23(b)(3) instructs rather than denying certification because it may be

14

records of all prerecorded messages it delivered, but also the names and addresses of its accountholders. *See supra*, Statement of Facts, Sections I-IV, VIII. Citibank also knows which of its telephone numbers are assigned to a cellular telephone service, and maintains notations for those designated as wrong numbers or with cease-and-desist instructions. *Id.*

Given the foregoing, for purposes of effectuating class notice, many of the names and addresses of individuals associated with cellular telephone numbers at issue can be identified in a practical and efficient manner. *See* Renewed Declaration of Carla A. Peak, attached as Exhibit H; *accord Brown*, 330 F.R.D. at 273-274 (certifying TCPA class action and discussing use of the defendant's internal wrong number notations to identify potential class members); *Knapper*, 329 F.R.D. at 244-246 (discussing viability of reverse number lookup process to identify potential class members for notice purposes); *West*, 323 F.R.D. at 302 (same); *Birchmeier*, 302 F.R.D. at 254 (rejecting argument that class was not manageable because it would allegedly be either impossible, or costly and onerous, to obtain the identities of 930,000 class members).

A class action is therefore the superior method to adjudicate this controversy. *See Johnson v. Comodo Grp., Inc.*, No. 16-4469 (SDW) (LDW), 2020 WL 525898, at *11 (D.N.J. Jan. 31, 2020) (certifying TCPA class action).

**IV.    This Court should follow Judge Logan's sound analysis in *Knapper*, not the inapposite decision in *Revitch*.**

While Citibank likely will reference *Revitch v. Citibank*, No. C 17-06907, 2019 WL 1903247 (N.D. Cal. April 28, 2019), that case is inapposite because, unlike here, the plaintiff there defined his proposed class by reference not only to his own name, but also to the defendant's internal records, which did not always accurately identify non-customers. *See* 2019 WL 1903247, at *3 (defining the class to include "*Jeremiah Revitch and* all persons in the United States … whose cellular telephone is identified in

---

challenging to identify particular class members. District courts have considerable experience with and flexibility in engineering solutions to difficult problems of case management . . . . Under this comparative framework, refusing to certify on manageability grounds alone should be the last resort."), *cert. denied*, 136 S. Ct. 1161 (2016).

15

Defendant's Contact Utilities Database[]"). In sharp contrast, Ms. Head defines her class by reference to *objective criteria not predicated on Citibank's recordkeeping*. That is, class membership here does not hinge on whether Citibank designated a particular telephone number as a potential wrong number; rather the class only includes persons who, in fact, were never a Citibank customer or an authorized user of a Citibank credit card.

And as the court in *Revitch* noted, by defining the proposed class with reference to those "not listed in Defendant's records as the intended recipient of the calls," *id.*, at *1, the *Revitch* plaintiff failed the predominance test under Rule 23(b)(3) because the "problem here is not identifying the individuals who fall within plaintiff's proposed class. Rather, the problem is that adjudicating the claims of those who *do* fall within plaintiff's proposed class would devolve into the tedious resolution of individualized issues based on individualized evidence." *Id*., at *4.

Here, no such problem exists. Ms. Head defines her proposed class by reference to those who are not, and never were, Citibank's accountholders or authorized users of its credit cards. Questions of consent for non-customers, therefore, can be resolved in a single stroke. *See Knapper*, 329 F.R.D. at 242 ("Likewise, whether consent was or was not given is a common question applicable to the class.").

**V.    Ms. Head's proposed notice plan satisfies Rule 23(c)(2)(B).**

Rule 23(c)(2)(B) requires delivery of the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Of course, "neither Rule 23 nor the Due Process Clause requires actual notice to each individual class member." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017). In fact, Rule 23 "recognizes it might be *impossible* to identify some class members for purposes of actual notice." *Id.* at 1129. Consequently, "[c]ourts have routinely held that notice by publication in a periodical, on a website, or even at an appropriate physical location is sufficient to satisfy due process." *Id.*

Here, to properly provide notice to potential class members, Ms. Head proposes a combination of direct mail, publication, and online notice consistent with numerous other

16

TCPA class actions.[7] *See* Ex. H. Persons receiving notice (whether by mail or publication) must then determine whether they are *bona fide* class members (*i.e.*, non-customers who received prerecorded messages from Citibank) who will be affected by this case.

Then, should there ultimately be a judgment in favor of the class, class members who wish to participate in any recovery will be able to attest to receiving prerecorded messages from Citibank despite not being an accountholder and, if necessary, submit supporting documentation. *See Briseno*, 844 F.3d at 1132 (explaining that the need for self-identification and related discovery from absent class members, if necessary, does not disturb a defendant's due process rights, and noting that "there is no due process right to a *cost-effective* procedure for challenging every individual claim to class membership").

And Citibank—which has records of all prerecorded messages it delivered for the entire class period, as well as the names of its accountholders and authorized users—will have the ability to verify or contest claimants' membership in the class.[8]

This method of class notice and class member participation is industry standard in TCPA class actions like this one. *See* Ex. H; *accord Bonoan v. Adobe, Inc.*, No. 3:19-cv-01068-RS, 2020 WL 6018934, at *2 (N.D. Cal. Oct. 9, 2020) ("KCC will utilize established third-party vendors to obtain contact information for potential class members in a manner consistent with industry standard in wrong number TCPA class actions. KCC will also use publication notice in an effort to reach potential class members. . . .").

---

[7] The existence of a list of telephone numbers to which a defendant delivered prerecorded voice messages makes a TCPA class readily identifiable. *See Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 997 (8th Cir. 2016) ("[F]ax logs showing the numbers that received each fax are objective criteria that make the recipient clearly ascertainable.").

[8] Ms. Head need not "demonstrate that there is an 'administratively feasible' means of identifying absent class members." *Briseno*, 844 F.3d at 1123; *see also Brown*, 330 F.R.D. at 273 n.10. Indeed, if it were otherwise, defendants could avoid class certification by keeping poor records. *See Birchmeier*, 302 F.R.D. at 250 ("Doing this—or declining to certify a class altogether, as defendants propose—would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct.").

Dated: July 23, 2021                    Respectfully submitted,

*/s/ Michael L. Greenwald*
Michael L. Greenwald
Greenwald Davidson Radbil PLLC

*/s/ Matthew R. Wilson*
Matthew R. Wilson
Meyer Wilson Co., LPA

Counsel for Plaintiff and the proposed class

## CERTIFICATE OF SERVICE

I certify that on July 23, 2021, the foregoing document was filed with the Court using CM/ECF, which will send notification of such to counsel of record.

*/s/ Michael L. Greenwald*
Michael L. Greenwald