Matthew R. Wilson (*admitted pro hac vice*)
Michael J. Boyle, Jr. (*admitted pro hac vice*)
Meyer Wilson Co., LPA
1320 Dublin Road, Ste. 100
Columbus, Ohio 43215
(614) 224-6000
(614) 224-6066 (Fax)
mwilson@meyerwilson.com
mboyle@meyerwilson.com

Michael L. Greenwald (*admitted pro hac vice*)
Aaron D. Radbil (*admitted pro hac vice*)
Greenwald Davidson Radbil PLLC
7601 N. Federal Highway, Suite A-230
Boca Raton, Florida 33487
(561) 826-5477
mgreenwald@gdrlawfirm.com
aradbil@gdrlawfirm.com

Counsel for Plaintiff and the proposed class

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christine Head, *on behalf of herself and others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>Citibank, N.A.,<br><br>Defendant.<br>_____ | No.: 3:18-cv-08189-ROS<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF HER RENEWED MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL** |

### Introduction

Citibank, N.A. grounds its opposition to class certification on a series of straw man arguments that do not withstand scrutiny. First, it repeatedly criticizes Ms. Head for not identifying class members (other than herself) at the certification stage. But "the language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017).

As this Court explained in certifying a TCPA class in the face of similar arguments:

> Defendant argues its own records are often inaccurate and it would be inordinately difficult to determine who received the allegedly prohibited telemarketing calls. It is not entirely clear what requirement of Rule 23 this argument is aimed at as there is no requirement in Rule 23 that class membership be easily ascertainable. To the extent the Court can understand this argument, Defendant seems to believe Plaintiff must offer a simple way of identifying each and every class member before a class can be certified. Defendant is wrong.

*Bennett v. GoDaddy.com, LLC*, No. 16-CV-03908-PHX-ROS, 2019 WL 1552911, at *11 n.11 (D. Ariz. April 8, 2019) (Silver, J.).

Second, in comparing this case to others where courts denied class certification, Citibank argues against a class definition that Ms. Head does not propose. To be clear, Ms. Head does not "seek[] to certify a purported class against Citibank that two other federal district courts have already ruled cannot be certified." Doc. 125 at 2. Rather, Ms. Head proposes a class definition not at issue in either case Citibank cites, and which neither court addressed. That is, while in the cases Citibank cites the plaintiffs defined their proposed classes by reference to Citibank's internal records, Ms. Head does not do so here. This difference is critical. Instead, Ms. Head tailors her proposed class to persons who are not Citibank accountholders or authorized users—irrespective of, and without reference to, Citibank's internal recordkeeping. Thus, that Citibank's records identify millions of cellular telephone numbers to which it delivered prerecorded voice messages is probative of the numerosity requirement under Rule 23(a) and will provide a starting point for the dissemination of class notice. But the existence or non-existence of such wrong number

codes is irrelevant to whether a person fits within the class definition. As a result, the potential individualized issues that concerned other courts are not present here. Instead, Ms. Head's proposed class is materially identical to those certified by Judge Logan in *Knapper v. Cox Commc'ns, Inc.*, 329 F.R.D. 238, 247 (D. Ariz. 2019), and last week in *Wesley v. Snap Finance LLC*, --- F.R.D. ----, 2021 WL 4291275 (D. Utah. Sept. 21, 2021).[1] And the decisions in *Knapper* and *Wesley* underscore why Ms. Head's proposed class warrants certification.

Third, while Citibank says issues of consent and arbitration predominate, it fails to identify any class members who it believes consented to its calls or who agreed to arbitrate their claims. And this is not surprising, given that Ms. Head defines her proposed class only to include individuals who are *not* current or former Citibank customers or authorized users of its credit cards—people who necessarily have no relationship with Citibank. And, Citibank does not explain how persons who were never accountholders would have agreed to arbitrate claims against it or consented to debt-collection robocalls regarding past-due credit card accounts to which they have no connection.

Fourth, Ms. Head offers ample evidence to satisfy the specific requirements of Rule 23. She demonstrates that the class is so numerous that joinder is impracticable, that she is typical of other class members, and that common issues not only exist, but predominate over any individual questions.

Fifth, Citibank's attacks on Ms. Head's proposed methodology for providing class notice are not only factually inaccurate, but are at odds with *Briseno*—a decision Citibank simply ignores. Moreover, Citibank appears to misapprehend the purpose of class notice,

---

[1]     In *Wesley*, also a wrong number TCPA class action like this one with a materially similar proposed class definition, the defendant (represented by the same law firm as Citibank here) advanced many of the same arguments against certification as Citibank poses here. The defendant in *Wesley* also offered similar testimony from the same expert Citibank proposes here and, like here, sought to exclude the testimony of the plaintiff's expert—the same expert offered by Ms. Head here. Ms. Head respectfully submits that *Wesley*, therefore, offers exceptionally pertinent guidance here. *See* 2021 WL 4291275.

and conflates the issuance of notice to potential class members with a determination as to who is, and who is not, a *bona fide* class member.

Finally, persons like Ms. Head who meet the class definition enjoy Article III standing, particularly at this stage of the litigation. And the Supreme Court's recent decision in *TransUnion v. Ramirez*, 141 S. Ct. 2190 (2021), confirms as much.

Ultimately, this case concerns prerecorded voice messages that Citibank delivered to persons who are not its customers and with whom Citibank had no relationship. It follows, then, that Citibank will not know the identities of the persons it robocalled at wrong numbers (nor will it have consent to robocall these persons),[2] as it necessarily only concerns itself with its accountholders. But that Citibank's recordkeeping—on its own— does not easily identify those it harmed is not a reason to deny class certification. To the contrary, "difficulty in identifying all class members is not dispositive of manageability or feasibility at this stage." *Knapper*, 329 F.R.D. at 247. And "given the potential class size and the relatively small amount of statutory damages for each case, individual litigation would not promote efficiency or reduce litigation costs. This is particularly so for claims that all stem from the same cause of action and involve common issues." *Id*. Accordingly, this Court should certify Ms. Head's proposed class.

## I.     Citibank's central objection to class certification—that Ms. Head does not identify other class members at this stage—contravenes settled law.

Ignoring *Briseno*, Citibank repeatedly faults Ms. Head's supposed failure to identify class members at the class certification stage. *See, e.g.*, Doc. 125 at 9. Citibank then relatedly suggests that Ms. Head fails to satisfy the requirements of Rule 23 because she does not identify other class members at this stage. *See, e.g.*, *id*. at 20 (arguing that Ms. Head does not satisfy numerosity because she does not "identify even a single person similarly situated to Plaintiff."); *id*. at 21 (same, regarding typicality).

Critically, however, Ms. Head need not identify specific class members at the class

---

[2]     Citibank's own proposed expert, Margaret A. Daley, conceded that "[m]isdirected calls can be a daily occurrence, the persistence of callers can be overwhelming, and sorting out the problem can be challenging." https://iapp.org/news/a/why-cant-the-courts-get-wrong-number-cases-right/ (last visited Sept. 27, 2021).

certification stage and, contrary to Citibank's suggestion, she need not establish that class members can "be identified in a feasible manner."[3] *Compare id*. at 20, *with Briseno*, 844 F.3d at 1133 ("In summary, the language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification."); *see also Bennett*, 2019 WL 1552911, at *11 n.11 ("In the Ninth Circuit's view, if there will be problems identifying class members, notifying class members, or assessing the veracity of individuals claiming to be class members, all those issues should be addressed after certification.").

Accordingly, Citibank's contentions regarding the perceived difficulty of identifying class members are unfounded, as is its insistence that Ms. Head identify other class members to satisfy the elements of Rule 23. *See Briseno*, 844 F.3d at 1124-25 ("ConAgra claims that Plaintiffs did not propose any way to identify class members and cannot prove that an administratively feasible method exists because consumers do not generally save grocery receipts and are unlikely to remember details about individual purchases of a low-cost product like cooking oil. We have not previously interpreted Rule 23 to require such a demonstration, and . . . we do not do so now."); *Wesley*, 2021 WL 4291275, at *9 ("As the court previously addressed, Wesley is not required to identify any other class member at the class certification stage.").

And not only is identifying class members not a separate requirement at the class certification stage, but it is also unnecessary to satisfy the requirements of Rule 23(a). *See Cherry v. Dometic Corp.*, 986 F.3d 1296, 1303 (11th Cir. 2021). "Nor does a requirement of administrative feasibility follow from Rule 23(b)." *Id*.

## II. In relying on the inapposite *Revitch* and *Tomeo* decisions, Citibank argues against a class that Ms. Head does not propose.

Citibank correctly notes that two district courts declined to certify TCPA class actions against it. But Ms. Head does not seek to certify the same classes as those proffered

---

[3]     An ascertainable class is one defined in a clear, objective manner. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663-64 (7th Cir. 2015). And here, Citibank does not challenge the sufficiency of the proposed class definition, which Ms. Head defines clearly and by reference to objective criteria. *See* Doc. 120 at 2 (defining proposed class).

in *Revitch* and *Tomeo*. Thus, Citibank far overstates its position when it suggests that Ms. Head "seeks to certify a purported class against Citibank that two other federal district courts have already ruled cannot be certified." Doc. 125 at 2. And of course, neither *Revitch* nor *Tomeo* stands for the proposition that no class can ever be certified against Citibank; rather, the decisions simply show that particular courts declined to certify specific classes advanced by specific named plaintiffs.[4]

To that end, throughout its opposition Citibank conflates two critically distinct groups of persons: those who are *bona fide* class members entitled to a recovery should a judgment favorable to the class result from this case, and the more expansive group of *potential* class members who may receive class notice (some of whom, due to notations in Citibank's records, will receive direct mail notice). To be sure, class members here are those—and only those—who meet the criteria set forth in Ms. Head's proposed class definition. Doc. 120 at 2. In particular, class members must be non-customers of Citibank. *Id*. Ms. Head's class definition does not, importantly, reference Citibank's records, and class membership is not dependent on what, if anything, Citibank's records show. *Id*.

On the other hand, membership in the proposed *Revitch* and *Tomeo* classes required the existence of certain notations in Citibank's records. *See Revitch v. Citibank*, No. C 17-06907, 2019 WL 1903247, at *3 (N.D. Cal. April 28, 2019) (the proposed class included persons "whose cellular telephone is identified in Defendant's Contact Utilities Database" and "where such person was not listed in Defendant's records as the intended recipient of the calls.");[5] *Tomeo v. Citigroup, Inc.*, No. 13 C 4046, 2018 WL 4627386, at *1 (N.D. Ill. Sept. 27, 2018) (defining the proposed class to include those where "Citi's business records indicate that Citi was told that it had called the wrong number").

Consequently, where Citibank defeated certification in *Tomeo* because it offered

---

[4]     Neither Ms. Head, nor her counsel, were involved in either *Revitch* or *Tomeo*.

[5]     Citibank frames the holding in *Revitch* as one where the court "den[ied] certification because evidence demonstrated that identifying class members and resolving consent as to class members requires individualized inquires." Doc. 125 at 2. But identifying class members is not required at the class certification stage. *See supra* § I.

evidence that its wrong number designations did not necessarily mean it called a wrong number—thus, class members, who were defined by reference to wrong number designations in Citibank's records, might not have been recipients of wrong number calls, and accordingly may have provided prior express consent to be called—a similar offer of evidence here cannot defeat class certification because having a wrong number-designated telephone number is not a prerequisite to being a class member, as it was in *Tomeo*.

Likewise, the district court denied certification in *Revitch*, in part, because Citibank's internal records were an unreliable indicator of membership in the specific class proposed there. 2019 WL 1903247, at *4. Also problematic for the plaintiff in *Revitch* was that he defined his proposed class to "*expressly include[] himself.*" *Id.* at *3 (proposing a class consisting of "Jeremiah Revitch and all persons in the United States . . . ."). This "oddity" resulted from the plaintiff otherwise not being a member of his proposed class. *Id.* In sharp contrast here, there is no dispute that Ms. Head is a member of the class she proposes: she received prerecorded voice messages from Citibank, regarding a past-due credit card account during the proposed class period, despite not being a Citibank accountholder or authorized user. *See* Doc. 120 at 5.

Pertinent, then, is that courts presented with TCPA wrong-number class definitions defined by non-accountholders and not by the defendant's internal records—like Ms. Head's proposed class—have certified the classes over the objections Citibank now presents. *See, e.g.*, *Knapper*, 329 F.R.D. at 244 ("courts have certified TCPA cases despite the possibility that a substantial proportion of the phone numbers marked as 'wrong number' in Defendant's call records may not have actually been a wrong number. *See Johnson* . . . ; *Abdeljalil* . . . ; *West* . . ."); *see also Lavigne v. First Community Bankshares, Inc.*, No. 1:15-cv-00934-WJ/LF, 2018 WL 2694457, at *8 (D.N.M. June 5, 2018) (collecting cases). And as the court in *Wesley* summarized:

> Snap's consent argument based on Wesley's use of the call logs fails to demonstrate an individualized issue that would predominate over common issues to the class because the identified consent issues do not translate to Wesley's proposed class members—noncustomers of Snap. The relevant question under this requirement is "whether [Wesley] can show that common

6

questions subject to generalized, classwide proof predominate over individual questions." This means that the relevant individual issues are those among members of the proposed class. Snap has identified an issue that likely would arise if Wesley defined her class by reference to the "Wrong Number" notations in its call logs. If the proposed class was so defined, the inaccuracy of the records would raise an individualized issue of consent with the class members. But Wesley's proposed class is not defined by reference to "wrong number" calls. Snap has not identified any individual issues among the class comprised of noncustomers of Snap that would overcome Wesley's demonstration of predominance.

*Wesley*, 2021 WL 4291275, at *15.[6] The same is true here.

### III. Citibank offers no evidence that class members consented to its robocalls. Instead, its consent and arbitration-based contentions are focused on whether telephone numbers its records associate with a wrong-number notation are sometimes associated with its accountholders—a non-sequitur with no bearing on the class definition at issue.

As noted *supra § II*, Citibank offered evidence in *Tomeo* and *Revitch* that its wrong number designations sometimes did not mean it called a wrong number, and because class membership hinged, in part, on Citibank's internal records, the *Tomeo* and *Revitch* courts found common questions did not predominate because a sizable number of class members likely consented to Citibank's robocalls. This is because the parties in *Tomeo* and *Revitch*, as well as Ms. Head here, agree that Citibank has consent to robocall its own customers.

But here, despite bearing the burden of proof on its affirmative defense of prior express consent, *see Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017), Citibank presents no evidence that a single member of Ms. Head's proposed class consented to its prerecorded voice calls. And how could it? Ms. Head defines her proposed class not by telephone numbers with a wrong-number designation, but rather by non-Citibank-accountholders. Citibank does not identify any persons who meet the class definition but who it contends consented to its prerecorded calls, nor does it explain why it would have consent to place robocalls to persons with whom it has no preexisting

---

[6]     The defendant in *Wesley* made the very same arguments, based on the decisions in *Tomeo* and *Revitch*, that Citibank makes here. *See Wesley*, No. 2:20-cv-00148-RJS-JCB, Doc. 71 at 24-28 (D. Utah. May 14, 2021).

relationship.[7] *See Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1307 (D. Nev. 2014) ("courts should ignore a defendant's argument that proving consent necessitates individualized inquiries in the absence of any evidence that express consent was actually given.").

Instead, Citibank performs sleight of hand by putting forth evidence—as it put forth in *Revitch* and *Tomeo*—that its records are unreliable indicators of whether it robocalled an actual wrong number or whether it in fact reached its customer. But unlike in *Revitch* and *Tomeo*, the existence of a particular notation in Citibank's records is not part of the class definition, and whether Citibank has such a notation for a given record or telephone number is irrelevant to whether a person is, or is not, a class member.

And the court in *Revitch* underscored this key distinction between the proposed classes there and in *Tomeo*, on the one hand, and the class proposed by Ms. Head here: "The problem here is not identifying the individuals who fall within plaintiff's proposed class. Rather, the problem is that adjudicating the claims of those who *do* fall within plaintiff's proposed class would devolve into the tedious resolution of individualized issues based on individualized evidence." *Revitch*, 2019 WL 1903247, at *4.

But here, where Citibank offers expert testimony to demonstrate that some telephone numbers with wrong number notations in its records actually belong to accountholders, *see, generally*, Doc. 127; *see also* Doc. 125 at 5-8, that evidence has no bearing on whether Citibank has consent to call persons who are not its accountholders or authorized users of its credit cards. Rather, Citibank's proffered evidence—even if accepted as true, *see supra* § II—merely supports the notion that class members cannot be identified from Citibank's records alone. But not being able to identify class members solely from a defendant's records at the class certification stage is not an impediment to class certification. *See supra* § I; *see also Birchmeier v. Caribbean Cruise Line, Inc.*, 302

---

[7]    Citibank acknowledges this: "The evidence demonstrates that Citibank only calls accountholders' numbers obtained by various methods, including from accountholders' applications." Doc. 125 at 23. That is, and while an obvious point, Citibank does not obtain telephone numbers from the non-accountholders who would be class members here.

F.R.D. 240, 250 (N.D. Ill. 2014) (requiring "the contours of the class [to] be defined by [a] defendant's own recordkeeping . . . . would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity").[8]

Thus,  the salient question here regarding Citibank's consent defense—common to all members of Ms. Head's proposed class because it is limited to persons who are not accountholders or authorized users of Citibank credit cards—is whether Citibank has consent to call persons with whom it has no relationship, even if it originally obtained the class member's telephone number from one of its accountholders, either mistakenly or where its customer's telephone number was subsequently reassigned to someone new. *See N.L. by Lemos v. Credit One Bank, N.A.*, 960 F.3d 1164, 1166 (9th Cir. 2020) (answering that question, as a matter of law, in the negative). And because this key question can be resolved in one stroke, common questions predominate. *See Wesley*, 2021 WL 4291275, at \*14 ("She contends that where her proposed class definition includes only noncustomers of Snap, the class includes only those who necessarily did not provide Snap with prior express consent to place calls to their cellular telephone numbers. The court agrees with Wesley, and other courts evaluating similarly defined classes, that this individual issue is predominated by common issues.") (internal quotations omitted).

Citibank's reference to arbitration, Doc. 125 at 26-27, similarly exemplifies its movement of the goalposts from the class definition Ms. Head proposes. Conceding that Ms. Head "is not bound by an arbitration clause," *id*. at 26, Citibank then contends that Ms. Head "cannot represent a class that includes accountholders who are subject to arbitration agreements and cannot adjudicate this issue on a class basis." *Id*. (internal quotations omitted). It is a good thing, then, that Ms. Head's proposed class is limited to

---

[8]     *Accord Reyes v. BCA Fin. Servs., Inc.*, No. 16-24077-CIV-Goodman, 2018 WL 3145807, \*14 (S.D. Fla. June 26, 2018) ("the Court disagrees with BCA's position that the limitations in its records keeping . . . prove fatal to class certification"); *Rhodes v. Nat'l Collection Sys., Inc.*, 317 F.R.D. 579, 583 (D. Colo. 2016) ("to countenance defendant's argument would put the court's imprimatur on potentially confusing and rather inadequate record keeping, undoubtedly inviting other [defendants] to adopt similarly lax procedures as an easy end run around class action lawsuits. Courts rightly condemn this a facile manner.").

persons who are not a "current or former Citibank, N.A. customer or authorized user." Doc. 120 at 2. That is, Ms. Head's class does not—by definition—include accountholders.

And Citibank does not explain why it believes non-customers or those not authorized to use its credit cards could be bound by the arbitration provisions contained in its cardholder agreements, nor does it identify any class members who, despite not being Citibank customers, agreed to arbitrate their claims against it. Of course, hypothetical concerns do not defeat class certification. *See G.M. Sign, Inc. v. Finish Thompson, Inc.*, 07-5953, 2009 WL 2581324, at *5 (N.D. Ill. Aug. 20, 2009) (a defendant "cannot defeat class certification by asserting the vague possibility that some of the individuals" on a list of potential class members may not be part of the class).

Citibank's reference to Viann Bonoan, Doc. 125 at 26, underscores this point. To be sure, Ms. Bonoan was an authorized user of a Citibank credit card and, therefore, would not be a member of Ms. Head's proposed class because her class specifically excludes authorized users of Citibank credit cards. Doc. 120 at 2. In this way, Citibank's argument again boils down to any perceived difficulty in identifying class members, such as, from Citibank's view, needing to vet whether a hypothetical eventual claimant was actually a Citibank accountholder or authorized user. But as noted *supra* § I, any difficulty in identifying class members is not a proper consideration at this stage.

**IV.** **This Court should reject Citibank's attempt to exclude Ms. Peak's opinions for the same reasons articulated in *Wesley*.**

**A. Ms. Peak's opinions are relevant and well-founded.**

Part and parcel with her motion for class certification, Ms. Head submits the renewed declaration of Carla Peak concerning the best practicable methods for providing notice to potential class members, as required by Rule 23. *See* Doc. 120-8. Ms. Peak has designed and implemented scores of notice plans in class actions under the TCPA, and in at least one matter where Citibank's counsel here utilized her expertise. Her proposed methodology is not new or controversial; it tracks notice plans in dozens of wrong number TCPA class actions just like this one. *Accord Bonoan v. Adobe, Inc.*, No. 3:19-cv-01068-RS, 2020 WL 6018934, at *2 (N.D. Cal. Oct. 9, 2020); *Knapper v. Cox Commc'ns, Inc.*,

No. 2:17-cv-913-SPL, Doc. 120 at 4 (D. Ariz. July 12, 2019) (Logan, J.) (approving materially similar notice plan in certified TCPA class action).[9]

In providing notice, Ms. Peak would use various means of publication, such as print and online advertising and the creation of a dedicated website, to advise potential class members of their rights. *See* Doc. 120-8, at ¶¶ 18-19, 22-23.

In addition, Ms. Peak would employ direct mail notice in an effort to reach potential class members. To do so, Ms. Peak would use Citibank's records as a starting point. That is, she would use telephone numbers that Citibank's own records indicate are associated with a wrong number to locate associated names and addresses, to which court-approved notice would then be mailed. *See id*. at ¶ 14. Ms. Peak would use data vendors such as LexisNexis, PacificEast, Nexxa, and others' reverse-append processes, and public and proprietary records, to verify whether a telephone number is cellular, and to find the most recent addresses of the individuals associated with that telephone number. *Id.* at ¶¶ 15, 20.

Ms. Peak opined that these notice procedures have been used successfully in numerous TCPA class actions, *id.* at ¶¶ 7, 15, and that the proposed notice plan "satisfies due process in that it is the best notice practicable under the circumstances." *Id.* at ¶ 25.

In response, Citibank moves to strike Ms. Peak's declaration based largely on a mischaracterization of the facts of this case and the purpose of Ms. Peak's declaration. To be clear, Ms. Peak was not retained to identify *bona fide* class members at the class

---

[9]      Citibank does not challenge Ms. Peak's qualifications or expertise, nor could it as numerous courts have accepted her testimony regarding class notice plans. *See, e.g.*, *Larson v. Harman-Mgmt. Corp.*, No. 116CV00219DADSKO, 2019 WL 7038399, at *12 (E.D. Cal. Dec. 20, 2019) (in TCPA class action, "[t]he court has reviewed the declaration of Carla Peak, KCC's Vice President of Legal Notification Services, and is satisfied that KCC can diligently and effectively carry out its duties as the settlement administrator in this action."). Were that not enough, Citibank's counsel here retained—or approved of the retention of—Ms. Peak, and endorsed her use of a similar notice methodology in a separate TCPA class action. *See Abante Rooter & Plumbing Inc. v. Oh Ins. Agency*, No. 1:15-cv-09025, Doc. 200 (N.D. Ill. May 10, 2019) (unopposed motion for preliminary approval of a class settlement and certification of that class); *id.* at Doc. 200-5 (Ms. Peak's declaration describing a similar methodology as that proposed here).

certification stage, as Rule 23 does not require that she do so.[10] *See Wesley*, 2021 WL 4291275, at *3 ("However, this argument misstates the purpose for which Wesley relies on Peak's testimony. . . . Wesley has demonstrated Peak's substantial experience in class action notice plans makes her qualified to provide testimony concerning a notice plan for this TCPA claim."). Rather, Ms. Peak opines that notice can be adequately provided to potential class members in a manageable way. And of course, receiving notice does not mean a person is a *bona fide* class member.[11] Instead, the purpose of notice at this stage is to apprise class members of their rights so that those affected by this case can make a decision as to whether to stay in the class or exclude themselves.

It is for the purpose of providing the "best notice that is practicable under the circumstances," as required by Fed. R. Civ. Pro. 23(c)(2)(B), and to demonstrate that the class is manageable under the superiority requirement of Rule 23(b)(3), that Ms. Head submits Ms. Peak's declaration. In both respects, Ms. Peak's opinions are proper. *See Wesley*, 2021 WL 4291275, at *3 ("Wesley has demonstrated Peak's proposed notice plan follows an accepted and often used method in providing notice to potential TCPA class members. Accordingly, the court concludes Peak's testimony is reliable.").

**B. Citibank ignores the lion's share of Ms. Peak's notice plan.**

As an initial matter, this Court need not conduct a full *Daubert* analysis at this juncture. *See Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 495 (C.D. Cal. 2012) ("This means that a district court need only conduct a tailored *Daubert* analysis which scrutinizes the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence.") (internal citations omitted).

---

[10]    Thus, Citibank's suggestion that Ms. Peak's methodology "is demonstrably unfit" "as a means for identifying class members," Doc. 125 at 15, misses the mark.

[11]    Even if Citibank is correct that some telephone numbers with wrong number notations are in fact associated with Citibank accountholders, the end result is that some people who are not class members will receive notice of this case. But such potential over-notice poses no problems and necessarily results from, for example, publication notice campaigns that are widely seen and publicly available.

Because Ms. Peak is qualified to give her opinions, and her opinions regarding class notice comport with industry standards, this Court should accept them.

Nonetheless, Citibank attacks Ms. Peak's methodology by wrongly stating that "there is no way to identify Plaintiff as a class member" and "Plaintiff would not receive notice[.]" Doc. 125 at 10. But the evidence supports neither conclusion. First, Citibank only concerns itself with the direct mail portion of Ms. Peak's notice campaign. It says nothing about providing notice to class members by publication, a dedicated website, targeting online advertising, and other means of reaching potential class members described by Ms. Peak. *See generally* Doc. 125. Indeed, Citibank's proposed expert—who concedes she is not an expert on class notice—admitted as much. *See* Deposition of Margaret A. Daley, Sept. 14, 2020, attached as Exhibit A, at 21:4-21:20; 26:21-27:7; 65:15-67:4; *id*. at 106:21-107:1 ("My expert report contains my opinions and I made it very clear that I am not opining on notification process, publicizing, putting things up on Facebook. That is not – that notice process is not part of my opinion."); *see also* Deposition of Margaret A. Daley, July 13, 2021, attached as Exhibit B, at 7:1-15 (Q. . . . You previously testified that you were not offering an opinion on the publication press release or website components of Ms. Peak for a proposed notice plan; is that still true? A. Yes.); *id*. at 8:18-9:17. Citibank's premise that "Plaintiff would not receive notice" under Ms. Peak's methodology, therefore, lacks support.

As well, while Citibank does not address the portions of Ms. Peak's notice plan other than the direct mail notice portion,[12] it bears mentioning that Ms. Head may also receive notice by direct mail. This is because Ms. Peak identified "Jill Brownmiller, with

---

[12]     And even then, Ms. Daley only addresses half of Ms. Peak's direct notice opinion as the mailing of notice is the start of the process, not the end. Those who receive notice (whether by mail, publication, or otherwise) must then determine whether they are a member of the class and, if so, make a decision to stay in the class and be bound by any future judgment, or exclude themselves and not be so bound. *See* Doc. 120-8 at ¶¶ 24, 26. But Ms. Daley's analysis stops with the reverse look ups and Citibank's records, as she provides those receiving notice with no opportunity to consider whether they are class members. *See* Ex. A at 99:6-14; Ex. B at 36:17-25; 39:4-40:24. As a result, Ms. Daley did not meaningfully test Ms. Peak's methodology. She looked at only the very first step.

an address in Arizona," as being associated with Ms. Head's number. Doc. 120-8, ¶ 17. Ms. Brownmiller is related to Ms. Head's employer, who provided Ms. Head with the telephone at issue. *See* Doc. 120-4 at 18:2-6, 21:7-12; 44:18-24. So, while Ms. Peak did not identify Ms. Head by name, she did identify Ms. Brownmiller, who would receive direct mail notice that she could pass on to Ms. Head. As a result, while it certainly cannot be said that Ms. Head would not receive any notice of the certified class—whether by targeted online advertising, publication, or otherwise—Citibank's suggestion that Ms. Head would not receive direct mail notice is itself not necessarily accurate.[13]

Similarly unpersuasive is Citibank's suggestion that Ms. Peak "mistakenly assumes that phone indicator codes accurately identify 'wrong numbers,'" Doc. 125 at 12, and that "Plaintiff inexplicably cites to Peak's testimony to support the statement that Plaintiff's proposed class members 'can be identified in a practical and efficient manner.'" *Id*. at 15-16. But, again, this misunderstands Ms. Head's reference to Ms. Peak's opinion, which states: "*for purposes of effectuating class* notice, *many of the names and addresses of individuals associated with cellular telephone numbers at issue* can be identified in a practical and efficient manner." Doc. 120 at 16 (emphasis added). This omitted context pervades Citibank's motion, and is critical, as Citibank repeatedly conflates (1) the users of and subscribers to cellular telephone numbers that Citibank designated as wrong numbers, with (2) *bona fide* class members who, by definition, are non-Citibank-accountholders. That is, while Ms. Head proposes using Citibank's records as a starting point to identify the first group (potential class members for purposes of effectuating direct mail notice under Rule 23) by employing the methodology Ms. Peak outlines in her declaration, Ms. Head does not suggest that Citibank's records alone identify the second group (*bona fide* class members). *See id.* To the contrary, Ms. Head notes that she will use Citibank's records as a starting point for effectuating the direct mail portion of class notice, not an end point for determining ultimate class membership. *See id.* at 15-18.

Because Ms. Peak's opinions are therefore well-founded and relevant to Rule 23,

---

[13]     Neither Ms. Bonoan nor Ms. Peak are class members. As a result, that reverse telephone look ups did not identify them by name is irrelevant. Doc. 125 at 13.

this Court should not exclude them. *See Wesley*, 2021 WL 4291275, at *4 ("Last, Wesley has demonstrated Peak's testimony is relevant to the class certification motion. . . . Wesley relies on Peak's testimony [] to demonstrate her proposed class is manageable under the superiority requirement of Federal Rule of Civil Procedure 23(b)(3). Wesley also relies on this testimony to support her proposed notice plan pursuant to Rule 23(c)(2)(B)."); *see also Knapper*, 329 F.R.D. at 245-46.[14]

### V. Citibank will have the opportunity to contest class membership if Ms. Head obtains a class judgment.

While framing its arguments as against commonality and predominance, in reality Citibank's true complaint is that it believes it will be difficult for it to contest class

---

[14]     While not directly germane to the instant motion because identifying class members is unnecessary at this stage, it bears mention that Ms. Daley's proposed opinions are internally inconsistent and should be disregarded. *Accord Bakov v. Consol. World Travel, Inc.*, No. 15 C 2980, 2019 WL 1294659, at *12 (N.D. Ill. Mar. 21, 2019) (certifying a TCPA class, collecting cases contradicting Ms. Daley's findings). By way of example, Ms. Daley states on the one hand that the reverse lookup vendors Ms. Peak proposes to use "are highly unreliable and cannot identify the actual recipients of telephone calls." Doc. 125 at 12. Yet on the other hand, Ms. Daley utilizes the results of reverse look ups from one of those proposed vendors to exclude telephone numbers from class consideration. *Id.* at 6-7. If Ms. Daley believes reverse lookups to be so unreliable, why would she use them to exclude people from class membership? And the inconsistencies do not end there. As another example, Ms. Daley purports to exclude telephone numbers from the class, even though telephone numbers cannot be class members; people are. And Ms. Daley not only does not know which persons are associated with those telephone numbers, but she made no effort to call or text those numbers or otherwise permit the subscribers to identify themselves as class members. Also, excluding class members based on the result from a reverse lookup makes no sense because a reverse lookup is not among the criteria for class membership. Moreover, while Ms. Peak lists multiple reliable reverse lookup vendors, Ms. Daley only used one and did not test any others in this case. Additionally, where the reverse lookups from one vendor did not yield a name, Ms. Daley excluded the subscribers to those telephone numbers from the class, *see* Doc. 125 at 7, without knowing who those people are. At bottom, Ms. Daley purports to exclude numerous potential class members from class membership for dubious reasons and without allowing class members to determine whether they meet the class definition. Were that not enough, Ms. Daley acknowledged that she was not retained to offer opinions on who is or who is not a class member. *See* Ex. B. at 25:25-26:2 ("I'm not opining about that. What actually constitutes a bona fide class member is outside the scope of my work."). Ms. Head will also address these issues at the *Daubert* stage of the proceedings.

membership, based on its records. *See, e.g.*, Doc. 125 at 24.

Of course, Citibank's records are not dispositive of who is or who is not a class member. *See supra* §§ II-III. Ms. Head explained how she would provide notice to potential class members and how, if she ultimately obtains a class judgment, class members can self-identify through affidavits and phone records[15] while allowing Citibank the reasonable opportunity to contest claims. *See* Doc. 120 at 17-18. This methodology—which Citibank fails to address—comports with Rule 23. *See Wortman v. Air New Zealand*, 326 F.R.D. 549, 561 (N.D. Cal. 2018) ("Moreover, it should not be hard for class members to self-identify. . . . In the event that class members do not produce sufficient proof of their purchase, Defendant will have an opportunity to 'individually challenge the claims of absent class members if and when they file claims for damages.'") (quoting *Briseno*, 844 F.3d at 1131).[16]

Indeed, Citibank does not dispute that it maintains records of the telephone numbers

---

[15]     Citibank baldly asserts—without citation—that "putative class members cannot self-identify[.]" Doc. 125 at 10 n.8. But settled, binding law says otherwise. *See Briseno*, 844 F.3d at 1132 (referencing with approval self-identifying affidavits as evidence of class membership); *accord Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 472 (6th Cir. 2017) ("Moreover, *Mullins* and *Briseno* suggest that utilizing affidavits alone as a mechanism to identify class members need not be a barrier to class certification under Rule 23's implied ascertainability requirement.").

[16]     Allowing for self-identification is particularly warranted in a case like this, where Citibank necessarily does not know the names of the persons to whom it delivered prerecorded messages at wrong numbers; rather, it only knows the names of the accountholders it tried to reach, in error. That is, Citibank's opposition to self-identification is circular and self-serving. It starts with the premise that it cannot identify recipients of its wrong number robocalls from its records alone. It then says third-party identification sources are unreliable. And then it concludes by saying that because it cannot identify class members, this Court should not certify the class. But what Citibank ignores is that two parties can attest to a call in connection with which a prerecorded voice message was delivered—the entity that places the call (Citibank), and the called party (potential class members, who also would have access to their telephone records). Here, the very violations at issue resulted from Citibank calling wrong numbers assigned to people with whom it has no relationship. Thus, call recipients who received prerecorded voice messages from Citibank are in the best position to identify themselves—as Ms. Head accurately did—subject, again, to Citibank's ability to ultimately contest those claims.

to which it attempted to deliver prerecorded voice messages and can search its records to determine whether a particular person is or was an accountholder. Doc. 120 at 4. And while Citibank self-servingly states that confirming whether an eventual claimant received wrong number calls "requires a painstaking and detail-intensive manual review of account notes and additional research," Doc. 125 at 8, "there is no due process right to a *cost-effective* procedure for challenging every individual claim to class membership." *Briseno*, 844 F.3d at 1132 (internal citation omitted).

That is, Citibank's internal records are not necessary to state or submit a claim. And to the extent Ms. Head obtains a judgment for the benefit of the class and class members submit claims as a result, Citibank will have ample opportunity to contest claims. *See Six Mexican Workers v. Ariz. Citrus Growers*, 641 F. Supp. 259, 261 (D. Ariz. 1986).[17]

## VI.    Ms. Head satisfies the numerosity requirement of Rule 23.

Curiously, Citibank suggests that Ms. Head fails "to meet her evidentiary burden of proving ***numerosity*** under Rule 23." Doc. 125 at 20. But she does exactly that.

"[C]ourts [generally] find the numerosity requirement satisfied when a class includes at least 40 members." *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010). And this Court "is entitled to make common sense assumptions in order to support a finding of numerosity." *Torres v. Goddard*, 314 F.R.D. 644, 654-55 (D. Ariz. 2010) (McNamee, J.) (internal citations and quotations omitted).

Ms. Head offers overwhelming evidence that her class exceeds 40 members— likely by multiple orders of magnitude. To be certain, for only a minority portion of the

---

[17]    In *Six Mexican Workers*, the court did not require the identities of class members to be established at trial. *See* 641 F. Supp. at 262-63. Instead, after the class prevailed on its claims the court instituted a procedure to "find[] the individual class members" by way of a claims administration process, and thereafter "ensure that the claimant is actually the particular class member he or she says he or she is." *Id.* That is, "[w]hether a claimant is a class member is a question that can be . . . appropriately, fairly, and efficiently resolved through a claims administration process as authorized by Rule 23." *Krakauer v. Dish Network, LLC*, No. 1:14-CV-333, 2017 WL 3206324, at *4 (M.D.N.C. July 27, 2017) (explaining post-judgment claims process in TCPA class action); *see also Birchmeier*, 302 F.R.D. at 245 ("class members [may] be identified during a claims administration process if the class prevails").

class period, Citibank identified nearly *five million* telephone numbers it associates with credit card accounts, which are potential wrong numbers. Doc. 125 at 4, 7. And Citibank's expert's analysis shows approximately 20.1% (about 1 million) are cellular telephone numbers to which Citibank attempted to deliver at least one prerecorded voice message during only a portion of the class period. *See id.* at 7. Moreover, Citibank makes over one million outbound calls each day regarding past-due credit card balances to consumers in over 40 states—amounting to more than 2.5 billion such robocalls during the class period. *Id.* at 3, 9. In light of the millions of wrong-number coded telephone numbers in its system, the high frequency of cellular telephone number reassignment among persons facing financial distress—the very demographic receiving collections robocalls from Citibank, *id.* at 3-4—coupled with Citibank's admission that it "periodically" calls wrong numbers, *id.* at 6, Ms. Head satisfies numerosity. *See id.* at 9-10 (collecting cases).

Indeed, it would strain credulity to suggest that joinder would be practicable where Citibank's own records and expert analysis suggest it attempted to deliver prerecorded voice messages to *millions* of cellular telephone numbers it designated as wrong numbers during the seven-year class period. *See id.* at 7.[18]

## VII. Ms. Head undoubtedly is a class member, and she satisfies typicality, commonality, and predominance.

Citibank does not dispute that Ms. Head meets the class definition. Instead, it suggests that Ms. Head does not satisfy typicality because she does not identify other class members at this stage. Doc. 125 at 21. But Citibank's response is a non-sequitur, for the reasons set forth *supra* § I; *Accord McMillion v. Rash Curtis & Assocs.*, No. 16-CV-

---

[18]    Citibank's expert devotes a section of her report to "The Problem of Reassigned Numbers." Doc. 99 at ¶¶ 34-38. But if Citibank, which made billions of robocalls during the class period to millions of cellular telephone numbers, did not reach a significant number of non-customers, reassigned numbers could not be considered a meaningful problem. Nor would the FCC create "a database of reassigned numbers to help businesses comply with the TCPA in the face of a substantial rate of number reassignment," *id.* at ¶ 34, if wrong number calls were infrequent. To be sure, common sense dictates that Citibank would not have a dedicated, internal wrong number code, which it associates with millions of telephone numbers, if it did not reach a substantial number of wrong numbers.

18

03396-YGR, 2017 WL 3895764, at *7 (N.D. Cal. Sept. 6, 2017) ("[W]ith respect to Perez, … he, like the members of the Non-Debtor classes, never had a debt collection account with Rash Curtis. Accordingly, the Court finds that Perez has satisfied Rule 23(a)(3)'s typicality requirement .…").

Citibank's arguments against commonality and predominance likewise fail. Doc. 125 at 21-25. Ms. Head established several common questions, including whether Citibank utilized prerecorded voice messages and whether it is liable for calls placed to wrong or reassigned cellular telephone numbers (*i.e.*, calls to persons who are not its accountholders). Doc. 120 at 10-11, 13-14. In response, Citibank once again suggests that its wrong number codes do not necessarily mean that it called a wrong number. But such evidence does not answer the question of whether it had consent to robocall non-customers. *See supra* §§ II-III, V.

Likewise, determining whether a class member received a prerecorded voice message is not an impediment to class certification. *See Wesley*, 2021 WL 4291275, at *13-14. First, Citibank's records identify when it delivered a prerecorded voice message, by specific result code. *See* Doc. 120 at 4; Doc. 120-3 at 5 (Citibank admitting that, "if given a particular 10-digit telephone number, Citibank can search its records . . . to identify the dates on which an artificial or prerecorded voice message was delivered to the phone number[.]"). Moreover, examining call durations—whether on Citibank's internal records or on a class member's telephone bill or telephone—will provide supporting evidence that a prerecorded message played. *Wesley*, 2021 WL 4291275, at *14.

**VIII.   A class action is the superior method to adjudicate this case.**

Citibank does not meaningfully contest the superiority requirement of Rule 23(b)(3). Doc. 125 at 27. Instead, it restates its familiar (and incorrect) refrain that a certified class would be unmanageable because "Plaintiff posits no method to use class wide proofs to identify class members or adjudicate the claims of the class[.]." *Id*. To the contrary, Ms. Peak's opinions demonstrate that a certified class will be manageable. *See Wesley*, 2021 WL 4291275, at *17. And "[b]ecause [Ms. Head's] proposed class definition

includes only people who were not customers of [defendant], individual issues of consent are unlikely to affect the manageability of the potential class." *Id.*

### IX.   Ms. Head and members of her proposed class enjoy Article III standing.

Finally, citing *Ramirez*, Citibank contends that "Plaintiff must prove that each putative class member has standing to certify her class." Doc. 125 at 18. But *Ramirez* contains no such holding. Rather, the Court specifically declined to answer whether a plaintiff must show that absent class members have Article III standing at the certification stage. *See Ramirez*, 141 S. Ct. at 2208 n.4 ("We do not here address the distinct question whether every class member must demonstrate standing *before* a court certifies a class."). This Court should decline Citibank's invitation to extend *Ramirez*—which addressed class member standing after a jury verdict in favor of the class—to the certification stage.

In any event, and as *Ramirez* confirms, Ms. Head and all members of her proposed class have Article III standing to assert their claims in federal court. This is because the injuries suffered by Ms. Head and class members—invasion of privacy and intrusion upon seclusion—have "a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id*. at 2204 (internal quotations omitted).  That is, the TCPA violations at issue constitute intangible harms that are concrete, and thus sufficient to support standing, without any additional harm. *See id*. ("Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion.") (citing *Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) ("The harm posed by unwanted text messages is analogous to that type of intrusive invasion of privacy.")).

The Ninth Circuit's decision in *Van Patten* likewise forecloses Citibank's standing-related argument: "Unsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients. A plaintiff alleging a violation under the TCPA need not allege any *additional* harm beyond the one Congress has identified." 847 F.3d at 1043; *see also Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192

20

(10th Cir. 2021) (finding Article III standing, in light of *Ramirez*, "despite Medicredit's contentions that it made only one call to Ms. Lupia, that Ms. Lupia didn't answer that call, and that Ms. Lupia suffered no actual damages.").

Here, Citibank delivered 23 prerecorded voice messages to Ms. Head's voice mail, and she answered a number of Citibank's calls where she was greeted by a recorded message. Doc. 120 at 5. Thus, there can be no doubt that Ms. Head has standing to proceed here. And for the same reasons, class members—who by definition received prerecorded calls from Citibank—also have standing to assert their claims.[19]

### Conclusion

Citibank's opposition to class certification is largely an exercise in misdirection. It argues against a class that Ms. Head does not propose, and suggests requirements for certification that do not exist. And while claiming that individual issues of consent predominate, it fails to identify a single class member (*i.e.*, a non-customer) who provided it with such consent, nor does it explain how it could possibly have consent to deliver prerecorded voice messages to persons who are not its accountholders.

For the reasons explained by the numerous courts to certify materially identical TCPA class actions, *see* Doc. 120 at 8-9 (collecting cases), including last week's decision in *Wesley*, this Court should certify this matter as a class action.

Dated: September 27, 2021

Respectfully submitted,

*/s/ Michael L. Greenwald*
Michael L. Greenwald
Greenwald Davidson Radbil PLLC

*/s/ Matthew R. Wilson*
Matthew R. Wilson
Meyer Wilson Co., LPA

Counsel for Plaintiff and the proposed class

---

[19]    Citibank's remaining Article III-related arguments boil down to its continued refrain that Plaintiff "has not identified a single other person" who meets the class definition. Doc. 125 at 19. But for the same reasons explained *supra* §§ I-II, Citibank misses the mark.

21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I certify that on September 27, 2021, the foregoing document was filed with the Court using CM/ECF, which will send notification of such to counsel of record.

*/s/ Michael L. Greenwald*
Michael L. Greenwald