1
2
3
4
5
6
7

8 **UNITED STATES DISTRICT COURT**

9 **CENTRAL DISTRICT OF CALIFORNIA**

10

11 JENNY BROWN, et al.,         )  Case No. CV 13-1170 DMG (Ex)
                           )

12                 Plaintiffs,  )  **ORDER RE CROSS-MOTIONS FOR**
                           )  **SUMMARY JUDGMENT;**

13      v.                    )  **DEFENDANT'S MOTION FOR**
                           )  **DECERTIFICATION OF THE CLASS**

14 DIRECTV, LLC, et al.,     )  **[364, 373, 374, 377, 387]**
                           )

15                Defendants.  )
                           )

16 _____)

17      Before the Court are Defendant DirecTV's Motions for Summary Judgment

18 ("DMSJ") [Doc. # 377] and for Decertification of the Class ("MDC") [Doc. # 373], and

19 Plaintiffs Jenny Brown and Carmen Montijo's Motion for Partial Summary Judgment

20 ("PMSJ") [Doc. # 374] and to Partially Exclude Expert Report of Dr. Debra Aron [Doc. #

21 387]. The motions are fully briefed. [Doc. ## 381 ("Opp. to PMSJ"), 385 ("Opp. to

22 DMSJ"), 386 ("Opp. to MDC"), 387 (Motion to Exclude), 388 ("Reply ISO DMSJ"), 389

23 ("Reply ISO PMSJ"), 392 ("Reply ISO MDC")]. The Court held a hearing on the motions

24 on November 12, 2021. For the reasons set forth below, the Court **GRANTS in part** and

25 **DENIES in part** Plaintiffs' MSJ, **GRANTS in part** and **DENIES in part** DirecTV's MSJ,

26 and **DENIES** DirecTV's MDC.

27
28

# I.

## FACTUAL BACKGROUND[1]

DirecTV is a satellite television provider with millions of customers. PSUF 7-8. When a customer does not pay his or her bill, DirecTV sends the account to collections. PSUF 9. At any given time, around 3 to 4 million DirecTV customer accounts are in active collections. PSUF 27. When the bills first become past-due, DirecTV initially places the account in "first-party collections," generally while the account-holder is still an active customer. DSUF 10-11. After some period of time, the account ages out of first-party collections, when DirecTV transfers it to "third-party collections." DSUF 18. DirecTV contracts with outside debt collection agencies ("OCAs") to handle all third-party collections and, until 2017, to handle all first-party collections as well. DSUF 15-16, 19; PSUF 13. In 2017, after DirecTV's merger with AT&T, it transferred some first-party collections work in house. PSUF 13.

During first-party collections, the OCAs (and later, DirecTV itself) would attempt to reach out to customers in DirecTV's own name—*i.e.*, when the OCAs called to collect on DirecTV debts, they would say, "This is DirecTV calling." DSUF 13; PSUF 11, 58. The OCA would call the phone number on the account that the customer had provided to DirecTV, no matter how much time had passed since the number was provided. DSUF 17; PSUF 130-131. Some calls were "prerecorded," meaning they delivered a recorded or automated voice message, rather than a live person speaking. DSUF 14; PSUF 37. One OCA that DirecTV contracted with for first-party collections was iQor. DSUF 15.

---

[1] The summarized facts are uncontroverted, unless otherwise stated. Facts are drawn from Plaintiffs' Statement of Undisputed Facts ("PSUF"), as set forth in their Reply [Doc. # 389-1], and Defendant's Statement of Undisputed Facts ("DSUF"), as set forth in its Reply [Doc. # 388-1]. The Reply Statements contain the parties' responses and sur-responses, as well as their Additional Material Facts, which are incorporated in the Court's citations. The Court has reviewed the entire record, but only discusses the uncontroverted material facts that are necessary to or affect its analysis. The Court has reviewed the parties' evidentiary objections. To the extent the Court does not address any of them, it is because the Court did not rely on the objected-to evidence in reaching its ruling. Any objections to such evidence are **OVERRULED as moot.**

During third-party collections, the process differed in two material ways. First, unlike with first-party collections, the OCAs did not collect under DirecTV's name or hold themselves out as DirecTV to the called party. DSUF 32. The OCAs still remitted the entirety of all payments collected to DirecTV though, minus a commission. PSUF 32-33. Second, in third-party collections the OCAs did not rely solely on the phone number provided by the customer to DirecTV. Instead, OCAs also attempted to search for up-to-date phone numbers, a process known as "skip-tracing." DSUF 26-27, PSUF 92. One OCA that DirecTV contracted with for third-party collections was Credit Management, LP ("CMI"). PSUF 39. CMI made prerecorded calls during third-party collections, specifically with a script that prompted the called party to press certain numbers in response to questions. PSUF 39, 41. One prompt allowed the recipient to select a "wrong person" option. PSUF 43.

Both iQor and CMI maintained call data for each call placed during DirecTV's first- and third-party collections. PSUF 166. The data included codes that were applied to the call to signify a certain disposition. Some of these codes were intended to signify that the recipient of the call was not the DirecTV customer that the OCA intended to reach; *i.e.*, that it was a "wrong number." PSUF 169-70, 180-82. These codes were appended to some calls that were prerecorded. PSUF 172, 176.

For first-party collections, iQor uploaded its disposition codes, including those referring to wrong numbers, to a DirecTV database on a daily basis. PSUF 148-49. CMI did not contemporaneously provide its disposition codes directly to DirecTV for third-party collections, but it did input daily status updates on the customer accounts in DirecTV's system. PSUF 151. These updates included status codes that represented "bad phone," which sometimes was coupled with an explanatory note that said, "wrong number." PSUF 151-52. CMI also sent monthly performance reports to DirecTV. PSUF 105. One monthly report, for February 2014, conveyed that CMI made 388,680 calls, of which 54,151 were "connected. PSUF 110. CMI was able to validate that the "right party" had been reached

in 2,412 of these 54,151 connected calls.  PSUF 111.  In one audit of iQor in 2013, iQor told DirecTV that it was coding about 50 calls a day as "wrong number."  PSUF 146.

DirecTV estimated that about 10% of accounts sent to third-party collections had wrong phone numbers reported, with that amount increasing to 20-40% for the life of the debt.  PSUF 138.  In a deposition, a DirecTV senior manager stated that wrong number calls are the result of phone numbers being recycled among users by phone companies, and that some people will receive calls intended for the previous user of the number.  PSUF 155.  She also acknowledged that prerecorded calls were used by OCAs in order to "reduce[] headcount."  PSUF 53.  Another deponent agreed that it is "common knowledge" that some phone numbers are no longer correct as to the customer they are assigned and "no longer function to reach a DirecTV customer."  PSUF 156.  DirecTV also admitted that skip-tracing "can lead to the wrong number being identified."  PSUF 154.  In late 2013, DirecTV conducted an audit of iQor's "wrong number" process with respect to first-party collections, to ensure it was following the proper procedure of removing numbers that were reported as wrong numbers.  PSUF 145.

DirecTV's contracts with each OCA for all of its third-party collections, including with CMI, were nearly identical.  PSUF 74.  The agreements required the OCAs to provide DirecTV with a list of their management-level personnel and to replace those personnel upon DirecTV's request.  PSUF 85.  They required the OCAs to inform DirecTV of any changes to their equipment configuration and to use standardized forms, scripts, and letters that they could not alter without DirecTV's prior written approval.  PSUF 88.  The agreements gave DirecTV the discretion to recall accounts from the OCA "for any reason" and to disallow the OCA from using any independent contractor.  PSUF 83, 87.  The agreements set a maximum discount off the debt at which the OCA could settle an account.  PSUF 93.  DirecTV performed site visits at OCAs on a roughly annual basis, during which its representatives would sometimes observe calls, review scripts, assess quality control procedures, obtain skip-tracing information, and request follow-up documentation.  PSUF 95-103, 224.  The OCAs and their personnel were subject to quarterly program reviews by

DirecTV. PSUF 82. DirecTV contractually required the OCAs to skip-trace in third-party collections. PSUF 136. Either party could terminate the agreement with 60 days' notice. DSUF 31.

DirecTV received several complaints from persons claiming that they received debt collection calls about DirecTV accounts that they did not have, including some that indicated they received prerecorded calls. PSUF 154.[2] In November 2013, performed an audit of the OCAs' compliance with the Telephone Consumer Protection Act ("TCPA"). PSUF 119-21. On December 4, 2015, DirecTV told all of its OCAs to "stop auto dialing cell phone number [*sic*], even when you have consent." PSUF 122. The OCAs complied. PSUF 123.

## II.

## PROCEDURAL BACKGROUND

The procedural background of this case prior to class certification is described in the Court's March 29, 2019 Order Re Plaintiff's Motion for Class Certification ("Class Cert. Order"). [Doc. # 275 at 1-2.[3]] The Court initially certified a class represented by Plaintiffs consisting of persons who, within four years prior to and after the filing of the action, received a non-emergency, prerecorded telephone call to a cell phone from DirecTV and/or its third-party debt collectors, and who did not provide their cell phone number to DirecTV on an initial application for DirecTV service. *Id.* at 25. The Court also certified a subclass consisting of the same people, except who were never DirecTV customers. *Id.* On August 5, 2019, the Court granted in part DirecTV's Motion to Compel Arbitration. [Doc. # 287.] Following that ruling, the parties stipulated to modify the class definition, essentially to

---

[2] At oral argument, DirecTV protested that the complaints offered by Plaintiffs were in regard to telemarketing calls, not the debt collection calls that are the subject of this lawsuit. Based on counsel's representations, the Court reviewed the record and confirmed that the complaints in fact clearly and unambiguously pertain to debt collection calls. *See* Hutchinson Decl., Ex. 53, 54, 55, 59, 60, 61, 69, 70, 71, 72, 74 [Doc. ## 376-10 through 376-15, 376-18 through 376-21, 376-23].

[3] All page references herein are to the page numbers inserted by the CM/ECF system.

only include the original subclass.  [Doc. # 299.]  The new Class in this action, as approved by the Court, is now defined as:

> All persons residing within the United States who, within four years prior to and after the filing of this action, received a non-emergency telephone call(s) from DIRECTV and/or its third-party debt collectors regarding a debt allegedly owed to DIRECTV, to a cellular phone through the use of an artificial or prerecorded voice, and who has not been a DIRECTV customer at any time since October 1, 2004.

Plaintiffs now move for partial summary judgment on a subset of their claims, and DirecTV moves for summary judgment on all of Plaintiffs' claims.  *See* PMSJ; DMSJ. DirecTV also moves to decertify the Class.  *See* MDC.

**III.**

**LEGAL STANDARD**

**A.    Summary Judgment**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  Material facts are those that may affect the outcome of the case.  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v.*

-6-

*City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Id.*

A court presented with cross-motions for summary judgment should review each motion separately, giving the nonmoving party for each motion the benefit of all reasonable inferences from the record. *Center for Bio-Ethical Reform, Inc. v. Los Angeles Cty. Sheriff Dep't*, 533 F.3d 780, 786 (9th Cir. 2008).

**B.    Class Decertification**

Federal Rule of Civil Procedure 23 provides district courts with broad discretion in making a class certification determination. *Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001). A district court retains "the flexibility to address problems with a certified class as they arise, including the ability to decertify." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 809-10 (9th Cir. 2010) ("Federal Rule of Civil Procedure 23 provides district courts with broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court.") (internal citations and quotation marks omitted). However, "[o]nce a class is certified, the parties can be expected to rely on it, conduct discovery, prepare for trial, and engage in settlement discussion on the assumption that it will not be altered except for good cause." *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 409-10 (C.D. Cal. 2000).

"The standard used by the courts in reviewing a motion to decertify is the same as the standard used in evaluating a motion to certify." *Id.* at 410. The Court incorporates the relevant legal standards pertaining to Rule 23 class certification from its Class Certification Order. Class Cert. Ord. at 5-6.

# IV.

## DISCUSSION

Plaintiffs claim that DirecTV is liable to Class Members under the TCPA, which prohibits a non-emergency call to a cellular phone using an artificial or prerecorded voice without prior express consent. 47 U.S.C. § 227(b)(1)(A). The statute subjects those liable to a penalty of $500 per violation, which may be enhanced by up to three times that amount if the violation was done willfully or knowingly. *Id.* at § 227(b)(3).

Plaintiffs seek summary judgment against DirecTV for 87,493 calls made by CMI and 96,053 calls made by iQor that they contend were prerecorded and placed to cell phones belonging to Class Members, who by definition were never DirecTV customers and so could not have provided consent.[4] *See* PMSJ at 15. DirecTV's Opposition largely dovetails with its own motion for summary judgment on all of Plaintiffs' alleged violations, as well as its motion to decertify. Certain issues thus cut across all three motions, and the Court discusses them in turn.

## A. "Wrong Number" Codes

The calls that are the subject of Plaintiffs' MSJ are those that Plaintiffs' expert identified as prerecorded, dialed to cell phone numbers, and which contained a "wrong number" disposition code, which Plaintiffs maintain indicates that the called party was not the intended recipient, and therefore was not a DirecTV customer. DirecTV does not meaningfully dispute that the calls Plaintiffs identified were prerecorded and made to cell phones. *See* PSUF 35, 171.[5] But DirecTV argues that wrong number codes cannot be used as a proxy for non-customers.

---

[4] Other calls placed by other OCAs are part of this action but not subject to Plaintiffs' motion.

[5] DirecTV argues that the methodology of Plaintiffs' expert, Christina Peters-Stasiewicz, for identifying whether the number was assigned to a cell phone failed to take into account whether the number was actually in use (*i.e.*, assigned to a customer), as opposed to simply assigned to a wireless carrier. But Peters-Stasiewicz only included numbers where the call connected, which demonstrates that the number had to have been in use. *See* Pltf.'s Response to PSUF 35; PSUF 185. DirecTV also does not dispute Plaintiffs' SUF 171 to the extent it indicates Peters-Stasiewicz identified only prerecorded calls.

-8-

First, some numbers with a wrong number code also have other codes assigned to them indicating that they are the "right party" or that they have paid or promised to pay the debt, which suggests some ambiguity and unreliability in the codes. *See* PSUF 196. Second, representatives from iQor and CMI attest that it is "well known" in the debt collection industry that debtors will attempt to dodge collectors by falsely saying that they have reached the wrong number. Kolosovskiy Decl. ¶ 7 [Doc. # 377-26]; Wilson Decl. ¶ 6 [Doc. # 381-9]. Even if the call was genuinely to the wrong number, that does not necessarily mean that the recipient did not also happen to be a current or former DirecTV customer (just not the debtor), who therefore is not a Class Member.

DirecTV argues on this basis not only that Plaintiff's MSJ should be denied, but also that summary judgment should be granted in its favor on *all* alleged violations, because Plaintiffs have no evidence that DirecTV or any of its OCAs called non-customers other than wrong number codes. DirecTV also argues that determining whether calls went to non-customers is an individualized issue that will predominate over other common questions, and so the Class should be decertified.[6]

In response, Plaintiffs tacitly walk back their original motion and contend that they do *not* rely solely on wrong number codes as a proxy for Class Members. *See* Reply ISO PSMJ at 21-24. Instead, the wrong number codes will be a starting point, and Plaintiffs will rely on the post-judgment claims process to definitively identify Class Members. This multi-step process would first use a "reverse look-up" procedure to identify the person that the "wrong number" belonged to, using phone carrier records and third-party consumer databases. These names would be cross-referenced with DirecTV's customer database— which DirecTV stipulated to make available for this purpose, in the event of a settlement or judgment [*see* Doc. # 363 at ¶ 12]—to remove any customers. Plaintiffs would then provide traditional notice to that person (*i.e.*, via phone call, text message, mail, and/or e-mail), and finally, require them to submit a claim form with an affidavit attesting to their

---

[6] DirecTV does not challenge any other element of class certification. The Court's findings on those elements from its Class Certification Order therefore stand. *See* Class Cert. Ord. at 7-9, 23-24.

information.  A special master could oversee any disputes between the parties along the way.  *See* Verkhovskaya Report ¶¶ 71-127 [Doc. # 386-2].

DirecTV objects to this process as involving too many individualized inquiries, as well as raising due process and Article III concerns by sweeping in non-Class Members into a potential class-wide judgment and relying on claims administration to adjudicate the scope of liability.  *See* Reply ISO MDC at 8-10.

To the extent that Plaintiffs expect the Court to grant a class-wide monetary award now based on all 183,546 wrong number calls in their motion, then determine just how much of that belongs to Class Members through the claims process, the Court agrees with DirecTV that this procedure would be problematic.  Plaintiffs concede that such an award would include statutory damages for at least *some* non-Class Members,[7] which they have no standing to pursue.

But that does not mean that Plaintiffs' procedure is otherwise improper—if done in the proper sequence.  The Class is defined to include only non-customers, and DirecTV has no evidence that any non-customer provided prior express consent to be called.[8]  So, if DirecTV called non-customers on their cell phones with a prerecorded message, it would be liable.  The only questions outstanding would be, which non-customers were called, and how many?  Those questions simply amount to ascertaining the Class Members and adding up the total damages.  The Ninth Circuit has held that Rule 23 does not impose an independent requirement for an administratively feasible way to identify class members.  *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017); *see also Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 632 (9th Cir. 2020) ("Our cases do not additionally task district courts with analyzing, for predominance purposes, the logistical difficulties

---

[7] *See* Reply ISO PMSJ at 25 ("[P]erhaps some calls to DirecTV customers have been wrongly identified as calls to non-customers."); Opp. to MDC at 31 ("Plaintiffs do not assert that every single wrong number code is perfectly accurate.").

[8] Prior express consent is an affirmative defense upon which DirecTV bears the burden of proof. *See Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017).

attendant to identifying plaintiffs who were exposed to misrepresentations and therefore may be entitled to class membership. To the contrary, we have suggested—without mentioning predominance—that the superiority prong might best lend itself to considering that issue.").[9] Thus, under this Circuit's binding precedent, no matter how laborious or imperfect the process of identifying Class Members is, it does not present a predominance issue.[10]

The class members in *Briseno* were persons who purchased the defendant's cooking oil during the class period. 844 F.3d at 1123. In that case, there was *no* meaningful method to identify class members because consumers usually do not save grocery receipts or remember individual low-cost purchases. *Id.* at 1125. Individualized notice was therefore impossible, and putative class members could file a claim with nothing more than a "self-serving affidavit." *Id.* at 1129-32. But even in that situation, there is no freestanding ascertainability requirement, and certification may still be appropriate as long as a class action is superior to individual litigation. In a low-value consumer action like *Briseno*, the class action remains superior even with those identified pitfalls. *Id.*

Here, Plaintiffs outline a method to identify Class Members that is far more targeted and objective than publication notice and a claimant's uncorroborated affidavit. Even if wrong number codes were not used at all and notice was effectuated only by publication, the parties would still have an objective way to test a claim: check the affiant's phone

---

[9] The *Walker* court clarified that certain narrow ascertainability issues *could* affect predominance. For example, the court discussed how difficulties in identifying consumers who were exposed to misrepresentations could implicate whether a class-wide presumption of reliance is appropriate. Concluding that "exposure is relevant to predominance, but only to establish reliance," the court otherwise reaffirmed *Briseno*'s core holding. 953 F.3d at 632-33.

[10] DirecTV's reliance on *Hunter v. Time Warner Cable Inc.*, No. 15-CV-6445 (JPO), 2019 WL 3812063 (S.D.N.Y. Aug. 14, 2019), is therefore unavailing. That case's predominance finding with respect to class membership rested on the premise that "[t]he Second Circuit has recognized an 'implied requirement of ascertainability' in Rule 23. . . . Accordingly, where 'potentially thousands of individualized and elaborate inquiries would be required to identify who is part of the class, . . . 'predominance' is not satisfied." *Id.* at *10 (citations omitted). After *Briseno*, that is not the law in the Ninth Circuit.

number against Plaintiffs' lists of prerecorded cell phone calls and his or her name against DirecTV's customer database.[11]  The focus of DirecTV's objection really is Plaintiffs' *notice* procedure, more so than the ultimate method to verify class membership.[12] Plaintiffs' use of wrong number codes as a starting point for class notice (but not for class membership)[13] may be overinclusive and imperfect, but notice often is.  Plaintiffs' procedure remains superior to individual litigation where the maximum award is $1,500 per individual lawsuit.

DirecTV argues that *Briseno* does not apply here because, unlike in that case, the identification of Class Members will affect its overall aggregate liability.[14]  Reply ISO MDC at 16-18.  Each Class Member who submits a valid claim adds another $500 to

---

[11] Even if it *were* a predominance issue, this straightforward, objective process for each claimant would not predominate over the common issues.  *See West v. California Servs. Bureau, Inc.*, 323 F.R.D. 295, 301-02 (N.D. Cal. 2017) ("[S]everal district courts have deemed commonality and predominance satisfied in TCPA cases despite the possibility that a substantial proportion of the phone numbers marked as 'wrong number' in defendant's call log databases 'may not have actually been a wrong number.'").

[12] The Court already approved the parties' notice plan, predicated on wrong number disposition codes, which is identical to the process Plaintiffs' now outline, and was *jointly* proposed.  [Doc. # 317 at 2.]

[13] This case is therefore distinguishable from those cited by DirecTV where the class was defined by those with a "wrong number" code.  *See, e.g., Davis v. AT&T Corp.*, No. 15-cv-2342-DMS (DHB), 2017 WL 1155350 (S.D. Cal. Mar. 28, 2017); *Revitch v. Citibank, NA*, No. C-17-06907 WHA, 2019 WL 1903247 (N.D. Cal. Apr. 28, 2019); *Tillman v. Ally Financial Inc.*, No. 2:16–cv–313–FtM– 99CM, 2017 WL 7194275 (M.D. Fla. Sept. 29, 2017); *Tomeo v. CitiGroup, Inc*., No. 13-C-4046, 2018 WL 4627386, at *9-*10 (N.D. Ill. Sept. 27, 2018).  In those cases, the issue was not ascertaining class members, but determining whether those who *were* class members were non-customers or otherwise did not consent. That question concerns whether certain class members have a valid claim, which does implicate predominance.  *See Revitch*, 2019 WL 1903247 at *4 ("The problem here is not identifying the individuals who fall within plaintiff's proposed class.  Rather, the problem is [] adjudicating the claims of those who *do* fall within plaintiff's proposed class.").  In other cases, where the class was defined by non-customers, as opposed to wrong numbers, courts have certified the class.  *See Knapper v. Cox Commc'ns, Inc.*, 329 F.R.D. 238, 244 (D. Ariz. 2019) ("[C]ourts have certified TCPA cases despite the possibility that a substantial proportion of the phone numbers marked as 'wrong number' in Defendant's call records may not have actually been a wrong number.") (collecting cases and certifying non-customer class).

[14] In *Briseno*, aggregate liability could be determined using the defendant's price and sales data, which would not change regardless of how many class members emerged with a claim.  844 F.3d at 1132.

-12-

DirecTV's total liability, which is different from the case where class members divvy up a predefined common fund. DirecTV contends that this situation presents additional due process concerns not present in *Briseno*.

While *Briseno* did not directly address this issue, the Seventh Circuit did in a case heavily relied upon by *Briseno*. The Seventh Circuit noted that "the defendant's due process interest is implicated [when] the calculation of each class member's damages affects the total amount of damages it owes to the class." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015). But, "so long as the defendant is given a fair opportunity to challenge the claim to class membership and to contest the amount owed each claimant during the claims administration process, its due process rights have been protected." *Id.*[15] *Mullins* makes clear that its principal holding—the no independent ascertainability requirement, adopted by the Ninth Circuit in *Briseno*—applies to *all* class actions, not just those with concrete aggregate damages unaffected by claims administration. *Id.* at 672 ("In sum, the concern about protecting a defendant's due process rights does not justify the heightened ascertainability requirement. *In all cases*, the defendant has a right not to pay in excess of its liability and to present individual defenses, but both rights are protected by other features of the class device and ordinary civil procedure.") (emphasis added).[16]

Plaintiffs' proposed claims administration procedure allows DirecTV to challenge the class membership of claimants during class administration.[17] The fact that these

_____

[15] There must also be "a common method of determining individual damages," *Mullins*, 795 F.3d at 670, but that is easily satisfied here, where individual damages are liquidated by statute per violation.

[16] *See also Briseno*, 844 F.3d at 1131 ("Defendants will have similar opportunities to individually challenge the claims of absent class members if and when they file claims for damages."); *id.* at 1132 ("If the concern is that claimants in cases like this will eventually offer only a 'self-serving affidavit' as proof of class membership, it is again unclear why that issue must be resolved at the class certification stage to protect a defendant's due process rights."). DirecTV's due process concerns with a special master evaluating an individual's claim to class membership after judgment are therefore unfounded. The Federal Rules of Civil Procedure provide a procedure for special masters to make decisions and for parties to appeal those decisions to the Court. *See* Fed. R. Civ. P. 53.

[17] At the hearing, Plaintiffs suggested that they may not necessarily need a claims-made process, and for some calls the procedure could be opt-out rather than opt-in. But due process may require a claims-made process (at least as to those whom the parties cannot agree are Class Members) to give DirecTV a

challenges would arise during the claims process, as opposed to at trial, does not run afoul of Rule 23 or due process. Nor does it affect predominance or overcome the superiority of a class action.[18] Accordingly, DirecTV's MDC is **DENIED**.

Turning to summary judgment—although the imprecision of wrong number codes does not preclude class certification, it does preclude final disposition and a monetary award on each of those calls prior to class administration, as discussed above. *See supra* at 9. Plaintiffs cannot preemptively recover damages at the summary judgment phase that they have not proven belong to Class Members. Plaintiffs' MSJ, to the extent it seeks pre-claims administration damages for all 183,546 iQor and CMI calls, is therefore **DENIED**.

But partial summary judgment may still be appropriate as to liability, even if not as to the total amount of damages, so long as the material facts are undisputed. A class action is a representative action, and if the uncontroverted facts demonstrate liability as to one representative Class Member, then DirecTV is liable to the entire Class.

DirecTV has put forth no evidence that any Class Member provided prior express consent. And DirecTV's evidence and expert testimony does not establish that *none* of the 183,546 calls labeled as "wrong numbers" went to non-customers. In fact, even viewing

---

fair opportunity to contest the claim to class membership, given the concerns it raises. The Court does not decide this issue at this stage, which was not presented in the parties' motions.

[18] Another way of framing DirecTV's objection is that the Class definition has essentially pushed the whole ball game into the ascertainability question, because a Class Member is defined necessarily to have a valid claim—a non-customer who received a prerecorded call to his or her cell phone. In other words, the Class is "fail-safe." But the Court already addressed the fail-safe argument in its Class Certification Order. *See* Class Cert. Ord. at 10–11. The Court found that the Class was not fail-safe because each element involved an objective, non-legal inquiry—including whether the Class Member is a non-customer. Contrary to DirecTV's premise, it is *not* a foregone conclusion that non-customers automatically prevail. If DirecTV was able to prove that a significant number of non-customers consented to be called, it may have been able to defeat liability, and if it could have shown that such a determination was overly individualized, it may have defeated class certification. But it has presented no evidence of consent by a non-customer, whether common or individualized. *See Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1307 (D. Nev. 2014) ("[I]n the absence of any evidence of consent by the defendant, consent is a common issue with a common answer."). And what theoretical issues it did raise (e.g., customers falsely asserting a wrong number had been called, customers who have "family plan" phone numbers, etc.) pertain more to the ascertainability of Class Members than to liability.

the evidence in the light most favorable to DirecTV, no reasonable jury could conclude that not a single one of those calls went to non-customers. DirecTV's expert concluded that out of approximately one million phone numbers in iQor's dataset with a wrong number code, 22% also had some other code indicating it may have been the "right party." Aron Report ¶ 81 [Doc. # 373-7]. Setting all of those aside, that still leaves 78% of numbers with an unambiguous and uncontroverted "wrong number" code. It is unreasonable and speculative to conclude that *all* of those attributions are the result of a debtor misleading the caller and not *one* wrong number code legitimately represents a non-customer wrong number. The OCA would not have bothered using wrong number codes if they were anywhere near 100% unreliable, nor would DirecTV have required the OCAs to provide it with wrong number information. For that matter, the fact that the OCAs used a *right party* code suggests they recognized a possibility in which they did not reach the right party.

Moreover, DirecTV itself admitted that phone number recycling and skip-tracing sometimes led to wrong numbers being dialed, and that non-customers were in fact dialed with prerecorded calls. *See* PSUF 154-56. In an internal email following a consumer complaint about prerecorded debt collection calls, DirecTV admitted outright: "This non-customer is getting collections calls for a DIRECTV account." Hutchinson Decl., Ex. 72 [Doc. # 376-21]; *see also id.* at Ex. 73 [Doc. # 376-22] (confirming that the non-customer's phone number was a dialed wrong number, and that the customer was autodialed). In response to one complaint in 2014 about a prerecorded call, DirecTV wrote:

> [T]he number which you only recently acquired as your cellular phone number was a number provided to us as the primary and preferred point of contact by a customer for their DIRECTV service account. . . . We do not believe there is a TCPA violation where consent has been provided to dial a cellular phone number, and that companies who dial now "wrong" numbers in good faith are not liable for statutory damages under the TCPA, at least until they have had a reasonable amount of time to act on information that the number is wrong.

PSUF 159. DirecTV *admitted* that it called a genuine "wrong number," though it apparently believed (erroneously)[19] that this did not amount to a TCPA violation.

In light of these facts, no reasonable jury could conclude that iQor and CMI did not make prerecorded cell phone calls to Class Members.

Finally, DirecTV argues that the wrong number codes are inadmissible hearsay. *See* MDC at 16-18; Opp. to PMSJ at 13-14. They contend that though the code notations themselves may be business records, they reflect declaratory statements made by the call recipients to the OCAs, which are not. But a statement offered against an opposing party that the party "manifested that it adopted or believed to be true" is not hearsay. Fed. R. Evid. 801(d)(2)(B). The only reason to maintain records of self-reported wrong numbers and to act upon those declarations would be if they believed the statements had truth to them. DirecTV admitted that it did no independent analysis on disposition codes and "would make decisions based on those codes." Simone Depo. at 42:23-43:4 [Doc. # 386-3]. It audited OCAs to ensure they were removing numbers with wrong number codes. PSUF 145.[20] The wrong number statements are therefore adoptive admissions by DirecTV and are not hearsay.[21] Moreover, even if they are inadmissible hearsay, the wrong number

_____

[19] *See N. L. by Lemos v. Credit One Bank, N.A.*, 960 F.3d 1164, 1167 (9th Cir. 2020) (holding that a caller cannot escape TCPA liability when the party it intended to call had consented, though the actual party called had not).

[20] At the hearing, DirecTV pointed out that the audits only applied to first-party OCAs, not third-party. The audits are used as *evidence* of DirecTV's adoptive admission for a certain category of statements. There is no material difference between the contexts in which customers made the statements to first-party collectors versus to third-party collectors, so the adoptive admission can apply to both analogous contexts.

[21] DirecTV argues that a party cannot adopt the contents of a document without being in possession of it, and the OCAs, not DirecTV, were in possession of the call data. Reply ISO MDC at 26; *see also Transbay Auto Servs. Inc. v. Chevron Inc.*, 807 F.3d 1113, 1121 (9th Cir. 2015) (discussing "possession plus" standard for adopting contents of a document). First, at least with respect to iQor, the data was passed on to DirecTV. Second, as discussed in detail below, iQor and CMI were agents of DirecTV, and the adoptive admissions were made within the scope of that relationship. *See* Fed. R. Evid. 801(d)(2)(D). Third, the statements at issue here are those made by the call recipients to the OCAs on the phone, which are not documents and so cannot be in the possession of anyone. The documentary portion of the evidence are the call data, which are business records. *See* Fed. R. Evid. 803(6).

1    codes are not necessary to establish liability.  As discussed above, there is ample evidence

2    through DirecTV's own admissions that DirecTV's OCAs made prerecorded calls to Class

3    Members.

4    **B.    Agency Liability**

5         The next major issue is whether DirecTV can be liable for the calls made by the

6    OCAs as their principal in an agency relationship.   Plaintiffs move for summary

7    adjudication on this issue with respect to iQor and CMI's first- and third-pary collections,

8    and DirecTV moves on it with respect to all third-party collections only.  *See* PMSJ at 18-

9    29; DMSJ at 20-29.

10        "[A] defendant may be held vicariously liable for TCPA violations where the

11   plaintiff establishes an agency relationship, as defined by federal common law, between

12   the defendant and a third-party caller."  *Gomez v. Campbell-Ewald Co*., 768 F.3d 871, 879

13   (9th Cir. 2014), *aff'd*, 577 U.S. 153 (2016).   An agency relationship "arises when one

14   person (a 'principal') manifests assent to another person (an 'agent') that the agent shall

15   act on the principal's behalf and subject to the principal's control, and the agent manifests

16   assent or otherwise consents so to act."  *Mavrix Photographs, LLC v. LiveJournal, Inc.*,

17   873 F.3d 1045, 1054 (9th Cir. 2017) (quoting Restatement (Third) of Agency § 1.01).  "For

18   an agency relationship to exist, an agent must have authority to act on behalf of the

19   principal and '[t]he person represented [must have] a right to control the actions of the

20   agent.'"  *Id.* (quoting Restatement (Third) of Agency § 1.01 cmt. c).

21        Relying on the Restatement (Third) of Agency, the Ninth Circuit has described four

22   "avenues through which a principal can be held liable for the legal consequences of its

23   agent's conduct":   "actual authority, apparent authority, ratification, and employment

24   (respondeat superior)."  *Jones v. Royal Admin. Servs., Inc*., 887 F.3d 443, 449 (9th Cir.

25   2018).  An agent has actual authority to take a certain action when "the agent reasonably

26   believes, in accordance with the principal's manifestations to the agent, that the principal

27   wishes the agent so to act."  Restatement (Third) of Agency § 2.01.  Apparent authority

28   exists when "a third party reasonably believes the actor has authority to act on behalf of

-17-

the principal and that belief is traceable to the principal's manifestations." *Id.* at § 2.03. Ratification is "the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Id.* at § 4.01. And respondeat superior arises for acts "committed by employees while acting within the scope of their employment." *Id.* at § 2.04.

As an initial matter, both sides misstate the law of agency in the Ninth Circuit. Plaintiffs describe four independent theories by which they maintain DirecTV may be liable for the OCAs' calls: actual authority, apparent authority, ratification, and "formal authority." *See* Reply ISO PMSJ at 8-9, 12-17. But what Plaintiffs call "formal authority" or "formal agency" is actually the test for the existence of an agency relationship. *See* Reply ISO PMSJ at 12 ("Formal Authority: An agency relationship exists where the parties mutually assent to (1) the agent acting on the principal's behalf, (2) subject to the principal's control.") (citing *Mavrix*, 873 F.3d at 1054). The existence of an agency relationship is only the first step of the analysis. The agent's conduct must also be attributable to the principal through one of actual authority, apparent authority,[22] ratification, or respondeat superior. *See Jones*, 887 F.3d at 449 ("[T]o reverse summary judgment as to actual authority, [Plaintiffs] must do more than establish an agency relationship. They must also establish actual authority to place the unlawful calls."). The mere existence of an agency relationship alone is not sufficient to establish liability.

For its part, DirecTV correctly recognizes the distinction between an agency relationship and the theories of attribution, but it conflates the test for an agency relationship with that of an employment relationship. DirecTV refers to the 10 factors articulated by the Ninth Circuit in *Jones* for what it purports to be the test for an agency relationship. *See* Opp. to PMSJ at 22 (citing *Jones*, 887 F.3d at 450-51). But the *Jones* court discussed those factors for the question of whether the defendant "can be held

---

[22] Apparent authority, unlike the other forms of attribution, does not require the existence of an agency relationship to establish liability. *See* Restatement (Third) of Agency § 2.03 cmt. a. So, while in some cases the relationship is not necessary, it is never sufficient on its own.

vicariously liable to the same degree that an employer may be held liable for the acts of its employees." 887 F.3d at 449. The court discussed actual authority and employment relationship as two independent issues on appeal and possible grounds for liability. *Id.* For the former, the court assumed, without deciding, that an agency relationship was present. *Id.* For the latter, the court adopted the 10 factors and concluded that an employment relationship was not established. *Id.* at 450-51. The court emphasized that its discussion did not foreclose the application of other principles of agency law not before it, such as apparent authority and ratification, and that its adoption of the 10 factors was limited to the question of vicarious liability via an employment relationship. *Id.* at 449 n.3, 451 n.4. Because Plaintiffs do not argue for the existence of an employment-style relationship, the 10 factors in *Jones* are not relevant.[23]

With those principles of agency attribution in mind, the Court will address the relationship between DirecTV and the OCAs with respect to first-party collections and third-party collections separately, because the relationship differed between the two.

### 1.     First-Party Collections

Plaintiffs argue that DirecTV is liable for first-party collections calls because iQor placed calls in DirecTV's name, thereby with apparent authority. PMSJ at 24-25. DirecTV does not dispute this factual point or contest the legal conclusion that iQor acted with apparent authority. *See* Opp. at 26, 29. In fact, DirecTV devotes very little of its Opposition brief to first-party collections, and it does not raise them in its own motion with respect to agency. In Opposition to Plaintiffs' motion, DirecTV argues only that Plaintiffs have failed to establish an agency relationship. But as noted above, *see supra* note 16, apparent authority "does not presuppose the present or prior existence of an agency relationship." Restatement (Third) of Agency § 2.03 cmt. a. It "applies to actors who

---

[23] The theory behind respondeat superior and the *Jones* factors is that some relationships, such as employment relationships, involve such power and control that the principal should be liable for *any* act by the agent within the scope of that relationship, even if the act was not actually authorized or ratified. Of course, there are agency relationships that fall short of respondeat superior—those are the ones that require actual authority, apparent authority, or ratification to impose liability.

appear to be agents but are not, as well as to agents who act beyond the scope of their actual authority." *Id.* Plaintiffs therefore need not prove an agency relationship existed, even though the uncontroverted facts in the record support the existence of both such a relationship and apparent authority. DirecTV's concession that the first-party OCAs acted with apparent authority is sufficient to establish liability. Plaintiffs' motion for partial summary judgment with respect to DirecTV's liability for iQor's first-party collections calls is **GRANTED**.

### 2. Third-Party Collections

Plaintiffs argue that DirecTV is liable for CMI's third-party collections via both actual authority and ratification. DirecTV argues that Plaintiffs fail to establish either theory of attribution for third-party OCAs' calls, and that they fail to establish the necessary predicate of an agency relationship.

### a. Agency Relationship

The hallmark of an agency relationship, in contrast with a mere contractual relationship to provide a service, is "the power to give interim instructions." Restatement (Third) of Agency § 1.01, cmt. f. This test is easily met here. DirecTV maintained a list of the OCA's management with essentially the power to fire them at will. That alone is arguably sufficient to demonstrate interim control. DirecTV also could recall accounts from the OCA at any time and for any reason, could disallow any subcontractors that the OCA sought to retain, and could terminate the relationship with 60 days' notice. Further, DirecTV required pre-approval before the OCA could alter any script or template and to provide notice before changing any equipment, and DirecTV set the threshold at which the OCA could settle the debt. DirecTV audited and reviewed the OCA's work, visited its sites to monitor performance, and required it to submit regular and substantial data and documentation. *See id.* ("The principal's right of control presupposes that the principal retains the capacity throughout the relationship to assess the agent's performance, provide instructions to the agent, and terminate the agency relationship by revoking the agent's authority."); *United States v. Dish Network L.L.C.*, 954 F.3d 970, 975 (7th Cir. 2020)

(affirming finding of agency relationship in TCPA case where defendant had "the right to control [the callers'] performance"). Perhaps most significantly, in December 2015, DirecTV gave the OCAs an interim instruction directly relevant to the issue in this case—it told them to stop autodialing cell phones—and they complied.

DirecTV notes that the OCAs had the ability to make staffing decisions themselves, trained their own employees, maintained their own internal databases, decided which numbers to dial themselves, and were not provided with any scripts by DirecTV. *See* Belloso Decl. ¶¶ 12-25 [Doc. # 377-21]. None of that controverts Plaintiffs' evidence of the degree of interim control that DirecTV had the power to wield. The fact that the OCAs made some decisions is not mutually exclusive with DirecTV's ability to give significant interim instructions. *See Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 923 (9th Cir. 2011), *rev'd sub nom. on other grounds, Daimler AG v. Bauman*, 571 U.S. 117 (2014) ("Even at common law, agents may exercise a considerable amount of discretion in performing their functions."). DirecTV need not have actually exercised control, so long as it retained the *right* to control.[24] *See id.* Uncontroverted evidence demonstrates that DirecTV retained that right over the OCAs.

### b. Ratification

The Court need not decide whether DirecTV actually authorized the OCAs to make prerecorded calls to the cell phones of non-customers, because the uncontroverted evidence demonstrates that it ratified those calls.[25]

---

[24] It is also immaterial that the parties' agreement may have labeled the OCAs as independent contractors or disavowed an agency relationship. *See Henderson v. United Student Aid Funds, Inc*., 918 F.3d 1068, 1073 (9th Cir. 2019) ("Whether an agency relationship exists is for a court to decide based on an assessment of the facts of the relationship and not based on how the parties define their relationship . . . . Thus, it is not dispositive . . . that the agreements between [defendants] and the debt collectors define their relationships as independent contractors.").

[25] The Court also need not address the parties' dispute about whether a preexisting agency relationship must be established before a principal can ratify an agent's act, and whether and how the ratification can itself create the agency relationship. *See* Opp. to DMSJ at 25; Reply ISO DMSJ at 20-22. Regardless, the Court has found an agency relationship independently existed.

Ratification occurs when the principal accepts the benefit of the agent's act either with actual knowledge of the material facts or with "knowledge of facts that would have led a reasonable person to investigate further"—also known as "willful ignorance." *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073, 1075 (9th Cir. 2019). In an analogous context as here, the Ninth Circuit in *Henderson* held that a principal ratified the TCPA-violating calls of its debt collections agent when it continued to accept the benefits of the collections agent's calls—*i.e.*, the payments on the debts—without repudiation, "despite knowing what the collectors were doing or, at the very least, knowing of facts that would have led a reasonable person to investigate further." *Id.* at 1075.

The uncontroverted evidence here shows that DirecTV at the very least should have investigated further into whether its third-party OCAs were making prerecorded calls to the cell phones of non-customers. It knew that the OCAs were skip-tracing—in fact, it required them to do so. It knew that skip-tracing sometimes leads to wrong numbers getting dialed. By its own estimate, it knew that at least 10% of phone numbers for accounts in third-party collections were wrong. DirecTV knew that the OCAs were coding calls as "wrong number"—the OCAs sent data about wrong numbers to DirecTV on a daily basis. DirecTV also knew that the OCAs were making prerecorded calls.

In *Henderson*, the Ninth Circuit found that the defendant had actual knowledge of TCPA violations when it knew that its debt collectors were combining skip-tracing with prerecorded calls. *Id.* at 1075-76. DirecTV argues that while it may have known about both skip-tracing and prerecorded calls separately, there is no evidence that it knew those practices were used in combination. Reply ISO DMSJ at 22. Even assuming there is no *direct* evidence of this knowledge (though the circumstantial evidence is substantial), actual knowledge is not required for ratification. DirecTV received monthly reports from third-party OCAs, conducted quarterly reviews of them, and performed annual site visits. It also conducted an audit specifically into the OCAs' TCPA compliance. With this level of knowledge and oversight of the agency's practices, DirecTV should have known that CMI was autodialing wrong numbers.

Moreover, DirecTV received complaints from people who were not DirecTV customers claiming to have received prerecorded calls. These complaints should have led DirecTV to further investigate its OCAs' calling practices. *Cf. Hodgin v. UTC Fire & Sec. Americas Corp.*, 885 F.3d 243, 252–53 (4th Cir. 2018) (finding defendant did not ratify telemarketers' calls when, upon receiving consumer complaints, defendant investigated and ultimately terminated agreement); *see also Naiman v. Blue Raven Solar, LLC, No.* 219CV01643JADEJY, 2021 WL 4395049, at *5-6 (D. Nev. Sept. 24, 2021) (citing *Henderson* and finding ratification where defendant received formal and online complaints about calls and took no further steps to ensure compliance). As discussed above, DirecTV responded to these complaints by admitting that its agents had autodialed non-customers. *See supra* at 15-16.

Despite this knowledge, only in December 2015 did DirecTV take steps to repudiate prerecorded calls of non-customers, when it directed the OCAs to stop autodialing cell phones.[26] Accordingly, and in sum, Plaintiffs' motion for partial summary judgment of liability with respect to prerecorded calls made by CMI before December 4, 2015 is **GRANTED**.[27] DirecTV's MSJ with respect to third-party calls made before that date is **DENIED**.

---

[26] DirecTV points out that its agreements with the OCAs only counted "attended" calls towards certain call quotas, suggesting a limitation on the use of "unattended" (*i.e.*, prerecorded) calls. DSUF 36; Reply ISO DMSJ at 22. DirecTV overstates the significance of this evidence. Merely because DirecTV required a certain minimum number of live calls—possibly because it believed them to be more effective at inducing payment—does not mean that it disavowed prerecorded calls. To the contrary, the express recognition of "unattended calls" suggests they were *not* prohibited.

[27] At the hearing, DirecTV argued that questions such as knowledge and willful ignorance are highly factual and belong before a jury. The Court agrees that, generally, these questions are factual and, when in dispute, must be resolved by a jury. But when the material facts are not genuinely controverted and those facts are sufficient to establish an element of the claim—including by DirecTV's own admissions—summary judgment is appropriate, even with regard to factual questions. Both sides moved for summary judgment on the same issue involving the same uncontroverted facts, revealing that the dispute really is a legal one, about how the law of ratification applies to those uncontroverted facts, not a factual one.

Because DirecTV did disavow any prerecorded calls that may have occurred after December 4, 2015, however, it did not ratify any of those calls. Such calls also would have been contrary to DirecTV's express directive and therefore could not have been within the OCAs' actual authority. For CMI calls made after December 4, 2015, Plaintiffs' MSJ is **DENIED**. For all third-party calls made after that date, DirecTV's MSJ is **GRANTED**.

## C.  Treble Damages

Plaintiffs argue that DirecTV should be subject to treble damages—$1,500 per violation, as opposed to $500—because its violations were "willful" or "knowing." PMSJ at 29-30; *see* 47 U.S.C. § 227(b)(3).

To be eligible for treble damages for a TCPA-violating call, DirecTV must have intended or known that the call was made to a non-customer who did not consent. *See Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1107 (11th Cir. 2015) ("If we interpreted the statute to require only that the violator knew he was making a 'call' or sending a fax, the statute would have almost no room for violations that are not 'willful [ ] or knowing[ ].'"). Though DirecTV should have known its practices at scale would inevitably lead to some non-customers getting dialed, there is no evidence that DirecTV or its agent actually knew that the recipient of each call was a non-customer *at the time of the call*. Rather, it may have genuinely believed that it was trying to reach the customer—otherwise, there would have been no reason to make the call at all. Although it had knowledge of or was indifferent to practices that would, as a matter of pure probability in the aggregate, ensure *some* non-customers would be called, as to each call at the time it was made, the culpability was at most negligence. The Court therefore **DENIES** Plaintiffs' MSJ to the extent it requests treble damages for each violation.[28]

---

[28] Plaintiffs cite *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643 (4th Cir. 2019), where the court approved treble damages because the defendant's "actions demonstrated indifference to ongoing violations and a conscious disregard for compliance with the law." *Id.* at 662. But *Krakauer* involved a defendant who contracted with a telemarketer, who essentially by definition would dial non-customers who had not previously consented. Here, in the context of debt collection, DirecTV's agents were attempting to reach consenting customers.

## D. Statute of Limitations

The TCPA has a four-year statute of limitations. 28 U.S.C. § 1658(a). The Class definition thus covers a period beginning on May 9, 2008, which is four years prior to the filing of the original Complaint on May 9, 2012. [*See* Doc. # 1.] DirecTV argues that calls prior to October 1, 2009 are time-barred, however, because DirecTV was not added to this case as a Defendant until October 1, 2013. DMSJ at 22-23; *see* Fourth Amend. Compl. [Doc. # 122.] Plaintiffs respond that the Class definition is the law of the case, DirecTV waived its statute-of-limitations defense by not raising it in opposition to class certification, and DirecTV otherwise provides no grounds for reconsideration of the Class Certification Order on this point. Opp. to DMSJ at 28-29. But the Court never actually ruled on the merits of the limitations defense, so there is no law of the case on this point. *See United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995) ("[T]he law of the case acts as a bar only when the issue in question was actually considered and decided by the first court."). And on a class certification motion, the Court does not necessarily have to assess the merits of the affirmative defenses to the underlying claim. It assesses whether common questions predominate, whether a class action is superior, etc. If DirecTV did raise the statute of limitations defense at class certification, the question would not be whether the defense has merit, but whether it involves a common question for class adjudication. DirecTV may not have raised the statute in opposition to certification because it acknowledged that the defense involved a common question, or even because it *preferred* to have a class that included time-barred claims, so that it could achieve a class-wide ruling on those claims.

Turning to the merits of the defense, Plaintiffs argue that the addition of DirecTV should relate back to the date of the original Complaint because DirecTV "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C)(ii). The original Complaint named only CMI as a Defendant and at no point mentioned DirecTV. [Doc. # 1.] The original Plaintiff's First Amended Complaint, filed on October 22, 2012, named Charter Communications as the Defendant who was allegedly CMI's principal. [*See* Doc.

# 29.] There is nothing to suggest DirecTV knew about those claims at the time and, even if it did, it reasonably would have concluded they involved a different set of calls from those currently at issue in this case.[29]

The amendment adding DirecTV therefore does not relate back. DirecTV is incorrect, however, as to when it was added to the action. DirecTV was first named as a Defendant in the Third Amended Complaint on August 14, 2013, not the Fourth Amended Complaint. [*See* Doc. # 111.] DirecTV's MSJ with regard to all calls made before August 14, 2009 is **GRANTED**.

## E. Prior Class Action Settlements

Finally, DirecTV asserts that four prior class action settlements release the claims for certain calls covered by Plaintiffs' claims. DMSJ at 31-32. Four OCAs (not iQor or CMI) entered into class action settlements that released TCPA claims against themselves and their "principals." Enhanced Recovery Company ("ERC") settled claims for calls made before August 6, 2014. DSUF 58. In two separate settlements, Convergent settled claims regarding calls from October 26, 2008 to May 10, 2016 and from November 11, 2016 to February 25, 2019. DSUF 59-60. NCO Financial Systems settled claims regarding calls from January 16, 2009 to August 31, 2016. DSUF 61.

Plaintiffs concede that the agreements are binding on DirecTV as the principal of each settling OCA. They argue that the ERC Settlement—and only the ERC Settlement—is unenforceable because it did not provide notice or consideration to the class members in that action. Opp. to DMSJ at 29-31. The ERC Settlement did not provide *individual* notice, but it did provide notice, in the form of notice to legal aid societies and states' Attorneys General for dissemination to their clientele.[30] *See* ERC Settlement ¶ 2.8 [Doc. # 377-29].

---

[29] Consumer complaints about calls generally also do not put DirecTV on notice as to any one specific claim.

[30] The Settlement did not provide individual notice because "the Class Members are unidentifiable because Defendant no longer has the names and addresses" of putative class members. ERC Settlement ¶ 2.1.1. Plaintiffs claim that this representation was fraudulent because ERC later produced its call data

Rule 23 and due process do not necessarily require individual notice in all cases to bind absent class members. *See Briseno*, 844 F.3d at 1129. The ERC Settlement also provided consideration in the form of injunctive relief. *See* ERC Settlement ¶ 2.2. In return, the class members retained their right to pursue their individual monetary claims, but waived their right to bring a class action. *Id.* at ¶ 2.7. Plaintiffs provide no authority suggesting that such a court-approved class action settlement is unenforceable.

Plaintiffs also argue that DirecTV should be prevented from introducing all four settlement agreements because it did not produce them in response to discovery requests asking DirecTV to "identify each TCPA lawsuit in which it was named as a defendant." Opp. to PMSJ at 31. DirecTV was not *named* as a defendant in any of the lawsuits that are the subjects of the settlements.

In sum, DirecTV's MSJ is **GRANTED** with respect to claims based on calls by ERC prior to August 6, 2014, by Convergent from October 26, 2008 to May 10, 2016 and November 11, 2016 to February 25, 2019, and by NCO/EGS from January 16, 2009 to August 31, 2016.

## V.

## CONCLUSION

In light of the foregoing, the Court **ORDERS** as follows:

1. DirecTV's MDC is **DENIED**.

2. For Plaintiffs' claims based on all calls made prior to August 14, 2009, DirecTV's MSJ is **GRANTED**.

3. For claims based on all third-party collections calls made after December 4, 2015, DirecTV's MSJ is **GRANTED**.

4. For claims based on calls made by ERC prior to August 6, 2014, by Convergent from October 26, 2008 to May 10, 2016 and November 11, 2016

---

to them. As has been made abundantly clear in this action, call data does not necessarily translate directly to names and addresses.

to February 25, 2019, and by NCO Financial Systems from January 16, 2009 to August 31, 2016, DirecTV's MSJ is **GRANTED**.

5.      For claims based on all other calls, DirecTV's MSJ is **DENIED**.

6.      For claims based on first-party collections calls made by iQor after August 14, 2009 and based on third-party collections calls made by iQor from August 14, 2009 to December 4, 2015, and identified in Exhibit 2 to the Declaration of Daniel Hutchinson [Doc. # 375-2], Plaintiffs' MSJ is **GRANTED** as to liability. The Court will enter judgment with regard to these claims following the completion of the claims administration process.

7.      For claims based on third-party calls made by CMI after August 14, 2009 and before December 4, 2015 and identified in Exhibit 1 to the Hutchinson Declaration [Doc. # 375-1], Plaintiffs MSJ is **GRANTED** as to liability. The Court will enter judgment with regard to these claims following the completion of the claims administration process.

8.      Plaintiffs' MSJ with respect to its request for treble damages is **DENIED**.

9.      Plaintiff's motion to partially exclude the expert report of Dr. Debra Aron [Doc. # 387] is **DENIED** as moot.[31]

**IT IS SO ORDERED.**

DATED: December 1, 2021

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

---

[31] The Court did not rely on the portions of the Aron Report that Plaintiffs seek to exclude in reaching any of its rulings.